**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

In re:

SAMMY VELA,                                          Chapter 7

      Debtor.                                       Case No.: 19-34286

_____/

KAPITUS SERVICING INC, F/K/A
COLONIAL FUNDING NETWORK, AS
SERVICING AGENT FOR YELLOW                 Ad. Pro. No. _____
STONE CAPITAL AND TRUST CAPITAL
FUNDING,

         Plaintiff,
   v.

SAMMY VELA,

        Defendant.

_____/

**KAPITUS SERVICING INC.'S**
**COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT**

     Kapitus Servicing Inc. ("Kapitus" or the "Plaintiff"), as servicing agent for Yellow Stone

Capital and Trust Capital Funding (the "Funders"), by and through its undersigned attorneys

files this Complaint under Section 523 of Title 11 of the United States Code, 11 U.S.C. §§ 101

– 1532 (as amended, the "Bankruptcy Code") objecting to the dischargeability of a pre-petition

debt owed by Debtor Sammy Vela ("Debtor" or "Vela") to Plaintiff and seeking the denial of

discharge of Plaintiff's debt owed by the Debtor, and in support hereof alleges as follows:

**JURISDICTION AND VENUE**

    1.     This is a core proceeding under 28 U.S.C. §157(b)(2)(I) and is brought pursuant to

11 U.S.C. §§ 523(a) and Rule 4007 of the Federal Rules of Bankruptcy Procedure.

2.      Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 157 and 1334.

3.      Venue over the instant action properly lies in this Court pursuant to 28 U.S.C. §1409(a) because this Complaint arises in Debtor's Chapter 7 bankruptcy case.

4.      If the Court should find that this is not a core proceeding, Plaintiff consents to entry of final judgment by the Court.[1]

5.      This Adversary Proceeding relates to *In re Sammy Vela*, Case No. 19-34286 (Bankr. S.D. Texas) (Chapter 7), now pending in this Court (the "Bankruptcy Case").

## THE PARTIES

6.      Plaintiff Kapitus, is and was, at all relevant times, a Virginia Corporation, and at all relevant times maintained its offices formally located at 211 Bulifants Blvd., Suite E, Williamsburg, VA 23188 and currently located at 2500 Wilson Boulevard, Suite 350, Arlington, VA 22201 as well as 120 West 45th Street, 4th Floor, New York, New York 10036.

7.      Upon information and belief, Sammy Vela is a natural person and is a resident of the state of Texas residing at 9903 Cinco Ridge Drive, Katy, Texas 77494.

8.      Debtor operated numerous restaurants under the trade name "Sammy's" and "Stadia", such as sports bars and restaurants, including (i) Sammys Grill, LLC d/b/a Stadia Bar and Grill ("Sammy's 1"), (ii) Stadia Bar & Grill Licensing Co, LLC d/b/a Stadia Sports Grill ("Stadia"), (iii) Sammy's Grill LLC 2 d/b/a Sammy's Sports Grill 2 ("Sammy' 2"), (iv) Sammy's

---

[1] Notwithstanding any of the allegations and claims herein, the institution of this Adversary Proceeding, the filing of this complaint and any other appearance in this Adversary Proceeding and in the above-referenced bankruptcy case (the "Bankruptcy Case"), including the submission of motions, opposition papers, and entry of orders, is without waiver, and express reservation, of any and all of Plaintiff's rights, defense and remedies available at law and in equity, including, without limitation, under the Agreement (as defined below), Uniform Commercial Code, any other applicable federal or state law and/or commercial code, and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* If and when Plaintiff shall file a proof of claim in the Bankruptcy Case (the "Proof of Claim"), Plaintiff expressly incorporates any reservation of rights that it shall incorporate in the Proof of Claim.

Grill LLC 3 d/b/a Sammy's Sports Grill 3 ("Sammy's 3"), (v) Sammy's Grill LLC 4 d/b/a Sammy's Sports Grill 4 ("Sammy's 4"), and (iv) Sammy's Grill LLC 5 d/b/a Sammy's Sports Grill 5 ("Sammy's 5" and collectively, with Sammy's 1, Sammy's 2, Sammy's 3 and Sammy's 4, the "Merchants" or "Restaurants").  Upon information and belief, except with respect to Stadia Bar & Grill Licensing Co, LLC, as discussed in more detail below, at all times relevant hereto, the Debtor was the officer, owner, director, member, and/or manager, controlled the Restaurants, and made all decisions and statements to Plaintiff relevant to the issues herein.

9.      Plaintiff is a secured creditor of the Restaurants and an unsecured creditor of Debtor with a claim against both in the amount of $559,982.97 and interest accruing since April 22, 2019 which is $574,481.14 through the Debtor's Petition Date and $588,288.92 through the day hereof, plus attorneys' fees, and costs incurred, pursuant to the Future Receivables Factoring Agreements and Settlement Agreement executed by Debtor and the Restaurants, as defined and more fully detailed below.

## GENERAL ALLEGATIONS

10.      Debtor filed for bankruptcy under Chapter 7 of the Bankruptcy Code on August 4, 2019.  [Doc. No. 1].

11.      Pursuant to Official Form 309A filed on August 7, 2019, the deadline to object to discharge is Tuesday, November 12, 2019 [Doc. No. 9].

12.      Accordingly, this Complaint is timely filed.

## SPECIFIC FACTUAL ALLEGATIONS

13.      In 2016, Debtor executed an application for financing with Plaintiff representing that the funding request was for business and not consumer purposes.

14.      Debtor provided five interviews on pre-funding calls in August, October (2), November, and December, during which Debtor stated to Plaintiff that (a) there were no material

changes to the Restaurant's business, (b) the Debtor was current on all payments to the landlord

for the Restaurants' business, (c) the Debtor's Restaurants were current on their taxes, including

all federal, state and payroll taxes, (d) the Debtor did not expect any tax liens to be filed, (e) Debtor

had no balance owed to another merchant cash advance provider, (f) the Debtor was not in arrears

on any loans, and (g) Debtor understood false statements constitute fraud.

15.     The relevant portions of the pre-funding call related to Sammys Grill, LLC and

Stadia Bar & Grill Licensing Co, LLC the occurred in August 2016 are transcribed below:

> Plaintiff:  Have there been any important changes to your business or that have
> happened to your business since the last time we funded?
>
> Debtor: No mam.
>
> Plaintiff: How is the relationship with your landlord?   Are you able to make all
> payments on schedule?
>
> Debtor: Yes.
>
> Plaintiff: So you are indeed up to date and current on your business property?
>
> Debtor: Yes, yes
>
> Plaintiff: Are you also current on your taxes, including all federal, state and payroll
> taxes?
>
> Debtor: Yes.
>
> Plaintiff: You do not expect any tax liens to be filed, do you?
>
> Debtor: No.
>
> . . .
>
> Plaintiff: Do you currently have a balance with any other merchant cash advance
> provider?
>
> Debtor: No mam.
>
> Plaintiff: Are you in arrears on any of these balances or loans with any other
> financial institutions?

Debtor: No mam.

Plaintiff: Do you understand that making a false statement or misrepresenting any information can be construed as a breach to your contract and even fraud and could subject yourself to legal action?

Debtor: Yes mam.

16.      The relevant portions of the pre-funding call related to Sammy's Grill LLC 2 that

occurred in October 2016 are transcribed below:

Plaintiff:  Have there been any important changes to your business or that impact your business since the last funding?

Debtor: No.

Plaintiff: Okay, how is your relationship with your landlord?   Are you having any difficulty?

Debtor: No.

Plaintiff: All righty, and all payments to your landlord have been made on schedule?

Debtor: Yeah.

Plaintiff: Great, and are you current on your payments with your landlord for your business property?

Debtor: Yeah.

Plaintiff: Okay, are you current on your taxes, including all federal, state and payroll taxes?

Debtor: Yeah.

Plaintiff: Okay, do you expect any tax liens to be filed?

Debtor: No.

. . .

Plaintiff: Do you currently have a balance with any other merchant cash advance provider?

Debtor: No.

Plaintiff: Okay, and are you behind on any other balances, loans or financial obligations?

Debtor: No.

Plaintiff: Okay and do you recognize that making a false statement or misrepresentation could be construed as a breach to your contract and could subject you to legal action?

Debtor: Yes.

17.     The relevant portions of the pre-funding call related to Sammy's Grill LLC 3 that occurred in October 2016 are transcribed below:

Plaintiff:  Have there been any important changes to your business or that impact your business since the last funding?

Debtor: No.

Plaintiff: How is your relationship with your landlord?    Are you having any difficulty?

Debtor: No.

Plaintiff: Okay, have all payments to your landlord been made on schedule?

Debtor: Yes mam.

Plaintiff: Okay, great, and are you current on your payments with your landlord on your business property?

Debtor: Yeah.

Plaintiff: All right, great, are you also current on your taxes, including all federal, state and payroll taxes?

Debtor: Yes mam.

Plaintiff: Okay, great, do you expect any tax liens to be filed?

Debtor: No.

. . .

Plaintiff: Do you currently have a balance with any other merchant cash advance provider?

Debtor: No.

Plaintiff: Are behind on any other balances, loans or financial obligations?

Debtor: No mam.

Plaintiff: Great, do you understand that making a false statement or misrepresentation could be construed as a breach to your contract and could subject you to legal action?

Debtor: Yes.

18.     The relevant portions of the pre-funding call related to Sammy's Grill LLC 4 that occurred in December 2016 are transcribed below:

Plaintiff:  Have there been any important changes to your business or that impact your business since the last funding?

Debtor: No.

Plaintiff: Okay, how is your relationship with your landlord?   Are you having any difficulty?

Debtor: No.

Plaintiff: Okay, have all payments to your landlord been made on schedule?

Debtor: Yes.

Plaintiff: Good, and are you current on your payments with your landlord for your business property?

Debtor: Yes.

Plaintiff: Good, are you current on your taxes, including all federal, state and payroll taxes?

Debtor: Yes.

Plaintiff: Good, do you expect any tax liens to be filed?

Debtor: No.

. . .

Plaintiff: Do you currently have a balance with another merchant cash advance provider?

Debtor: No.

Plaintiff: Are behind on any other loans, balances or financial obligations?

Debtor: No.

Plaintiff: Okay, and do you understand that making a false statement or misrepresentation could be construed as a breach to your contract or fraud and could subject you to legal action?

Debtor: Yes.

19.     The relevant portions of the pre-funding call related to Sammy's Grill LLC 5 that

occurred in November 2016 are transcribed below:

Plaintiff: Are you current on your payments to your landlord for the business property?

Debtor: Yes.

Plaintiff: Good, and are you current on your payments with your landlord for your business property?

Debtor: Yes.

Plaintiff: Are you in arears on any loans or with any financial institutions?

Debtor: No mam.

Plaintiff: Do you currently have a balance with any other merchant cash advance provider?

Debtor: For another company.  I do.

Plaintiff: What's the name of that company?

Debtor: Not, not for . . . its for Sammy's Sports Grill like number 2, but it's not with Sammy's 5 . . . so the answer is no I guess . . .

Plaintiff: So not for this business at least . . .

Debtor: No, no.

Plaintiff: Do you understand that making a false statement or misrepresentation could be construed as a breach to your contract or fraud and can subject you to legal action?

Debtor: Yeah.

20.    In his capacity as owner and officer of the Restaurants, and in his individual capacity as guarantor, Debtor executed five Merchant Cash Advance Agreements (MCA/Processor) on August 16, 2016, October 26, 2016 (2), November 9, 2016, and December 14, 2016 (hereinafter the "Agreements") with the Funders and its authorized sub-servicing agent, Kapitus Servicing Inc.   True and correct copies of the Agreements are attached hereto as **Exhibit A**.  The Debtor also cross-collateralized the Restaurants as set forth in the Security Agreements attached to the Agreements.

21.    Vela signed the August 16, 2016 Agreement as an authorized representative of Stadia Bar & Grill Licensing Co, LLC ("Stadia").   However, according to the Vela's former business partner, Christopher I.S. Rivers, pursuant to a confidential agreement, dated effective May 23, Vela and Rivers agreed that the Stadia entity, along with all assets owned or controlled by Stadia, would be transferred to Rivers and that all membership interests in Stadia owned or held by Vela would be assigned to Rivers.  See Declaration of Christopher I.S. Rivers attached hereto as **Exhibit B**. Accordingly, at the time Vela signed the August 16, 2016 Agreement, according to Mr. River's, Vela had no authority to sign on behalf of Stadia.

22.    Pursuant to the Agreements, Plaintiff purchased $830,195.00 of future accounts, monetary payments, and other general receivables generated in the course of the Restaurants' business operations (the "Receivables").   Contemporaneously with the execution of the Agreements, and as further security, the Debtor executed personal guaranties (the "Guaranties"),

guaranteeing Restaurants' full performance of all terms and obligations under the Agreements. Under the terms of the Agreements, Kapitus is designated as the Funders' general agent to service and enforce the Agreements; including enforcement through legal action.

23.     By no later than December 2016, Plaintiff had paid Debtor $585,000.00 as the agreed purchase price for the Receivables.  To allow Plaintiff to collect its purchased Receivables, the Agreements required the Restaurants to use and irrevocably authorize only one card processor acceptable to Plaintiff to provide card processing services and to remit the percentage of the Receivables collected by the Restaurants to Plaintiff as set forth in the Agreements (the "Processor Account").  *See* **Exhibit A**, Agreements, p. 1 & pp. 2–3 §§ 1.2, 2.5, 2.7 of each of the Agreements attached as part of Exhibit A.  From the Processor Account, the Agreements entitled Plaintiff to collect between 18%–25% of the weekly batch amount of Debtor's collected receivables via Automated Clearing House ("ACH") or through a bridge account to which 100% of the card settlement amounts would be deposited and the specified percentage collected by Plaintiff (the "Bridge Account") if the Bridge Account is required by Strategic.  *See id.*, p. 2, § 1.4.   Strategic required the Bridge Account to be used by the Restaurants.

24.     To avoid disruption, the Agreements prohibited changes to the Processor Account or the designation of the Processor Account except with Plaintiff's express written consent.  *See id.* at pp. 2-3 §§1.2, 2.5.  The Agreements further provide that the Restaurants would not take any action that could have an adverse effect upon their obligations under the Agreements. *See* p. 3 §2.5.  Moreover, the Agreements provide that the Merchant is responsible for maintaining a minimum balance in the Bridge Account equal to all fees charged to the Restaurants by the processor averaged over a six-month period. *See* p. 3 §1.4.

25.     In addition to the above terms, by entering the Agreements, Debtor represented, warranted, and covenanted the following:

II.     **REPRESENTATIONS, WARRANTIES AND COVENANTS.**   [The Restaurants] and each Owner/Guarantor represents, warrants and covenants that as of this date and during the term of the Agreement:

**2.1 Financial Condition and Financial Information.**  Its financial statements, copies of which have been furnished to FUNDER, and any financial statements furnished to FUNDER hereafter, fairly represent the financial condition of Merchant and each Owner/Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material adverse change in its financial condition, operation or ownership.

**2.2 Governmental Approvals.** Merchant is and will remain in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

…

**2.5 Merchant Processing Agreement and Arrangements.** Without FUNDER's prior written consent, Merchant will not: (i) change the card processor through which the Receipts are settled from Processor to another card processor; (ii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another processor; (iii) change its arrangement with Processor or amend the Merchant Processing Agreement in any way that is adverse to FUNDER; (iv) add card processing terminals; (v) use multiple card processing terminals; (vi) change its financial institution or bank account(s) (including, if applicable, the Bridge/Control Account); (vii) take any other action that could have any adverse effect upon Merchant's obligations under this Agreement or FUNDER's interest in the Receipts; or (viii) make any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor, or to induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor, or permit any event to occur that could have an adverse effect on the use,

acceptance, or authorization of cards for the purchase of Merchant's services and products.

...

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

…

**2.9 No Bankruptcy or Insolvency.** Merchant and Owner/Guarantors represent that they are not insolvent and neither Merchant nor any Owner/Guarantor has filed any petition for bankruptcy protection under Title 11 of the United States Code, no involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor, neither Merchant nor any Owner/Guarantor has admitted in writing its inability to pay its debts or made a general assignment for the benefit of creditors, and no other proceeding has been instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it insolvent or seeking reorganization, arrangement, adjustment, or composition of it or its debts. Merchant does not anticipate filing any such bankruptcy petition and is not aware and has no reason to believe that any such bankruptcy petition or other proceeding will be: filed or brought against it or any Owner/Guarantor.

**2.10 Other Financing.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase (such as a merchant cash advance) of, a loan against, or the sale or purchase of credits against, any Receipts, cash deposits or future card or mobile payment sales with any party other than FUNDER without its written permission.

**2.11 Unencumbered Receipts.** Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, FUNDER.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

...

**2.17 Bridge/Control Account.**  If Merchant is required to open a Bridge/Control Account, (i) Merchant will not, unless otherwise directed in writing by FUNDER, take any action to cause the Specified Percentage of the settlement amounts to be settled or delivered to any account other than the Bridge/Control Account and (ii) Merchant will at all times maintain the Minimum Balance in the Bridge/Control Account.

**2.18 Use of Proceeds.**  Merchant will conduct its business and use the Purchase Price in the ordinary course of its business, consistent with past practice.

*Id.* at pp. 2–3.

26.     In executing the Agreements, Debtor agreed that all information provided in forms and recorded interviews was "true, accurate, and complete in all respects", and the Agreements further emphasized that "**ANY MISREPRESENTATION MADE BY [THE RESTAURANTS] OR [DEBTOR] IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL FRAUDULENT INDUCEMENT TO OBTAIN FUNDING.**" *See* Agreements,  p. 1 (emphasis in original).

27.     In reliance on the representations made by Debtor in the Agreements and the pre-funding calls, Plaintiff agreed to purchase certain of the Restaurants' Receivables, as outlined above.

28.     Almost immediately after its execution by the parties, Debtor and the Restaurants materially violated the terms of the Agreements by failing to remit payment on their accounts.  The Restaurants and Debtor materially breached the Agreement multiple times commencing in November 2017 – less than three months after receiving the final funding under the Agreements.  By that time, the Restaurants and Debtors had issued stop payments on the Accounts, thereby prohibiting Plaintiff from collecting amounts owed to it in excess of $500,000.

29.     Following the default under the Agreements, Kapitus entered into a settlement agreement dated on or about December 29, 2017 (the "December 2017 Settlement Agreement").

Pursuant to the December 2017 Settlement Agreement, Debtor and the Restaurants acknowledged that a total outstanding balance $504,218.29 remained due and owing pursuant to the Agreements. The Debtor and the Restaurants defaulted on the December 2017 Settlement Agreement.

30.     Subsequently, Kapitus filed suit against the Debtor and the Restaurants in the amount of $486,918.23 plus costs and interest.   Thereafter, on or about August 9, 2018, Kapitus entered into a Stipulation of Settlement (the "August 2018 Settlement Agreement" and together with the December 2017 Settlement Agreement, the "Settlement Agreements").  See **Exhibit C**, the August 2018 Settlement Agreement.

31.     The Debtor and the Restaurants defaulted on the August 2018 Settlement Agreement. Plaintiff filed suit under the August 2018 Settlement Agreement and obtained a default judgment in New York State in the amount of $559,982.97, plus interest accruing since April 22, 2019.  *See* **Exhibit D**, New York Judgment.  Accordingly, the Restaurants and Debtor are jointly and severally liable to Plaintiff for the amount of $559,982.97, plus interest accruing since April 22, 2019, plus attorneys' fees and costs.

32.     Vela signed the December 2017 Settlement Agreement as the "Owner" of Stadia Bar & Licensing Co., LLC and the other Restaurants.   Vela signed the August 2018 Settlement Agreement as the "Managing Member" of Stadia Bar & Licensing Co., LLC and the other Restaurants.  However, according to Rivers, Vela was not the owner or the managing member of Stadia Bar & Licensing Co., LLC at any of these times.

33.     Upon information and belief, the Debtor made material misrepresentations and committed fraud in connection with the pre-funding calls and the Agreements.  First, upon information and belief, certain of the Restaurants were subject to tax liabilities and either had tax liens or should have reasonably expected tax liens to be filed.  The IRS filed tax liens against

Sammy's 1 in April 2015, against Sammy's 2 in May 2017, against Sammy's 3 in August 2017, and against Sammy's 4 in June 2018.  Second, upon information and belief, certain of the Restaurants were not current with their payroll.   Specifically, Sammy's 1, Sammy's 2, and Sammy's 3 are each a party to a lawsuit commenced by Employers One Source Group.  On information and belief, this lawsuit is related to being behind on payroll.  Third, upon information and belief, certain of the Restaurants were not current with their landlords.  Fourth, certain of the Restaurants have arrangements with other merchant cash advance providers.  Depending on when the Restaurants entered into these other arrangements, either there were misrepresentations made in the pre-funding calls or their were breaches of the representations made in the Agreements to obtain approval before entering into another merchant cash advance arrangement.   Upon information and belief, these acts and omissions, and others that constitute default of the Agreements, were performed or omitted by, at the direction of, or with the consent of the Debtor.

34.     In addition to signing the Agreements and the Settlement Agreement in his capacity as an owner and officer of the Restaurants, Debtor also signed the Agreements as a Guarantor, agreeing to be obligated to all terms of the Agreement.  *See* Agreements, pp. 6–7 of each of the Agreements attached as part of Exhibit A.   Indeed, Debtor personally guaranteed that he would not take any action, nor permit the Restaurants to take any action, that would breach the Agreements.  Debtor breached the guaranty in each respective Agreement in multiple respects.

35.     Upon information and belief, Debtor never had any intention to honor the Agreements, the December 2017 Settlement Agreement or the August 2018 Settlement Agreement.  Instead, upon information and belief, Debtor intended to use a bank account other than the Processor Account and/or Bridge Account to divert the Receivables proceeds away from Plaintiff at the execution of the Agreements.

36.     Debtor's conduct and statements demonstrate that Debtor obtained money from Plaintiff by false pretenses, false statements, or actual fraud.  Accordingly, the debt owed by Debtor to Plaintiff is non-dischargeable, and Plaintiff is entitled to an award of damages in the amount of $559,982.97 and interest accruing since April 22, 2019, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

### COUNT I
**(Non-dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A))**

37.     Plaintiff realleges paragraphs 1 through 36 and incorporates the same as though set forth herein.

38.     Plaintiff believes and alleges that the Debtor entered into the Agreements and the Settlement Agreements with the specific intent to never allow the Plaintiff to collect on the full Receivables it purchased.  In addition, Plaintiff believes and alleges that the Debtor made false statements to Plaintiff with the intent to induce Plaintiff to extend funds.

39.     Debtor also engaged in the following conduct:

a.  In the Agreements, Debtor represented that it had the authority to sign on behalf of Stadia.  According to Mr. Rivers, the Debtor had already assigned his interest in Stadia to his former business partner Rivers over three years prior to entering into the Agreements and Debtor had no authority to sign on behalf of Stadia. Plaintiff justifiably relied on this representation to extend funding and execute the Agreement.

b.  In the Agreements, Debtor and the Restaurants represented to Plaintiff that Debtor intended to use the funding proceeds for business purposes.  However, with respect to Stadia, the Debtor did not own this business and did not use the funds in connection with this business.

c.   The Debtor and the Restaurants also made the following representations and warranties to Plaintiff in the Agreements, each of which Plaintiff relied upon to provide the funding to the Restaurants:

**II.   REPRESENTATIONS, WARRANTIES AND COVENANTS.**   [The Restaurants] and each Owner/Guarantor represents, warrants and covenants that as of this date and during the term of the Agreement:

**2.1 Financial Condition and Financial Information.**   Its financial statements, copies of which have been furnished to FUNDER, and any financial statements furnished to FUNDER hereafter, fairly represent the financial condition of Merchant and each Owner/Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material adverse change in its financial condition, operation or ownership.

**2.2 Governmental Approvals.** Merchant is and will remain in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

…

**2.5 Merchant Processing Agreement and Arrangements.** Without FUNDER's prior written consent, Merchant will not: (i) change the card processor through which the Receipts are settled from Processor to another card processor; (ii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another processor; (iii) change its arrangement with Processor or amend the Merchant Processing Agreement in any way that is adverse to FUNDER; (iv) add card processing terminals; (v) use multiple card processing terminals; (vi) change its financial institution or bank account(s) (including, if applicable, the Bridge/Control Account); (vii) take any other action that could have any adverse effect upon Merchant's obligations under this Agreement or FUNDER's interest in the Receipts; or (viii) make any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor, or to induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor, or permit any

event to occur that could have an adverse effect on the use, acceptance, or authorization of cards for the purchase of Merchant's services and products.

...

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

…

**2.9 No Bankruptcy or Insolvency.** Merchant and Owner/Guarantors represent that they are not insolvent and neither Merchant nor any Owner/Guarantor has filed any petition for bankruptcy protection under Title 11 of the United States Code, no involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor, neither Merchant nor any Owner/Guarantor has admitted in writing its inability to pay its debts or made a general assignment for the benefit of creditors, and no other proceeding has been instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it insolvent or seeking reorganization, arrangement, adjustment, or composition of it or its debts. Merchant does not anticipate filing any such bankruptcy petition and is not aware and has no reason to believe that any such bankruptcy petition or other proceeding will be: filed or brought against it or any Owner/Guarantor.

**2.10 Other Financing.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase (such as a merchant cash advance) of, a loan against, or the sale or purchase of credits against, any Receipts, cash deposits or future card or mobile payment sales with any party other than FUNDER without its written permission.

**2.11 Unencumbered Receipts.** Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, FUNDER.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

...

**2.17 Bridge/Control Account.**  If Merchant is required to open a Bridge/Control Account, (i)Merchant will not, unless otherwise directed in writing by FUNDER, take any action to cause the Specified Percentage of the settlement amounts to be settled or delivered to any account other than the Bridge/Control Account and (ii) Merchant will at all times maintain the Minimum Balance in the Bridge/Control Account.

**2.18 Use of Proceeds.**  Merchant will conduct its business and use the Purchase Price in the ordinary course of its business, consistent with past practice.

*Id.* at pp. 2–3.

    d.  Plaintiff relied on these representations to extend the funding and execute the Agreements.  *Id.*, at p. 1.

    e.  However, upon information and belief, Debtor intended to use a bank account other than the Processor Account and/or Bridge Account to divert the Receivables proceeds away from Plaintiff at the execution of the Agreements.

    f.  Additionally, unknown to Plaintiff when it entered into the Agreements and Settlement Agreements, upon information and belief, at the time of the Agreements and the Settlement Agreements, and their negotiation, the Restaurants were behind on payments to numerous creditors, including other merchant advance companies, the IRS and certain landlords.  No such past due amounts owed or creditors were disclosed to Plaintiff.

    g.  Furthermore, upon information and belief, Debtor was behind on payroll and his rent obligations at the time he executed the Agreements.

    h.  Upon information and belief, the acts and omissions that constitute default of the Agreements were performed or omitted by, at the direction of, or with the consent of the Debtor.

i. Upon information and belief, the Debtor never had any intention to honor the Agreements or the Settlement Agreements, or any intent to use the funding proceeds from the Agreements for business purposes.

j. By December 16, 2016, Debtor had received $585,000.00 from Plaintiff based on Plaintiff's reliance on Debtor's false and fraudulent statements and acts. Debtor immediately defaulted on its payment obligations under the Agreements and the Settlement Agreements.

40. The Debtor's statements and acts described above constitute conduct to obtain money by false pretenses, false statements, or actual fraud.

41. The Debtor's debt to Plaintiff is a debt for money, property, services, or an extension, renewal, or refinancing of credit, obtained by false pretenses, a false representation, or actual fraud, and is non-dischargeable. Plaintiff is further entitled to an award of damages in the amount of $559,982.97 and interest accruing since April 22, 2019, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

## COUNT II
### (Non-dischargeability of Debtor Pursuant to 11 U.S.C. § 523(a)(2)(B))

42. Plaintiff repeats and realleges paragraphs 1 through 41 and incorporates the same as though set forth herein.

43. Pursuant to 11 U.S.C. § 523(a)(2)(B), a debt in which a debtor obtains money by a statement in writing that is materially false respecting an insider's financial condition, on which the creditor reasonably relied, and which the debtor caused to be published with intent to deceive is non-dischargeable.

44.     The Debtor and the Restaurants, an insider of the Debtor, did obtain money from Plaintiff by the following written materially false statements in the Agreement respecting Debtor's and the Restaurants' financial condition on which Plaintiff reasonably relied, among others:

a.  In the Agreements, Debtor represented that it had the authority to sign on behalf of Stadia.   The Debtor had already assigned his interest in Stadia to his former business partner Rivers over three years prior to entering into the Agreements and Debtor had no authority to sign on behalf of Stadia.   Plaintiff justifiably relied on this representation and the financial condition of Stadia to extend funding and execute the Agreement.

b.  In the Agreements, Debtor represented to Plaintiff that Debtor intended to use the proceeds of the Agreements for business purposes.  However, with respect to Stadia, the Debtor did not own this business and did not use the funds in connection with this business.

c.  The Debtor and the Restaurants also made the following representations and warranties to Plaintiff in the Agreements, each of which Plaintiff relied upon to provide the funding to the Restaurants:

**II.  REPRESENTATIONS, WARRANTIES AND COVENANTS.** [The Restaurants] represent[], warrant[] and covenant[] that as of this date and during the term of the Agreement:

**2.1 Financial Condition and Financial Information.** **[The Restaurants]** [are] solvent, and no transfer of property is being made by [the Restaurants] and no obligation is being incurred by [the Restaurants] in connection with this Agreement with the intent to hinder, delay, or defraud either present or future creditors of [the Restaurants]. [The Restaurants] bank statements and financial statements, provided to [Kapitus] fairly represent the financial condition of [the Restaurants] at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of [the Restaurants]. [The Restaurants] is current on any and all lease, rent or mortgage

payments due. No material changes, financial or otherwise, in the condition, operation or ownership of [the Restaurants] are in any way expected or anticipated. [The Restaurants] has a continuing, affirmative obligation to advise [Kapitus] of any material adverse change in its financial condition, operation or ownership. …

**2.7 Daily Batch Out.** [The Restaurants] will batch out receipts with the Processor on a daily basis. …

**2.9 No Bankruptcy or Insolvency.** As of the date of this Agreement, [the Restaurants] represent[] that it is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code or any state law analogue, and there has been no involuntary petition under such laws brought or pending against [the Restaurants]. [The Restaurants] further warrants that it does not anticipate filing any such receivership or bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Additional Financing. [The Restaurants] shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form of a purchase of receivables or a loan to the business with any party other than [Kapitus] without [Kapitus]'s written permission.**

**2.11 Unencumbered Receipts.** [The Restaurants] ha[ve] good, complete and marketable title to all Receipts, free and clear of all liabilities, liens and claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of [Kapitus].

**2.12 Business Purpose.** [The Restaurants] is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and [the Restaurants] is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

*See* **Exhibit A**, Agreement, p. 2–3.

    d. Plaintiff relied on these representations to extend the funding and execute the

       Agreements. *Id.*, at p. 1.

e.   Upon information and belief, Debtor intended to use a bank account other than the Processor Account to divert the Receivables proceeds away from Plaintiff at the execution of the Agreements.

f.   Additionally, unknown to Plaintiff when it entered into the Agreements and Settlement Agreements, upon information and belief, at the time of the Agreements and the Settlement Agreements, and their negotiation, the Restaurants were behind on payments to numerous creditors, including other merchant advance companies, the IRS.  No such past due amounts owed or creditors were disclosed to Plaintiff.

g.   Furthermore, upon information and belief, Debtor was behind on payroll and his rent obligations at the time he executed the Agreements.

h.   Between August 2016 and December 2016, upon information and belief, Debtor executed the Agreement in which he falsely and fraudulently represented that he intended to use the funds for business purposes rather than personal, family, or household purposes when, in fact, Debtor intended to transfer, remove, or conceal the Funds, or to permit the Funds to be transferred, removed, or concealed, to be used for personal, family, or household purposes.

i.   No later than December 2016, the Restaurants received $585,000.00 from Plaintiff based on Plaintiff's reliance on Debtor's false and fraudulent statements and acts.  Debtor immediately defaulted on its payment obligations under the Agreement.

j.  Upon information and belief, the acts and omissions that constitute default of the Agreements were performed or omitted by, at the direction of, or with the consent of the Debtor.

k.  Upon information and belief, the Debtor never had any intention to honor the Agreements or the Settlement Agreement, or any intent to use the funding proceeds from the Agreements for business purposes.

l.  Upon information and belief, Debtor conducted a massive fraud on Plaintiff by hiding past amounts owed, including to creditors, tax collectors, and landlords. Despite obligations to disclose this information, Debtor obtained substantial funds from Plaintiff by misrepresenting and falsely stating the financial status of the Restaurants, and did so with the intent to obtain funds from Plaintiff to continue funding the fraud.

45.  The Debtor's conduct described above constitutes obtaining money by materially false written statement regarding an insider's financial condition, on which Plaintiff relied, and which the Debtor made with the intent to deceive.

46.  Consequently, the Debtor's debt to Plaintiff is one for money obtained by materially false written statement regarding an insider's financial condition, on which Plaintiff relied, and which the Debtor made with intent to deceive, and is non-dischargeable.

47.  As a result of Debtor's statements and acts described above, Debtor is not entitled to a discharge pursuant to Section 523(a)(2) of the Bankruptcy Code.

48.  Accordingly, Debtor's debt to Plaintiff is non-dischargeable, and Plaintiff is entitled to an award of damages in the amount of $559,982.97 and interest accruing since April

22, 2019, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

## COUNT III
### (Nondischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4))

49.     Plaintiff repeats and realleges the above allegations set forth in Paragraph 1 through 49 and incorporates the same herein as though more fully stated at length.

50.     Debtor's liability to Plaintiff as alleged herein, is a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" within the meaning of 11 U.S.C. § 523 (a)(4).

51.     Plaintiff believes and alleges that the Debtor entered into the Agreements and the Settlement Agreement with the specific intent to take funds from Plaintiff without any intent to repay these funds.

52.     Debtor signed the August 16, 2016 Agreement, as an authorized representative and fiduciary of Stadia.     However, at the time the Debtor signed the Agreement, Debtor had no ownership interest in, or managerial authority over, Stadia.   The Debtor committed a fraud while acting in a purported fiduciary capacity for Stadia.

53.      By the end of December 2016, Plaintiff transferred $585,000.00 in reliance on the Debtor's statements during the pre-funding calls and the Agreements.

54.     Debtor immediately defaulted on its obligations under, and materially violated the terms of, the Agreements.

55.     Specifically, the Restaurants and Debtor failed to make any payments after November 2016, and issued stop payments on the accounts to ensure Plaintiff could not retrieve the Receivables owed to it.  The Restaurants made no subsequent payments to Kapitus under the

Agreements, thereby defaulting on its obligations under, and materially violated the terms of, the Agreements.

56.     As the Agreements were executed by the parties last in December 2016, Debtor materially breached the Agreements less than three months after their execution.

57.     Following the default under the Agreements, Kapitus attempted to work with Debtor and the Restaurants, and the parties entered into the December 2017 Settlement Agreement for the amount of $504,218.29 in an attempt to resolve the Account Balance outside of litigation.

58.     Debtor obtained the funds from the Agreements by committing fraud and defalcation while acting in a fiduciary capacity as the owner, managing member, shareholder, officer, and/or director of the Restaurants.

59.     Between August 2016 and December 2016, upon information and belief, Debtor executed the Agreement in which he falsely and fraudulently represented that he intended to use the funds for business purposes rather than personal, family, or household purposes when, in fact, Debtor intended to transfer, remove, or conceal the Funds, or to permit the Funds to be transferred, removed, or concealed, to be used for personal, family, or household purposes.

60.     Upon information and belief, Debtor misappropriated significant portions of the funds and/or receivables for his own benefit by fraudulent intent or deceit.

61.     Upon information and belief, Debtor transferred the funds and/or receivables into accounts not accessible by Plaintiff, which constitutes larceny.

62.     Upon information and belief, Debtor used the funds and/or receivables without explanation, reason, or purpose relating to the Restaurants' business.

63.     Alternatively, Debtor's misappropriation of the funds and/or receivables was embezzlement because Plaintiff entrusted Debtor with the funds and/or receivables and because Debtor may have obtained control over such funds and/or receivables without authorization.

64.     The Debtor's debt to Plaintiff is a debt for larceny and/or embezzlement because the Debtor stole the receivables to be deposited into the Account that Plaintiff acquired under the Agreements with the intent to permanently deprive the Plaintiff of those receivables.

65.     Plaintiff sustained damages as a result of Debtor's fraud and defalcation while acting as a fiduciary, his embezzlement, and/or his larceny of the funds and/or receivables.

66.     Debtor's obligation to Plaintiff is a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, and is nondischargeable.  Plaintiff is further entitled to an award of damages in the amount of $559,982.97 and interest accruing since April 22, 2019, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

## COUNT IV
### (Non-dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6))

67.     Plaintiff repeats and realleges paragraphs 1 through 68 and incorporates the same as though set forth herein.

68.     Pursuant to Section 523(a)(6) of the Bankruptcy Code, a debt incurred by a debtor who engages in willful malicious conduct which results in damage shall be non-dischargeable.

69.     Plaintiff believes and alleges that the Debtor entered into the Agreements and the Settlement Agreement with the specific intent not to use the proceeds from the Agreements for business purposes and not to repay the amounts owed under the Agreements and the Settlement Agreement. In addition, the Debtor made false statements to Plaintiff with the intent to induce Plaintiff to extend funds under the Agreements.

70.     Debtor immediately defaulted on its payment obligations under the Agreements and the Settlement Agreement.  Specifically, as the Agreements were executed by the parties last in December 2016 – the same month as the final funding of the $585,000.00 by the Funders – Debtor materially breached the Agreements less than three months after their execution.

71.     Upon information and belief, the Debtor never had any intention to honor the either the Agreements or the settlement Agreements.

72.     The Debtor also engaged in the following willful and malicious acts, among others:

a.   In the Agreements, Debtor represented that it had the authority to sign on behalf of Stadia.   The Debtor had already assigned his interest in Stadia to his former business partner Rivers over three years prior to entering into the Agreements and Debtor had no authority to sign on behalf of Stadia.   The Debtor willfully and maliciously executed the August 16, 2016 Agreement on behalf of Stadia.

b.   The Debtor willfully and maliciously executed the Agreements in which he represented that his and the Restaurants' financial condition was accurately reflected in the documents produced to Plaintiff.

c.   The Debtor willfully and maliciously executed the Agreements in which he represented that he intended to use the funds from Plaintiff for business purposes.

d.   The Debtor willfully and maliciously made material omissions of fact that induced Plaintiff into transferring the funds to the Restaurants, such as failing to disclose that he did not intend to pay the receivables to Plaintiff as represented in the Agreements and the Settlement Agreements.

e.   Plaintiff funded the purchase of Receivables to the Restaurants based on the Debtor's false and fraudulent statements and acts.

f.  Upon information and belief, Debtor willfully and maliciously misappropriated significant portions of the funds and/or receivables for her own benefit by fraudulent intent or deceit.

g.  Upon information and belief, Debtor willfully and maliciously transferred the funds and/or receivables into accounts not accessible by Plaintiff.

h.  Upon information and belief, Debtor willfully and maliciously used the funds and/or receivables without explanation, reason, or purpose relating to the Restaurants' business.

i.  Upon information and belief, the Debtor never had any intention to honor the Agreements or the Settlement Agreement, or any intent to use the funding proceeds from the Agreements for business purposes.  Instead, upon information and belief, Debtor willfully and maliciously utilized a bank account other than the Account to divert the Receivables proceeds away from Plaintiff at the execution of the Agreements and the Settlement Agreement.

j.  Upon information and belief, the Debtor willfully and maliciously had the intent to withhold, and not pay back, amounts owed to Kapitus under the Agreements or the Settlement Agreement.

73.  The Debtor's activities described herein constitute willful and malicious conduct which resulted in damage to Plaintiff, and the debt owed under the terms of the Agreements and the Settlement Agreement.

74.  Accordingly, Debtor's debt to Plaintiff is non-dischargeable, and Plaintiff is entitled to an award of damages in the amount of $559,982.97 and interest accruing since April

22, 2019, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for entry of judgment against the Debtor, as follows:

    a.  for an award of damages in the amount of $559,982.97 and interest accruing since April 22, 2019 plus attorneys' fees and costs incurred;

    b.  for an order providing that the debt owed by Debtor to Plaintiff is non-dischargeable in the instant bankruptcy case, in any other chapter under title 11 to which this case may be converted, and in any future bankruptcy case filed by or against the Debtor;

    c.  for attorneys' fees and costs herein incurred; and

    d.  for such other and further relief as this Court may deem just and proper.

Dated: November 12, 2019

                        DIAMOND MCCARTHY LLP

                        */s/ Charles M. Rubio*
                        Charles M. Rubio
                        Bar No. 24083768
                        crubio@diamondmccarthy.com
                        909 Fannin, Suite 3700
                        Houston, Texas 77010
                        Telephone: (713) 333-5100
                        Facsimile: (713) 333-5199

                        David W. Reynolds
                        Bar No. 24098319
                        dreynolds@diamondmccarthy.com
                        2711 Haskell Ave., Suite 3100
                        Dallas, Texas 75204
                        Telephone: (214) 389-5300
                        Facsimile (214) 389-5399

                        COUNSEL FOR PLAINTIFF