# Yellow Stone Capital

## MERCHANT CASH ADVANCE AGREEMENT

Agreement dated <u>August 16 2016</u> between **Yellow Stone Capital. ("FUNDER")** doing business at 1 Evertrust Plz 14th Floor Jersey City, NJ 07302-3051 and the merchant listed below ("the **Merchant**").

(Month)(Day)(Year)

### MERCHANT INFORMATION

Merchant's Legal Name: <u>Sammys Grill, LLC/ STADIA BAR & GRILL LICENSING CO LLC</u>
D/B/A: <u>Stadia Bar and Grill/ STADIA SPORTS GRILL</u>

State of Incorporation / Organization: <u>TX</u>

Type of entity: ( ) Corporation ( X ) Limited Liability Company ( ) Limited Partnership ( ) Limited Liability Partnership ( ) Sole Proprietor

| | | | |
|---|---|---|---|
| Physical Address: <u>22762 Westheimer Pky #400</u> | City: <u>Katy</u> | State: <u>TX</u> | Zip: <u>77450</u> |
| Mailing Address: | City: | State: | Zip: |
| Date business started (mm/yy): <u>12/08</u> | Federal ID# | | |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to FUNDER, as the lead purchaser for itself and other co-investors, [making FUNDER on behalf of itself and all co-investors (collectively the Funders), the absolute owner] in consideration of the purchase price specified below (the "<u>Purchase Price</u>"), all of Merchant's future accounts, contract rights and other rights to payment arising from or relating to the use by Merchant's customers of cash, credit cards, charge cards, debit cards, prepaid cards, mobile payments and other similar payment methods in the ordinary course of Merchant's business (the "<u>Receipts</u>") for the payment of Merchant's sale of goods or rendition of services until the purchased amount specified below (the "<u>Purchased Amount</u>") has been delivered by Merchant to FUNDER, provided that the Purchase Price, the Specified Percentage (as defined below) and/or the Purchased Amount may be adjusted by FUNDER and Merchant in writing if one or more card processing conditions are not satisfied.

The Purchased Amount shall be paid to FUNDER by Merchant's using and irrevocably authorizing only one card processor acceptable to FUNDER ("Processor") to remit to or for the benefit of FUNDER the percentage specified below (the "<u>Specified Percentage</u>") of Merchant's settlement amounts due from each card issuer with respect to the Receipts, until such time as FUNDER receives payment in full of the Purchased Amount. Furthermore Merchant will not enter into another cash advance agreement or any other type of cash advance agreement during the term of this contract. Notwithstanding anything to the contrary in this Agreement or any other agreement between Merchant and FUNDER, upon the occurrence of an Event of Default under Section 3 of the MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

Purchase Price: $155,000.00          Specified Percentage: 25%          Receipts Purchased Amount: $215,295.00

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", THE "MERCHANT SECURITY AGREEMENT AND GUARANTY" AND "ADMINISTRATIVE FORM" [Note: Is there a separate Administrative Form] ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

**MERCHANT #1**
By <u>Sammy Vela</u>
_____
        (Print Name and Title)                                                    (Signature)

**MERCHANT #2**
By _____
        (Print Name and Title)                                                    (Signature)

**OWNER/GUARANTOR #1**
By <u>Sammy Vela</u>
_____
        (Print Name and Title)                                                    (Signature)

**OWNER/GUARANTOR #2**
By _____
        (Print Name and Title)                                                    (Signature)

**Yellow Stone Capital**
By _____
        (Company Officer)                                                        (Signature)

Each person signing this Agreement on behalf of Merchant represents that he or she is authorized to sign this Agreement on behalf of Merchant, and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor represents that the information provided herein and in all of FUNDER's forms is true, accurate and complete in all respects. FUNDER may produce a monthly statement reflecting the delivery of the Specified Percentage of Receipts from Merchant to FUNDER and its participants via Processor.
ANY MISREPRESENTATION MADE BY MERCHANT OR ANY OWNER/GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.

---

**AUTHORIZED SERVICING AGENT – Colonial Funding Network, Inc.**
Colonial Funding Network, Inc. (Colonial) is the Authorized Servicing Agent of the FUNDER for this contract providing administrative, bookkeeping, reporting and support services for the FUNDER and the Merchant. Colonial is not affiliated or owned by the FUNDER and is acting as independent agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting and remit capture. Colonial may at its sole discretion participate in this financing by providing a small portion of the funds for this transaction directly to the FUNDER. Colonial is not a credit card processor, or in the business of processing credit cards. Merchant hereby acknowledges that in no event will Colonial be liable for any claims made against the FUNDER or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by the Merchant and Owner/Guarantor.

**MERCHANT #1**
By <u>Sammy Vela</u>
_____
        (Print Name and Title)                                                    (Signature)

---

CFN MCA 01-25-16                    Colonial Funding Network as Servicing Agent

<u>MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS</u>

**I. TERMS OF ENROLLMENT IN PROGRAM**

1.1 <u>**Merchant Cash Advance Agreement.**</u> These terms and conditions shall be incorporated in and made a part of the attached Merchant Cash Advance Agreement (such Merchant Cash Advance Agreement, as supplemented by these terms and conditions, this "Agreement").

1.2 <u>**Merchant Processing Agreement.**</u> Merchant shall execute an agreement (the "<u>Merchant Processing Agreement</u>") acceptable to FUNDER, with a card processor acceptable to FUNDER, to obtain card processing services. Merchant shall authorize Processor to deduct the amounts owed to FUNDER for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from Processor card transactions and to pay such amounts to FUNDER pursuant to FUNDER's instructions to Processor. The authorization shall be irrevocable without the written consent of FUNDER. Processor may rely upon the instructions of FUNDER, without any independent verification, in making such deductions and payments, and Merchant waives any claims for damages it may have against Processor in connection with such acts unless such damages were due to Processor's failure to follow FUNDER's instructions.

1.3 <u>**Purchase Price Reduction.**</u> FUNDER may, in its sole discretion, reduce the Purchase Price if one or more card processing conditions are not satisfied.

1.4 <u>**Bridge / Control Account.**</u> Merchant may be required to open a new bank account into which 100% of the settlement amounts will be deposited and the Specified Percentage collected by FUNDER (the "<u>Bridge / Control Account</u>"). **Merchant appoints FUNDER as "Acting Agent" over the Bridge / Control Account, and shall instruct Processor to designate the Bridge / Control Account as the deposit account for all of Merchant's customers' card transactions. Merchant assumes all responsibility for all fees, costs, charge-backs or suspicious items processed through the Bridge / Control Account (see "Miscellaneous Service Fees" paragraph 3.7). Merchant agrees to maintain a minimum balance in the Bridge / Control Account (the "<u>Minimum Balance</u>") equal to the per-month average of all fees charged to Merchant by Processor, averaged over a six-month period.**

1.5 <u>**Financial Condition.**</u> Merchant and each Owner/Guarantor authorize FUNDER, its agents and representatives, and any credit reporting agency engaged by FUNDER, to investigate their creditworthiness, financial responsibility and history, and they agree to provide FUNDER any financial statements, tax returns, references, or other credit or financial information as FUNDER deems necessary prior to or after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of credit and financial information. Merchant and each Owner/Guarantor authorize FUNDER to update their credit and financial profile from time to time in the future, as FUNDER deems appropriate. An investigative or consumer report may be made or obtained in connection with this Agreement.

1.6 <u>**Transactional History.**</u> Merchant authorizes Processor and each of Merchant's banks to provide FUNDER upon request with Merchant's card history or bank statements, as applicable.

1.7 <u>**Indemnification.**</u> Merchant and each Owner/Guarantor jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by FUNDER for monies owed to FUNDER from Merchant and (b) actions taken by

Processor in reliance upon information or instructions provided by FUNDER

1.8 <u>**No Liability.**</u> In no event will Processor or FUNDER (or any of the Funders) be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and each Owner/Guarantor.

1.9 <u>**Reliance on Terms.**</u> Sections 1.2, 1.7, 1.8, 2.5, and 4.6 hereof are agreed to for the benefit of Merchant, FUNDER (and it's Participants) and Processor, and notwithstanding the fact that Processor is not a party to this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

1.10 <u>**Sale of Receipts.**</u> Merchant and FUNDER intend that the transfer of the interest in the Receipts from Merchant to FUNDER constitute a sale, and not a loan, for all purposes. Merchant agrees that the Purchase Price equals the fair market value of such interest. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to FUNDER a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. In no event shall the aggregate of all amounts deemed interest hereunder charged and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that FUNDER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FUNDER shall promptly refund to Merchant any interest received by FUNDER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FUNDER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's interest in the Receipts.

1.11 <u>**Power of Attorney.**</u> Merchant irrevocably appoints FUNDER and any assignee of FUNDER as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to FUNDER from Processor, or upon the occurrence of an Event of Default under Section 3.1 hereof, to settle all obligations due to FUNDER from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in the Merchant Security Agreement and Guaranty); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FUNDER; and (v) to file any claims or take any action or institute any proceeding which FUNDER may deem necessary for the collection of any unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

1.12 <u>**Protection of Information.**</u> Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor, in respect of himself or herself personally, authorizes FUNDER to disclose to any third party information concerning Merchant's and each Owner's/Guarantor's credit standing (including credit bureau reports that FUNDER obtains) and business conduct. Merchant and each

Owner/Guarantor hereby waive to the maximum extent permitted by law any claim for damages against FUNDER or any of its affiliates and the Funders relating to any (i) investigation undertaken by or on behalf of FUNDER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.13 <u>**Confidentiality.**</u> Merchant understands and agrees that the terms and conditions of the products and services offered by FUNDER, including this Agreement, the Merchant Security Agreement and Guaranty and any other documents executed in connection with such agreements or related to such agreements (collectively, "<u>Confidential Information</u>") are proprietary and confidential information of FUNDER. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("<u>Advisor</u>"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to not disclose Confidential Information to any person in accordance with the terms of this Section 1.13.

1.14 <u>**Publicity.**</u> Merchant and each Owner/Guarantor authorize FUNDER to use their respective names in a listing of clients and in advertising and marketing materials.

1.15 <u>**D/B/A's.**</u> Merchant and each Owner/Guarantor hereby acknowledge and agree that FUNDER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FUNDER and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

1.16 <u>**Financial Information.**</u> Merchant and each Owner/Guarantor shall provide to FUNDER upon request copies of financial statements representing the financial condition of Merchant and/or such Owner/Guarantor.

**II. REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant and each Owner/Guarantor each represents, warrants and covenants that as of the date of this Agreement and on each date during the term of this Agreement:

2.1 <u>**Financial Condition and Financial Information.**</u> Its financial statements, copies of which have been furnished to FUNDER, and any financial statements furnished to FUNDER hereafter, fairly represent the financial condition of Merchant and each Owner/Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material adverse change in its financial condition, operation or ownership.

2.2 <u>**Governmental Approvals.**</u> Merchant is and will remain in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

2.3 <u>**Authorization.**</u> Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to execute this Agreement and to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 **Insurance.** Merchant has and will maintain business-interruption insurance naming FUNDER as loss payee and additional insured in such amounts and against such risks as are satisfactory to FUNDER and shall provide FUNDER proof of such insurance upon request.

2.5 **Merchant Processing Agreement and Arrangements.** Without FUNDER's prior written consent, Merchant will not: (i) change the card processor through which the Receipts are settled from Processor to another card processor; (ii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another processor; (iii) change its arrangements with Processor or amend the Merchant Processing Agreement in any way that is adverse to FUNDER; (iv) add card processing terminals; (v) use multiple card processing terminals; (vi) change its financial institution or bank account(s) (including, if applicable, the Bridge / Control Account); (vii) take any other action that could have any adverse effect upon Merchant's obligations under this Agreement or FUNDER's interest in the Receipts; or (viii) take any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor, or to induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor, or permit any event to occur that could have an adverse effect on the use, acceptance, or authorization of cards for the purchase of Merchant's services and products.

2.6 **Change of Name or Location.** Merchant will not conduct its businesses under any name other than as disclosed to Processor and FUNDER or change any of its places of business.

2.7 **Daily Batch Out.** Merchant will batch out receipts with Processor on a daily basis.

2.8 **Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from FUNDER to Merchant, execute, acknowledge and deliver to FUNDER and/or to any other person, firm or corporation specified by FUNDER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates on which the Purchased Amount or any portion thereof has been paid.

2.9 **No Bankruptcy or Insolvency.** Merchant and Owner/Guarantors represent that they are not Insolvent and neither Merchant nor any Owner/Guarantor has filed any petition for bankruptcy protection under Title 11 of the United States Code, no involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor, neither Merchant nor any Owner/Guarantor has admitted in writing its inability to pay its debts or made a general assignment for the benefit of creditors, and no other proceeding has been instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it insolvent or seeking reorganization, arrangement, adjustment or composition of it or its debts. Merchant does not anticipate filing any such bankruptcy petition and is not aware and has no reason to believe that any such bankruptcy petition or other proceeding will be filed or brought against it or any Owner/Guarantor.

2.10 **Other Financing.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase (such as a merchant cash advance) of, a loan against, or the sale or purchase of credits against, any Receipts, cash deposits or future card or mobile payment sales with any party other than FUNDER without its written permission.

2.11 **Unencumbered Receipts.** Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions,

conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, FUNDER.

2.12 **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.13 **Default Under Other Contracts.** Merchant's execution of or performance under this Agreement will not cause or create any breach or default by Merchant under any contract with another person or entity.

2.14 **Delivery of Confession of Judgment.** Upon execution of this Agreement, Merchant shall, if requested by FUNDER, deliver to FUNDER an executed Confession of Judgment (the "Confession of Judgment"), in the form provided by FUNDER, in favor of FUNDER in the amount of the Purchased Amount.

2.15 **Delivery of Assignment of Lease.** Merchant and each Owner/Guarantor authorize FUNDER to receive pertinent information regarding the commercial lease for the physical location(s) of Merchant's business (the "Premises") from any applicable leasing company and or agent. Merchant may be asked to deliver to FUNDER an executed Assignment of Lease assigning all of Merchant's right, title and interest in and to the Premises and under the lease for the Premises to FUNDER (the "Assignment of Lease").

2.16 **Sale of Business.** Merchant shall not sell, dispose, transfer or otherwise convey its business or assets without (i) the express prior written consent of FUNDER, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FUNDER.

2.17 **Bridge / Control Account.** If Merchant is required to open a Bridge / Control Account, (i) Merchant will not, unless otherwise directed in writing by FUNDER, take any action to cause the Specified Percentage of any settlement amounts to be settled or delivered to any account other than the Bridge / Control Account and (ii) Merchant will at all times maintain the Minimum Balance in the Bridge / Control Account.

2.18 **Use of Proceeds.** Merchant will conduct its business and use the Purchase Price in the ordinary course of its business, consistent with past practice.

2.19 **Accuracy of Information.** All information provided by Merchant and each Owner/Guarantor to FUNDER herein, in the Merchant Security Agreement and Guaranty, and in all other documents executed in connection with such agreements or related to such agreements is true, accurate and complete in all respects.

### III. EVENTS OF DEFAULT AND REMEDIES

3.1 **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or any Owner/Guarantor violates any term, covenant or condition in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER; (b) any representation or warranty by Merchant or any Owner/Guarantor in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER shall prove to have been incorrect, incomplete, false or misleading in any material respect when made; (c) Merchant or any Owner/Guarantor admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or

composition of it or its debts; (d) any Owner/Guarantor sends a notice of termination of the Merchant Security Agreement and Guaranty; (e) Merchant suspends, dissolves or terminates its business; (f) Merchant sells all or substantially all of its assets; (g) Merchant makes or sends notice of any intended bulk sale or transfer by Merchant; (h) Merchant performs any act that encumbers the cash flow of the business placing undue stress on the viability of the operations and reduces the value of the Collateral or the security interest granted in the Collateral under the Merchant Security Agreement and Guaranty; (i) any Owner/Guarantor performs any act that reduces the value of the Additional Collateral (as defined in the Merchant Security Agreement and Guaranty) or the security interest granted in the Additional Collateral under the Merchant Security Agreement and Guaranty; or (j) Merchant or any Owner/Guarantor files any petition for bankruptcy under the United States code or an involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor; (k)Merchant or any Owner/Guarantor defaults under any of the terms, covenants and conditions of any other agreement with FUNDER including those with affiliated / associated businesses.

3.2 **Remedies.** Upon the occurrence of an Event of Default that is not waived pursuant to Section 4.4 hereof, FUNDER on its own and on behalf of it's Participants may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Merchant Security Agreement and Guaranty, or pursuant to any other legal or equitable right or remedy. Upon FUNDER's notice to Merchant of any Event of Default, the entire Receipts Purchased Amount and unpaid fees not already paid to FUNDER shall become immediately due and payable to FUNDER. In addition, upon an Event of Default (i) FUNDER may enforce the provisions of the Merchant Security Agreement and Guaranty against each Owner/Guarantor; (ii) FUNDER may enforce its security interest in the Collateral and Additional Collateral; (iii) FUNDER may debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise; (iv) FUNDER may enter the Confession of Judgment as a judgment with the appropriate Clerk of Court and execute thereon; and (v) FUNDER may exercise its rights under the Assignment of Lease. All rights, powers and remedies of FUNDER in connection with this Agreement and the Merchant Security Agreement and Guaranty may be exercised at any time by FUNDER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 **Costs.** Merchant and each Owner/Guarantor shall pay to FUNDER all costs reasonably incurred by FUNDER in connection with (a) any Event of Default including without limitation any breach by Merchant or any Owner/Guarantor of the representations, warranties and covenants in this Agreement or the Merchant Security Agreement and Guaranty, and (b) the enforcement of FUNDER's remedies set forth in Section 3.2 hereof, including but not limited to court costs and attorneys' fees.

3.4 **Required Notifications.** Merchant and each Owner/Guarantor shall give FUNDER written notice within 24 hours of any filing by Merchant or any Owner/Guarantor under Title 11 of the United States Code or of the occurrence of any other event described in Section 3.1(c) hereof. Merchant shall give FUNDER seven days' written notice prior to the closing of any sale of all or substantially all of Merchant's assets or stock. Merchant shall give FUNDER seven days' written notice prior to the suspension, dissolution or terminations its business.

3.5 **Default Fee.** Upon the Occurrence of any Event of Default, and written notice to Merchant thereof, Merchant shall pay to FUNDER a default fee ("Default Fee") of $2,500. This Default Fee shall be payable on demand and stand in addition to any other fees or penalties outlined within this Agreement, the Merchant Security Agreement or Guaranty.

3.6 **Processor Change Fee.** Merchant shall pay a processor change fee (the "Processor Change Fee") to FUNDER in the amount of $5,000.00 in the event that Merchant (i) uses multiple card processing terminals without the prior written consent of FUNDER, (ii) changes its card processor without the prior written consent of FUNDER or (iii) directs Processor to deliver settlement amounts to any account other than the Bridge / Control Account (if Merchant is required to open a Bridge / Control Account). Such Processor Change Fee (i) shall be due and payable to FUNDER on demand, (ii) is not exclusive of, and is cumulative with, any other fee or amount paid or payable to FUNDER by Merchant pursuant to this Agreement or the Merchant Security Agreement and Guaranty; and (iii) shall not be construed as a waiver of any Event of Default hereunder or under the Merchant Security Agreement and Guaranty or as otherwise operating to reduce or limit FUNDER's rights or remedies provided for hereunder, under the Merchant Security Agreement and Guaranty or at law or in equity.

3.7 **Miscellaneous Service Fees.** Merchant shall pay certain fees for services related to the origination and maintenance of accounts which may include but not be limited to: Merchant funding is done electronically to their designated bank account and charged a fee of $35.00 for a Fed Wire or $15.00 for an ACH. The fee for underwriting and origination is paid from the funded amount in accordance with the schedule below. If Merchant is utilizing a Bridge / Control Account, there is an upfront fee of $395.00 for the bank fees and administrative costs of maintaining such account for each cash advance agreement with Merchant. Fund transfers from Bridge / Control Accounts to Merchant's operating bank account will be charged $10.95 per month via ACH. This fee will continue if the bridge account remains open after the RTR is paid. Merchant will be charged $50.00 for each change of its operating bank account once active with FUNDER. Any administrative adjustments associated with changes to the Specified Percentage will incur a fee of $75.00 per occurrence. (All fees are subject to change)

INITIALS: _____

**IV. MISCELLANEOUS**

4.1 **Modifications; Agreements.** No modification, amendment, or waiver of any provision of, or consent to any action under, this Agreement or the Merchant Security Agreement and Guaranty shall be effective unless the same is in writing and signed by FUNDER.

4.2 **Assignment.** Merchant acknowledges and understands that FUNDER is acting on its own behalf and as the administrator and lead investor for a group of independent co-investors a list of which can be provided to Merchant after funding and upon written notice to FUNDER. FUNDER may assign its rights

and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty in whole or in part without prior notice to Merchant or any Owner/Guarantor, including, without limitation, its right to receive all or any portion of the Purchased Amount and its obligation to fund all or any portion of the Purchase Price. Merchant acknowledges that, if any such assignment is made, persons other than FUNDER may have the right to exercise rights or remedies against Merchant pursuant to this Agreement. Merchant shall not have, and no Owner/Guarantor shall have, the right to assign its rights and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty or any interest herein or therein without the prior written consent of FUNDER, which consent may be withheld in FUNDER's sole discretion.

4.3 All notices, requests, consent, demands and other communications hereunder and under the Merchant Security Agreement and Guaranty shall be delivered by ordinary mail, effective upon mailing, to the respective parties to this Agreement and the Merchant Security Agreement and Guaranty at the addresses set forth in this Agreement and shall become effective only upon receipt. The Parties hereto may also send such notices, requests, consent, demands and other communications via facsimile ("FAX") or electronic mail ("Email") at such FAX numbers and email address communicated by the parties hereto in writing.

4.4 **Waiver Remedies.** No failure on the part of FUNDER to exercise, and no delay in exercising, any right under this Agreement or the Merchant Security Agreement and Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement or the Merchant Security Agreement and Guaranty preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder and under the Merchant Security Agreement and Guaranty are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Solicitations.** Merchant and each Owner/Guarantor authorize FUNDER and its affiliates to communicate with, solicit and /or market to Merchant and each Owner/Guarantor via regular mail, telephone, email and facsimile in connection with the provision of goods or services by FUNDER, its affiliates or any third party that FUNDER shares, transfers, exchanges, discloses or provides information with and will hold FUNDER, its affiliates and such third parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by and any of the methods described above.

4.6 **Terminated Merchant File and Match File.** Merchant expressly acknowledges that a Terminated Merchant File ("TMF"), or any successor thereto, is maintained by MasterCard or VISA containing the business name and names and identification of principals of merchants which have been terminated for one or more of the reasons specified in MasterCard or VISA operating regulations. Such reasons include, but are not limited to, fraud, counterfeit drafts, unauthorized transactions, excessive charge-backs and retrieval requests, money laundering, or where a high security risk exists. MERCHANT ACKNOWLEDGES THAT PROCESSOR AND FUNDER ARE REQUIRED TO REPORT THE BUSINESS NAME OF MERCHANT AND THE NAMES AND IDENTIFICATION OF ITS PRINCIPALS TO THE TMF WHEN A MERCHANT IS TERMINATED FOR ONE OR MORE OF THE REASONS SPECIFIED IN MASTERCARD OR VISA OPERATING REGULATIONS. MERCHANT EXPRESSLY AGREES AND CONSENTS TO SUCH REPORTING BY PROCESSOR AND FUNDER AND RELEASES EACH FROM ANY DAMAGES FOR DOING SO IN

GOOD FAITH.

4.7 **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement and the Merchant Security Agreement and Guaranty shall be binding upon and inure to the benefit of Merchant, each Owner/Guarantor, FUNDER (and it's Participants) and their respective successors and assigns. FUNDER's Participants shall be third party beneficiaries of all such agreements. This Agreement and the Merchant Security Agreement and Guaranty shall be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable conflicts of law principles. Any suit, action or proceeding arising hereunder or under the Merchant Security Agreement and Guaranty, or the interpretation, performance or breach hereof or thereof, shall, if FUNDER so elects, be instituted in any court sitting in New York, New York, (the "Acceptable Forum"). Each of Merchant and each Owner/Guarantor agrees that any state or federal court sitting in the Acceptable Forum is convenient to it, hereby irrevocably and unconditionally submits to the personal jurisdiction of any such court and hereby waives any and all objections to jurisdiction or venue. Each of Merchant and each Owner/Guarantor agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon such party and may be enforced in any other courts to whose jurisdiction such party is or may be subject, by suit upon such judgment. Should such suit, action or proceeding be initiated in any other forum, Merchant and each Owner/Guarantor waive any right to oppose any motion or application made by FUNDER to transfer such suit, action or proceeding to the Acceptable Forum.

4.8 **Survival of Representation, etc.** All representations, warranties and covenants herein and in the Merchant Security Agreement and Guaranty shall survive the execution and delivery of this Agreement and the Merchant Security Agreement and Guaranty and shall continue in full force until all obligations under this Agreement and the Merchant Security Agreement and Guaranty shall have been satisfied in full and this Agreement and the Merchant Security Agreement and Guaranty shall have terminated.

4.9 **Severability.** In case any of the provisions in this Agreement or the Merchant Security Agreement and Guaranty is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein or therein shall not in any way be affected or impaired.

4.10 **Entire Agreement.** Any provision hereof or of the Merchant Security Agreement and Guaranty prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof or thereof. This Agreement and the Merchant Security Agreement and Guaranty embody the entire agreement between Merchant, each Owner/Guarantor and FUNDER and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.12. ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* THIS SECTION PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT (FAA), AND SHALL BE INTERPRETED IN THE BROADEST WAY THE LAW WILL ALLOW.

**Covered claims**

- You or we may arbitrate any claim, dispute or controversy between you and us arising out of or related to your account, a previous related account or our relationship (called "Claims").
- **If arbitration is chosen by any party, neither you nor we will have the right to litigate that Claim in court or have a jury trial on that Claim.**
- Except as stated below, all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims. This also includes Claims made by or against anyone connected with us or you or claiming through us or you, or by someone making a claim through us or you, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.

**Arbitration limits**

- Individual Claims filed in a small claims court are not subject to arbitration, as long as the matter stays in small claims court.
- We won't initiate arbitration to collect a debt from you unless you choose to arbitrate or assert a Claim against us. If you assert a Claim against us, we can choose to arbitrate, including actions to collect a debt from you. You may arbitrate on an individual basis Claims brought against you, including Claims to collect a debt.
- Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis. The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis. If arbitration is chosen by any party, neither you nor we may pursue a Claim as part of a class action or other representative action. Claims of 2 or more persons may not be combined in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

**How arbitration works**

- Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA arbitration rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision. You can obtain copies of the AAA Rules at the AAA's website (www.adr.org) or by calling 800-778-7879. You

or we may choose to have a hearing, appear at any hearing by phone or other electronic means, and/or be represented by counsel. Any in-person hearing will be held in the same city as the U.S. District Court closet to your billing address.

- Arbitration may be requested any time, even where there is a pending lawsuit, unless a trial has begun or a final judgment entered. Neither you nor we waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, motion, or discovery in a court lawsuit. To choose arbitration, a party may file a motion to compel arbitration in a pending matter and/or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.
- The arbitration shall be conducted by a single arbitrator in accord with this arbitration provision and the AAA Rules, which may limit discovery. The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of either party if requested to do so. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statute of limitations, and may award damages or other relief under applicable law.
- The arbitrator shall make any award in writing and, if requested by you or us, may provide a brief statement of the reasons for the award. An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

**Paying for arbitration fees**

- We will pay your share of the arbitration fee for an arbitration of Claims of $75,000 or less if they are unrelated to debt collection. Otherwise, arbitration fees will be allocated according to the applicable AAA Rules. If we prevail, we may not recover our arbitration fees, unless the arbitrator decides you Claim was frivolous. All parties are responsible for their own attorney's fees, expert fees and any other expenses, unless the arbitrator awards such fees or expenses to you or us based on applicable law.

**The final award**

- Any award by an arbitrator is final unless a party appeals it in writing to the AAA within 30 days of notice of the award. The arbitration appeal shall be determined by a panel of 3 arbitrators. The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration, and will make decisions based on a majority vote. Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules. An award by a panel on appeal is final. A final award is subject to judicial review as provided by applicable law.

**Survival and Severability of Terms**

- This arbitration provision shall survive changes in this Agreement and termination of the account or the relationship between you and us, including the bankruptcy of any party and any sale of your account, or amounts owed on your account, to another person or entity. If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative Claim. This arbitration provision may not be amended, severed or waived, except as provided in this Agreement or in a written agreement between you and us.

4.11 **Facsimile Acceptance.** Facsimile signatures shall be deemed acceptable for all purposes

4.13 **Counterparts; Facsimile and PDF Acceptance.** This Agreement and the Merchant Security Agreement and Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument. Signatures on this Agreement and the Merchant Security Agreement and Guaranty sent by facsimile or PDF will be treated as original signatures for all purposes.

INITIALS: _____

| Origination Fee Schedule (From 3.7) | |
|---|---|
| Amount Funded | Origination Fee |
| Up to $7,500.00 | $199.00 |
| $7,501.00-$25,000.00 | $295.00 |
| $25,000.00-$50,000.00 | $395.00 |
| $50,001.00-$100,000.00 | $595.00 |
| $100,001.00-$250,000.00 | $795.00 |
| Over $250,000.00 | $995.00 |
| Due diligence Fee | $0.00 |
| Administrative Fee | $0.00 |
| UCC Termination Fee | $150 |

**\*\*\* All fees listed in this contract are subject to change.**

INITIALS: _____

## MERCHANT SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: <u>Sammys Grill, LLC/ STADIA BAR & GRILL LICENSING CO LLC</u>

D/B/A: <u>Stadia Bar and Grill/ STADIA SPORTS GRILL</u>

Physical Address: <u>22762 Westheimer Pky #400</u>       City: <u>Katy</u>       State: <u>TX</u>       Zip: <u>77450</u>

Federal ID/

### SECURITY AGREEMENT

**Security Interest**. To secure Merchant's payment and performance obligations to FUNDER and its affiliates or the Funders, a list of which may be provided to the Merchant if requested in writing after the funding of the purchase closes under the Merchant Cash Advance Agreement between Merchant and FUNDER (the "<u>Merchant Agreement</u>"), Merchant hereby grants to FUNDER a security interest in all personal property of Merchant, including all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, as those terms are defined in Article 9 of the Uniform Commercial Code of the State of New York as amended (the "<u>UCC</u>"), whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of such property, as that term is defined in Article 9 of the UCC (collectively, the "<u>Collateral</u>"). If the Merchant Agreement identifies more than one Merchant, this Security Agreement applies to each Merchant, jointly and severally.

Merchant acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Merchant and FUNDER will secure the obligations hereunder, and that the Merchant's payment and performance obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Collateral.

Merchant further acknowledges and agrees that, if Merchant enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Security Agreement, and that the Merchant's payment and performance obligations, and the Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC_3 statement, perfecting FUNDER's interest in the Collateral.

**Cross-Collateral**. To secure Guarantor's payment and performance obligations to FUNDER(and the Funders) under this Merchant Security Agreement and Guaranty (this "<u>Agreement</u>"), each Guarantor hereby grants FUNDER, for itself and its participants, a security interest in <u>Sammy's Grill LLC 2 / Sammy's Grill LLC 3  (d/b/a Sammy's Sports Grill 2)</u> (the "<u>Additional Collateral</u>"). Each Guarantor agrees and acknowledges that FUNDER will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Guarantor acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Guarantor and FUNDER will secure the obligations hereunder, and that the Guarantor's payment and performance obligations under this Agreement, and the Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Additional Collateral.

Guarantor further acknowledges and agreements that, if Guarantor enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Agreement, and that the Guarantor's payment and performance obligations, and the Additional Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interesting the Additional Collateral.

Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as FUNDER deems necessary to perfect or maintain FUNDER's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements. Each of Merchant and each Guarantor hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's security interest, which financing statements may contain notification that Merchant and each Guarantor have granted a negative pledge to FUNDER with respect to the Collateral and Additional Collateral, and that any subsequent lender or lienor may be tortiously interfering with FUNDER's rights. Merchant and each Guarantor shall be jointly and severally liable for and shall pay to FUNDER upon demand all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in protecting, preserving and enforcing FUNDER's security interest and rights.

**Negative Pledge**. Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral or Additional Collateral, as applicable without written permission of FUNDER.

**Consent to Enter Premises and Assign Lease**. FUNDER shall have the right to cure Merchant's default in the payment of rent for the Premises on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FUNDER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FUNDER may enter into an agreement with Merchant's landlord giving FUNDER the right: (a) to enter the Premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at the Premises.

**Remedies**. Upon any Event of Default, FUNDER may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing to FUNDER, whether by acceleration or otherwise.

### GUARANTY

**Performance Guaranty**. Each undersigned Guarantor ("<u>Guarantor</u>") hereby unconditionally guarantees to FUNDER, and its affiliates or the Funders,  , the payment and performance by Merchant of all of its obligations under this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified from time to time (the "<u>Guaranteed Obligations</u>"). Guarantor shall be liable for and FUNDER may charge and collect all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in connection with the collection of any or all of the Guaranteed Obligations from Guarantor or the enforcement of this Agreement. (It is understood by all parties that this Guaranty is not an absolute personal guaranty of payment and that the signors are only guaranteeing that they will not take any action or permit the merchant to take any action that is a breach of this agreement.)

**Guarantor Waivers**. In the event that Merchant fails to make a payment when due or otherwise perform under the Merchant Agreement, FUNDER may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral FUNDER may hold pursuant to this Agreement or any other guaranty.

FUNDER does not have to notify Guarantor of any of the following events and Guarantor will not be released from any of its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any material or adverse change in Merchant's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, or any other guarantee of the Guaranteed Obligations; (iv) FUNDER's acceptance of this Agreement; or (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FUNDER. In addition, FUNDER may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FUNDER; (ii) release Merchant from its obligations to FUNDER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations, including without limitation the Collateral or Additional

Collateral, in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to FUNDER under the Merchant Agreement and this Agreement are paid and performed in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FUNDER must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount. Guarantor agrees that its obligations under this Agreement shall be irrevocable and shall be unconditional irrespective of any circumstance that might otherwise operate as a legal or equitable discharge of a guarantor or a defense of a guarantor.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Agreement and that any misrepresentation may constitute fraud; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

INITIALS: _____

**Joint and Several Liability.** The obligations hereunder of each Guarantor are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT. CAPITALIZED TERMS NOT DEFINED IN THIS AGREEMENT SHALL HAVE THE MEANINGS SET FORTH IN THE MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS.

MERCHANTS AND OWNERS/GUARANTORS ACKNOWLEDGE THAT THIS WRITING REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO. IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS OF ANY PARTY IF NOT INCLUDED IN THIS WRITTEN AGREEMENT ARE CONSIDERED NULL AND VOID. ANY MODIFICATION OR OTHER ALTERATION TO THE AGREEMENT MUST BE IN WRITING AND EXECUTED BY THE PARTIES TO THIS CONTRACT.

INITIALS: _____

**MERCHANT #1**
By   Sammy Vela_____
        (Print Name and Title)
SS#

_____
        (Signature)
Drivers License Number:

**MERCHANT #2**
By   _____
        (Print Name and Title)
SS#

_____
        (Signature)
Drivers License Number:

**OWNER/GUARANTOR #1**
By   Sammy Vela_____
        (Print Name and Title)
SS#

_____
        (Signature)
Drivers License Number:

**OWNER/GUARANTOR #2**
By   _____
        (Print Name and Title)
SS#

_____
        (Signature)
Drivers License Number:

# Trust Capital Funding

## MERCHANT CASH ADVANCE AGREEMENT

Agreement dated <u>October 26 2016</u> between Trust Capital Funding, ("FUNDER") doing business at 10 Kearney Rd Suite, 102 Needham, MA 02494 and the merchant listed below ("the <u>Merchant</u>"):

### MERCHANT INFORMATION

Merchant's Legal Name: <u>SAMMY'S GRILL LLC 3</u>

D/B/A: <u>Sammy's Sports Grill 3</u>

Type of entity: ( ) Corporation ( X ) Limited Liability Company ( ) Limited Partnership ( ) Limited Liability Partnership ( ) Sole Proprietor          State of Incorporation / Organization: <u>TX</u>

Physical Address: <u>7035 W. Grand Parkway #99</u>          City: <u>Richmond</u>          State: <u>TX</u>          Zip: <u>77406</u>

Date business started (mm/yy): <u>11/15</u>          Federal ID

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to FUNDER, as the lead purchaser for itself and other co-investors, (making FUNDER on behalf of itself and all co-investors (collectively the Funders), the absolute owner] in consideration of the purchase price specified below (the "Purchase Price"), all of Merchant's future accounts, contract rights and other rights to payment arising from or relating to the use by Merchant's customers of cash, credit cards, charge cards, debit cards, prepaid cards, mobile payments and other similar payment methods in the ordinary course of Merchant's business (the "Receipts") for the payment of Merchant's sale of goods or rendition of services until the purchased amount specified below (the "Purchased Amount") has been delivered by Merchant to FUNDER, provided that the Purchase Price, the Specified Percentage (as defined below) and/or the Purchased Amount may be adjusted by FUNDER and Merchant in writing if one or more card processing conditions are not satisfied.

The Purchased Amount shall be paid to FUNDER by Merchant's using and irrevocably authorizing only one card processor acceptable to FUNDER ("Processor") to retain to or for the benefit of FUNDER the percentage specified below (the "Specified Percentage") of Merchant's settlement amounts due from each card issuer with respect to the Receipts, until such time as FUNDER receives payment in full of the Purchased Amount. Furthermore Merchant will not enter into another cash advance agreement or any other type of factoring agreement, or any other type of credit/debit card processing during the term of this contract. Notwithstanding anything to the contrary in this Agreement or any other agreement between FUNDER and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

Purchase Price: $120,000.00          Specified Percentage: 23%          Receipts Purchased Amount: $171,600.00

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", THE "MERCHANT SECURITY AGREEMENT AND GUARANTY" AND "ADMINISTRATIVE FORM" [Note: Is there a separate Administrative Form] ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

MERCHANT #1

By  <u>Sammy Vela</u>
          (Print Name and Title)          (Signature)

MERCHANT #2

By  _____
          (Print Name and Title)          (Signature)

OWNER/GUARANTOR #1

By  <u>Sammy Vela</u>
          (Print Name and Title)          (Signature)

OWNER/GUARANTOR #2

By  _____
          (Print Name and Title)          (Signature)

Trust Capital Funding

By  Mark Wesalawski
          (Company Officer)          (Signature)

Each person signing this Agreement on behalf of Merchant represents that he or she is authorized to sign this Agreement on behalf of Merchant, and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor represents that the information provided herein and in all of FUNDER's forms is true, accurate and complete in all respects. FUNDER may produce a monthly statement reflecting the delivery of the Specified Percentage of Receipts from Merchant to FUNDER and its participants via Processor.
ANY MISREPRESENTATION MADE BY MERCHANT OR ANY OWNER/GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.

AUTHORIZED SERVICING AGENT – Colonial Funding Network, Inc.

Colonial Funding Network, Inc. (Colonial) is the Authorized Servicing Agent of the FUNDER for this contract providing administrative, bookkeeping, reporting and support services for the FUNDER and the Merchant. Colonial is not affiliated or owned by the FUNDER and is acting as independent agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting and remit capture. Colonial may at its sole discretion participate in this financing by providing a small portion of the funds for this transaction directly to the FUNDER. Colonial is not a credit card processor, or is the business of processing credit cards. Merchant hereby acknowledges that in no event will Colonial be liable for any claims made against the FUNDER or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by the Merchant and Owner/Guarantor.

MERCHANT #1

By  <u>Sammy Vela</u>
          (Print Name and Title)          (Signature)

CFN MCA 01-25-16          Colonial Funding Network as Servicing Agent

## MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS

**I. TERMS OF ENROLLMENT IN PROGRAM**

**1.1 Merchant Cash Advance Agreement.** These terms and conditions shall be incorporated in and made a part of the attached Merchant Cash Advance Agreement (such Merchant Cash Advance Agreement, as supplemented by these terms and conditions, this "Agreement").

**1.2 Merchant Processing Agreement.** Merchant shall execute an agreement (the "Merchant Processing Agreement") acceptable to FUNDER, with a card processor acceptable to FUNDER, to obtain card processing services. Merchant shall authorize Processor to deduct the amounts owed to FUNDER for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from Processor card transactions and to pay such amounts to FUNDER pursuant to FUNDER's instructions to Processor. The authorization shall be irrevocable without the written consent of FUNDER. Processor may rely upon the instructions of FUNDER, without any independent verification, in making such deductions and payments, and Merchant waives any claims for damages it may have against Processor in connection with such acts unless such damages were due to Processor's failure to follow FUNDER's instructions.

**1.3 Purchase Price Reduction.** FUNDER may, in its sole discretion, reduce the Purchase Price if one or more card processing conditions are not satisfied.

**1.4 Bridge / Control Account.** Merchant may be required to open a new bank account into which 100% of the settlement amounts will be deposited and the Specified Percentage collected by FUNDER (the "Bridge / Control Account"). Merchant appoints FUNDER as "Acting Agent" over the Bridge / Control Account, and shall instruct Processor to designate the Bridge / Control Account as the deposit account for all of Merchant's customers' card transactions. Merchant assumes all responsibility for all fees, costs, charge-backs or suspicious items processed through the Bridge / Control Account (see "Miscellaneous Service Fees" paragraph 3.7). Merchant agrees to maintain a minimum balance in the Bridge / Control Account (the "Minimum Balance") equal to the per-month average of all fees charged to Merchant by Processor, averaged over a six-month period.

**1.5 Financial Condition.** Merchant and each Owner/Guarantor authorize FUNDER, its agents and representatives, and any credit reporting agency engaged by FUNDER, to investigate their creditworthiness, financial responsibility and history, and they agree to provide FUNDER any financial statements, tax returns, references, or other credit or financial information as FUNDER deems necessary prior to or after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of credit and financial information. Merchant and each Owner/Guarantor authorize FUNDER to update their credit and financial profile from time to time in the future, as FUNDER deems appropriate. An investigative or consumer report may be made or obtained in connection with this Agreement.

**1.6 Transactional History.** Merchant authorizes Processor and each of Merchant's banks to provide FUNDER upon request with Merchant's card history or bank statements, as applicable.

**1.7 Indemnification.** Merchant and each Owner/Guarantor jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by FUNDER for monies owed to FUNDER from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by FUNDER.

**1.8 No Liability.** In no event will Processor or FUNDER (or any of the Funders) be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and each Owner/Guarantor.

**1.9 Reliance on Terms.** Sections 1.2, 1.7, 1.8, 2.5, and 4.6 hereof are agreed to for the benefit of Merchant, FUNDER (and it's Participants) and Processor, and notwithstanding the fact that Processor is not a party to this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.10 Sale of Receipts.** Merchant and FUNDER intend that the transfer of the interest in the Receipts from Merchant to FUNDER constitute a sale, and not a loan, for all purposes. Merchant agrees that the Purchase Price equals the fair market value of such interest. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to FUNDER a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. In no event shall the aggregate of all amounts deemed interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that FUNDER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FUNDER shall promptly refund to Merchant any interest received by FUNDER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FUNDER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's interest in the Receipts.

**1.11 Power of Attorney.** Merchant irrevocably appoints FUNDER and any assignee of FUNDER as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to FUNDER from Processor, or upon the occurrence of an Event of Default under Section 3.1 hereof, to settle all obligations due to FUNDER from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in the Merchant Security Agreement and Guaranty); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FUNDER; and (v) to file any claims or take any action or institute any proceeding which FUNDER may deem necessary for the collection of any unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor, in respect of himself or herself personally, authorizes FUNDER to disclose to any third party information concerning Merchant's and each Owner's/Guarantor's credit standing (including credit bureau reports that FUNDER obtains) and business conduct. Merchant and each Owner/Guarantor hereby waive to the maximum extent permitted by law any claim for damages against FUNDER or any of its affiliates and the Funders relating to any (i) investigation undertaken by or on behalf of FUNDER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by FUNDER, including this Agreement, the Merchant Security Agreement and Guaranty and any other documents executed in connection with such agreements or related to such agreements (collectively, "Confidential Information") are proprietary and confidential information of FUNDER. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to not disclose Confidential Information to any person in accordance with the terms of this Section 1.13.

**1.14 Publicity.** Merchant and each Owner/Guarantor authorize FUNDER to use their respective names in a listing of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant and each Owner/Guarantor hereby acknowledge and agree that FUNDER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FUNDER and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Financial Information.** Merchant and each Owner/Guarantor shall provide to FUNDER upon request copies of financial statements representing the financial condition of Merchant and/or such Owner/Guarantor.

**II. REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant and each Owner/Guarantor each represents, warrants and covenants that as of the date of this Agreement and on each date during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Its financial statements, copies of which have been furnished to FUNDER, and any financial statements furnished to FUNDER hereafter, fairly represent the financial condition of Merchant and each Owner/Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material adverse change in its financial condition, operation or ownership.

**2.2 Governmental Approvals.** Merchant is and will remain in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to execute this Agreement and to incur and perform the obligations under this Agreement, all of which have been duly authorized.

CFN MCA 01-25-16                    Colonial Funding Network as Servicing Agent

2.4 <u>Insurance.</u> Merchant has and will maintain business-interruption insurance naming FUNDER as loss payee and additional insured in such amounts and against such risks as are satisfactory to FUNDER and shall provide FUNDER proof of such insurance upon request.

2.5 <u>Merchant Processing Agreement and Arrangements.</u> Without FUNDER's prior written consent, Merchant will not: (i) change the card processor through which the Receipts are settled from Processor to another card processor; (ii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another processor; (iii) change its arrangements with Processor or amend the Merchant Processing Agreement in any way that is adverse to FUNDER; (iv) add card processing terminals; (v) use multiple card processing terminals; (vi) change its financial institution or bank account(s) (including, if applicable, the Bridge / Control Account); (vii) take any other action that could have any adverse effect upon Merchant's obligations under this Agreement or FUNDER's interest in the Receipts; or (viii) take any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor, or to induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor, or permit any event to occur that could have an adverse effect on the use, acceptance, or authorization of cards for the purchase of Merchant's services and products.

2.6 <u>Change of Name or Location.</u> Merchant will not conduct its businesses under any name other than as disclosed to Processor and FUNDER or change any of its places of business.

2.7 <u>Daily Batch Out.</u> Merchant will batch out receipts with Processor on a daily basis.

2.8 <u>Estoppel Certificate.</u> Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from FUNDER to Merchant, execute, acknowledge and deliver to FUNDER and/or to any other person, firm or corporation specified by FUNDER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates on which the Purchased Amount or any portion thereof has been paid.

2.9 <u>No Bankruptcy or Insolvency.</u> Merchant and Owner/Guarantors represent that they are not Insolvent and neither Merchant nor any Owner/Guarantor has filed any petition for bankruptcy protection under Title 11 of the United States Code, no involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor, neither Merchant nor any Owner/Guarantor has admitted in writing its inability to pay its debts or made a general assignment for the benefit of creditors, and no other proceeding has been instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it insolvent or seeking reorganization, arrangement, adjustment or composition of it or its debts. Merchant does not anticipate filing any such bankruptcy petition and is not aware and has no reason to believe that any such bankruptcy petition or other proceeding will be filed or brought against it or any Owner/Guarantor.

2.10 <u>Other Financing.</u> Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase (such as a merchant cash advance) of, a loan against, or the sale or purchase of credits against, any Receipts, cash deposits or future card or mobile payment sales with any party other than FUNDER without its written permission.

2.11 <u>Unencumbered Receipts.</u> Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or

nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, FUNDER

2.12 <u>Business Purpose.</u> Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.13 <u>Default Under Other Contracts.</u> Merchant's execution of or performance under this Agreement will not cause or create any breach or default by Merchant under any contract with another person or entity.

2.14 <u>Delivery of Confession of Judgment.</u> Upon execution of this Agreement, Merchant shall, if requested by FUNDER, deliver to FUNDER an executed Confession of Judgment (the "<u>Confession of Judgment</u>"), in the form provided by FUNDER, in favor of FUNDER in the amount of the Purchased Amount.

2.15 <u>Delivery of Assignment of Lease.</u> Merchant and each Owner/Guarantor authorize FUNDER to receive pertinent information regarding the commercial lease for the physical location(s) of Merchant's business (the "<u>Premises</u>") from any applicable leasing company and or agent. Merchant may be asked to deliver to FUNDER an executed Assignment of Lease assigning all of Merchant's right, title and interest in and to the Premises and under the lease for the Premises to FUNDER (the "<u>Assignment of Lease</u>").

2.16 <u>Sale of Business.</u> Merchant shall not sell, dispose, transfer or otherwise convey its business or assets without (i) the express prior written consent of FUNDER, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FUNDER.

2.17 <u>Bridge / Control Account.</u> If Merchant is required to open a Bridge / Control Account, (i) Merchant will not, unless otherwise directed in writing by FUNDER, take any action to cause the Specified Percentage of the settlement amounts to be settled or delivered to any account other than the Bridge / Control Account and (ii) Merchant will at all times maintain the Minimum Balance in the Bridge / Control Account.

2.18 <u>Use of Proceeds.</u> Merchant will conduct its business and use the Purchase Price in the ordinary course of its business, consistent with past practice.

2.19 <u>Accuracy of Information.</u> All information provided by Merchant and each Owner/Guarantor to FUNDER herein, in the Merchant Security Agreement and Guaranty, and in all other documents executed in connection with such agreements or related to such agreements is true, accurate and complete in all respects.

## III. EVENTS OF DEFAULT AND REMEDIES

3.1 <u>Events of Default.</u> The occurrence of any of the following events shall constitute an "<u>Event of Default</u>" hereunder: (a) Merchant or any Owner/Guarantor violates any term, covenant or condition to this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER; (b) any representation or warranty by Merchant or any Owner/Guarantor in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER shall prove to have been incorrect, incomplete, false or misleading in any material respect when made; (c) Merchant or any Owner/Guarantor admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) any Owner/Guarantor sends a notice of termination of the Merchant Security Agreement and Guaranty; (e) Merchant suspends, dissolves or terminates its business; (f) Merchant sells all or substantially all of its assets; (g) Merchant makes

or sends notice of any intended bulk sale or transfer by Merchant; (h) Merchant performs any act that encumbers the cash flow of the business placing undue stress on the viability of the operations and reduces the value of the Collateral or the security interest granted in the Collateral under the Merchant Security Agreement and Guaranty; (i) any Owner/Guarantor performs any act that reduces the value of the Additional Collateral (as defined in the Merchant Security Agreement and Guaranty) or the security interest granted in the Additional Collateral under the Merchant Security Agreement and Guaranty; or (j) Merchant or any Owner/Guarantor files any petition for bankruptcy under the United States code or an involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor; (k) Merchant or any Owner/Guarantor defaults under any of the terms, covenants and conditions of any other agreement with FUNDER including those with affiliated / associated businesses.

3.2 <u>Remedies.</u> Upon the occurrence of an Event of Default that is not waived pursuant to Section 4.4 hereof, FUNDER on its own and on behalf of it's Participants may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Merchant Security Agreement and Guaranty, or pursuant to any other legal or equitable right or remedy. Upon FUNDER's notice to Merchant of any Event of Default, the entire Receipts Purchased Amount and unpaid fees not already paid to FUNDER shall become immediately due and payable to FUNDER. In addition, upon an Event of Default (i) FUNDER may enforce the provisions of the Merchant Security Agreement and Guaranty against each Owner/Guarantor; (ii) FUNDER may enforce its security interest in the Collateral and Additional Collateral; (iii) FUNDER may debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise; (iv) FUNDER may enter the Confession of Judgment as a judgment with the appropriate Clerk of Court and execute thereon; and (v) FUNDER may exercise its rights under the Assignment of Lease. All rights, powers and remedies of FUNDER in connection with this Agreement and the Merchant Security Agreement and Guaranty may be exercised at any time by FUNDER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 <u>Costs.</u> Merchant and each Owner/Guarantor shall pay to FUNDER all costs reasonably incurred by FUNDER in connection with (a) any Event of Default including without limitation any breach by Merchant or any Owner/Guarantor of the representations, warranties and covenants in this Agreement or the Merchant Security Agreement and Guaranty, and (b) the enforcement of FUNDER's remedies set forth in Section 3.2 hereof, including but not limited to court costs and attorneys' fees.

3.4 **Required Notifications.** Merchant and each Owner/Guarantor shall give FUNDER written notice within 24 hours of any filing by Merchant or any Owner/Guarantor under Title 11 of the United States Code or of the occurrence of any other event described in Section 3.1(c) hereof. Merchant shall give FUNDER seven days' written notice prior to the closing of any sale of all or substantially all of Merchant's assets or stock. Merchant shall give FUNDER seven days' written notice prior to the suspension, dissolution or termination its business.

3.5 **Default Fee.** Upon the Occurrence of any Event of Default, and written notice to Merchant thereof, Merchant shall pay to FUNDER a default fee ("Default Fee") of $2,500. This Default Fee shall be payable on demand and stand in addition to any other fees or penalties outlined within this Agreement, the Merchant Security Agreement or Guaranty.

3.6 **Processor Change Fee.** Merchant shall pay a processor change fee (the "Processor Change Fee") to FUNDER in the amount of $5,000.00 in the event that Merchant (i) uses multiple card processing terminals without the prior written consent of FUNDER, (ii) changes its card processor without the prior written consent of FUNDER or (iii) directs Processor to deliver settlement amounts to any account other than the Bridge / Control Account (if Merchant is required to open a Bridge / Control Account). Such Processor Change Fee (i) shall be due and payable to FUNDER on demand, (ii) is not exclusive of, and is cumulative with, any other fee or amount paid or payable to FUNDER by Merchant pursuant to this Agreement or the Merchant Security Agreement and Guaranty; and (iii) shall not be construed as a waiver of any Event of Default hereunder or under the Merchant Security Agreement and Guaranty or as otherwise operating to reduce or limit FUNDER's rights or remedies provided for hereunder, under the Merchant Security Agreement and Guaranty or at law or in equity.

3.7 **Miscellaneous Service Fees.** Merchant shall pay certain fees for services related to the origination and maintenance of accounts which may include but not be limited to: Merchant funding is done electronically to their designated bank account and charged a fee of $35.00 for a Fed Wire or $15.00 for an ACH. This fee for underwriting and origination is paid from the funded amount in accordance with the schedule below. If Merchant is utilizing a Bridge / Control Account, there is an upfront fee of $395.00 for the bank fees and administrative costs of maintaining such account for each cash advance agreement with Merchant. Fund transfers from Bridge / Control Accounts to Merchant's operating bank account will be charged $10.95 per month via ACH. This fee will continue if the bridge account remains open after the RTR is paid. Merchant will be charged $50.00 for each change of its operating bank account once active with FUNDER. Any administrative adjustments associated with changes to the Specified Percentage will incur a fee of $75.00 per occurrence. (All fees are subject to change.)

INITIALS: [signature]

## IV. MISCELLANEOUS

4.1 **Modifications; Agreements.** No modification, amendment, or waiver of any provision of, or consent to any action under, this Agreement or the Merchant Security Agreement and Guaranty shall be effective unless the same is in writing and signed by FUNDER.

4.2 **Assignment.** Merchant acknowledges and understands that FUNDER is acting on its own behalf and as the administrator and lead investor for a group of independent co-investors a list of which can be provided to Merchant after funding and upon written notice to

FUNDER. FUNDER may assign its rights and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty in whole or in part without prior notice to Merchant or any Owner/Guarantor, including, without limitation, its right to receive all or any portion of the Purchased Amount and its obligation to fund all or any portion of the Purchase Price. Merchant acknowledges that, if any such assignment is made, persons other than FUNDER may have the right to exercise rights or remedies against Merchant pursuant to this Agreement. Merchant shall not have, and no Owner/Guarantor shall have, the right to assign its rights and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty or any interest herein or therein without the prior written consent of FUNDER, which consent may be withheld in FUNDER's sole discretion.

4.3 All notices, requests, consent, demands and other communications hereunder and under the Merchant Security Agreement and Guaranty shall be delivered by ordinary mail, effective upon mailing, to the respective parties to this Agreement and the Merchant Security Agreement and Guaranty at the addresses set forth in this Agreement and shall become effective only upon receipt. The Parties hereto may also send such notices, requests, consent, demands and other communications via facsimile ("FAX") or electronic mail ("Email") at such FAX numbers and email addresses communicated by the parties hereto in writing.

4.4 **Waiver Remedies.** No failure on the part of FUNDER to exercise, and no delay in exercising, any right under this Agreement or the Merchant Security Agreement and Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement or the Merchant Security Agreement and Guaranty preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder and under the Merchant Security Agreement and Guaranty are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Solicitations.** Merchant and each Owner/Guarantor authorize FUNDER and its affiliates to communicate with, solicit and /or market to Merchant and each Owner/Guarantor via regular mail, telephone, email and facsimile in connection with the provision of goods or services by FUNDER, its affiliates or any third party that FUNDER shares, transfers, exchanges, discloses or provides information with and will hold FUNDER, its affiliates and such third parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by any and of the methods described above.

4.6 **Terminated Merchant File and Match File.** Merchant expressly acknowledges that a Terminated Merchant File ("TMF"), or any successor thereto, is maintained by MasterCard or VISA containing the business name and names and identification of principals of merchants which have been terminated for one or more of the reasons specified in MasterCard or VISA operating regulations. Such reasons include, but are not limited to, fraud, counterfeit drafts, unauthorized transactions, excessive charge-backs and retrieval requests, money laundering, or where a high security risk exists. MERCHANT ACKNOWLEDGES THAT PROCESSOR AND FUNDER ARE REQUIRED TO REPORT THE BUSINESS NAME OF MERCHANT AND THE NAMES AND IDENTIFICATION OF ITS PRINCIPALS TO THE TMF WHEN A MERCHANT IS TERMINATED FOR ONE OR MORE OF THE REASONS SPECIFIED IN MASTERCARD OR VISA OPERATING REGULATIONS. MERCHANT EXPRESSLY AGREES AND CONSENTS TO SUCH REPORTING BY PROCESSOR AND FUNDER AND RELEASES EACH FROM ANY DAMAGES FOR DOING SO IN GOOD FAITH.

4.7 **Binding Effect; Governing Law, Venue and**

Jurisdiction. This Agreement and the Merchant Security Agreement and Guaranty shall be binding upon and inure to the benefit of Merchant, each Owner/Guarantor, FUNDER (and it's Participants) and their respective successors and assigns. FUNDER's Participants shall be third party beneficiaries of all such agreements. This Agreement and the Merchant Security Agreement and Guaranty shall be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable conflicts of law principles. Any suit, action or proceeding arising hereunder or under the Merchant Security Agreement and Guaranty, or the interpretation, performance or breach hereof or thereof, shall, if FUNDER so elects, be instituted in any court sitting in New York, New York, (the "Acceptable Forum"). Each of Merchant and each Owner/Guarantor agrees that any state or federal court sitting in the Acceptable Forum is convenient to it, hereby irrevocably and unconditionally submits to the personal jurisdiction of any such court and hereby waives any and all objections to jurisdiction or venue. Each of Merchant and each Owner/Guarantor agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon such party and may be enforced in any other courts to whose jurisdiction such party is or may be subject, by suit upon such judgment. Should such suit, action or proceeding be initiated in any other forum, Merchant and each Owner/Guarantor waive any right to oppose any motion or application made by FUNDER to transfer such suit, action or proceeding to the Acceptable Forum.

4.8 **Survival of Representation, etc.** All representations, warranties and covenants herein and in the Merchant Security Agreement and Guaranty shall survive the execution and delivery of this Agreement and the Merchant Security Agreement and Guaranty and shall continue in full force until all obligations under this Agreement and the Merchant Security Agreement and Guaranty shall have been satisfied in full and this Agreement and the Merchant Security Agreement and Guaranty shall have terminated.

4.9 **Severability.** In case any of the provisions in this Agreement or the Merchant Security Agreement and Guaranty is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein or therein shall not in any way be affected or impaired.

4.10 **Entire Agreement.** Any provision hereof or of the Merchant Security Agreement and Guaranty prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof or thereof. This Agreement and the Merchant Security Agreement and Guaranty embody the entire agreement between Merchant, each Owner/Guarantor and FUNDER and supersede all prior agreements and understandings relating to the subject matter hereof.

CFN MCA 01-25-16                Colonial Funding Network as Servicing Agent

**4.12. ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* THIS SECTION PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT (FAA), AND SHALL BE INTERPRETED IN THE BROADEST WAY THE LAW WILL ALLOW.

**Covered claims**
- You or we may arbitrate any claim, dispute or controversy between you and us arising out of or related to your account, a previous related account or our relationship (called "Claims").
- If arbitration is chosen by any party, neither you nor we will have the right to litigate that Claim in court or have a jury trial on that Claim.
- Except as stated below, all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims. This also includes Claims made by or against anyone connected with us or you or claiming through us or you, or by someone making a claim through us or you, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.

**Arbitration limits**
- Individual Claims filed in a small claims court are not subject to arbitration, as long as the matter stays in small claims court.
- We won't initiate arbitration to collect a debt from you unless you choose to arbitrate or assert a Claim against us. If you assert a Claim against us, we can choose to arbitrate, including actions to collect a debt from you. You may arbitrate on an individual basis Claims brought against you, including Claims to collect a debt.
- Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis. The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis. If arbitration is chosen by any party, neither you nor we may pursue a Claim as part of a class action or other representative action. Claims of 2 or more persons may not be combined in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

**How arbitration works**
- Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA arbitration rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision. You can obtain copies of the AAA Rules at the AAA's website (www.adr.org) or by calling 800-778-7879. You or we may choose to have a hearing, appear at any

hearing by phone or other electronic means, and/or be represented by counsel. Any in-person hearing will be held in the same city as the U.S. District Court closet to your billing address.
- Arbitration may be requested any time, even where there is a pending lawsuit, unless a trial has begun or a final judgment entered. Neither you nor we waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, motion, or discovery in a court lawsuit. To choose arbitration, a party may file a motion to compel arbitration in a pending matter and/or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.
- The arbitration shall be conducted by a single arbitrator in accord with this arbitration provision and the AAA Rules, which may limit discovery. The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of either party if requested so to do. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statute of limitations, and may award damages or other relief under applicable law.
- The arbitrator shall make any award in writing and, if requested by you or us, may provide a brief statement of the reasons for the award. An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

**Paying for arbitration fees**
- We will pay your share of the arbitration fee for an arbitration of Claims of $75,000 or less if they are unrelated to debt collection. Otherwise, arbitration fees will be allocated according to the applicable AAA Rules. If we prevail, we may not recover our arbitration fees, unless the arbitrator decides you Claim was frivolous. All parties are responsible for their own attorney's fees, expert fees and any other expenses, unless the arbitrator awards such fees or expenses to you or us based on applicable law.

**The final award**
- Any award by an arbitrator is final unless a party appeals it in writing to the AAA within 30 days of notice of the award. The arbitration appeal shall be determined by a panel of 3 arbitrators. The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration, and will make decisions based on a majority vote. Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules. An award by a panel on appeal is final. A final award is subject to judicial review as provided by applicable law.

**Survival and Severability of Terms**
- This arbitration provision shall survive changes in this Agreement and termination of the account or the relationship between you and us, including the bankruptcy of any party and any sale of your account, or amounts owed on your account, to another person or entity. If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative Claim. This arbitration provision may not be amended, severed or waived, except as provided in this Agreement or in a written agreement between you and us.

**4.11 Facsimile Acceptance.** Facsimile signatures shall be deemed acceptable for all purposes

**4.13 Counterparts; Facsimile and PDF Acceptance.** This Agreement and the Merchant Security Agreement and Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument. Signatures on this Agreement and the Merchant Security Agreement and Guaranty sent by facsimile or PDF will be treated as original signatures for all purposes.

INITIALS: _____

**Origination Fee Schedule (From 3.7)**

| Amount Funded | Origination Fee |
|---|---|
| Up to $7,500.00 | $199.00 |
| $7,501.00-$25,000.00 | $295.00 |
| $25,000.00-$50,000.00 | $395.00 |
| $50,001.00-$100,000.00 | $595.00 |
| $100,001.00-$250,000.00 | $795.00 |
| Over $250,000.00 | $995.00 |
| Due diligence Fee | $0.00 |
| Administrative Fee | $0.00 |
| UCC Termination Fee | $150 |

*** All fees listed in this contract are subject to change.

INITIALS: _____

CFN MCA 01-25-16                 Colonial Funding Network as Servicing Agent

## MERCHANT SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: SAMMY'S GRILL LLC 3

D/B/A: Sammy's Sports Grill 3

Physical Address: 7035 W. Grand Parkway   City: Richmond        State: TX        Zip: 77406
#99

Federal ID#:

### SECURITY AGREEMENT

**Security Interest.** To secure Merchant's payment and performance obligations to FUNDER and its affiliates or the Funders, a list of which may be provided to the Merchant if requested in writing after the funding of the purchase closes under the Merchant Cash Advance Agreement between Merchant and FUNDER (the "Merchant Agreement"), Merchant hereby grants to FUNDER a security interest in all personal property of Merchant, including all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, as those terms are defined in Article 9 of the Uniform Commercial Code of the State of New York as amended (the "UCC"), whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of such property, as that term is defined in Article 9 of the UCC (collectively, the "Collateral"). If the Merchant Agreement identifies more than one Merchant, this Security Agreement applies to each Merchant, jointly and severally.

Merchant acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Merchant and FUNDER will secure the obligations hereunder, and that the Merchant's payment and performance obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Collateral.

Merchant further acknowledges and agrees that, if Merchant enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Security Agreement, and that the Merchant's payment and performance obligations, and the Collateral granted, under such future Agreements, will relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC_3 statement, perfecting FUNDER's interest in the Collateral.

**Cross-Collateral.** To secure Guarantor's payment and performance obligations to FUNDER(and the Funders) under this Merchant Security Agreement and Guaranty (this "Agreement"), each Guarantor hereby grants FUNDER, for itself and its participants, a security interest in Sammy's Grill LLC 2  (d/b/a Sammy's Sports Grill 2), SAMMY'S GRILL LLC 3 (d/b/a Sammy's Sports Grill 3) (the "Additional Collateral"). Each Guarantor agrees and acknowledges that FUNDER will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Guarantor acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Guarantor and FUNDER will secure the obligations hereunder, and that the Guarantor's payment and performance obligations under this Agreement, and the Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Additional Collateral.

Guarantor further acknowledges and agreements that, if Guarantor enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Agreement, and that the Guarantor's payment and performance obligations, and the Additional Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interesting the Additional Collateral.

Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as FUNDER deems necessary to perfect or maintain FUNDER's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements. Each of Merchant and each Guarantor hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's security interest, which financing statements may contain notification that Merchant and each Guarantor have granted a negative pledge to FUNDER with respect to the Collateral and Additional Collateral, and that any subsequent lender or lienor may be tortiously interfering with FUNDER's rights. Merchant and each Guarantor shall be jointly and severally liable for and shall pay to FUNDER upon demand all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in protecting, preserving and enforcing FUNDER's security interest and rights.

**Negative Pledge.** Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral and Additional Collateral, as applicable without written permission of FUNDER.

**Consent to Enter Premises and Assign Lease.** FUNDER shall have the right to cure Merchant's default in the payment of rent for the Premises on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FUNDER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FUNDER may enter into an agreement with Merchant's landlord giving FUNDER the right: (a) to enter the Premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at the Premises.

**Remedies.** Upon any Event of Default, FUNDER may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing to FUNDER, whether by acceleration or otherwise.

### GUARANTY

**Performance Guaranty.** Each undersigned Guarantor ("Guarantor") hereby unconditionally guarantees to FUNDER, and its affiliates or the Funders, , the payment and performance by Merchant of all of its obligations under this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified from time to time (the "Guaranteed Obligations"). Guarantor shall be liable for and FUNDER may charge and collect all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in connection with the collection of any or all of the Guaranteed Obligations from Guarantor or the enforcement of this Agreement. (It is understood by all parties that this Guaranty is not an absolute personal guaranty of payment and that the signors are only guaranteeing that they will not take any action or permit the merchant to take any action that is a breach of this agreement.)

**Guarantor Waivers.** In the event that Merchant fails to make a payment when due or otherwise perform under the Merchant Agreement, FUNDER may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral FUNDER may hold pursuant to this Agreement or any other guaranty.

FUNDER does not have to notify Guarantor of any of the following events and Guarantor will not be released from any of its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any material or adverse change in Merchant's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, or any other guarantee of the Guaranteed Obligations; (iv) FUNDER's acceptance of this Agreement; or (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FUNDER. In addition, FUNDER may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FUNDER; (ii) release Merchant from its obligations to FUNDER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to FUNDER

under the Merchant Agreement and this Agreement are paid and performed in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FUNDER must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount. Guarantor agrees that its obligations under this Agreement shall be irrevocable and shall be unconditional irrespective of any circumstance that might otherwise operate as a legal or equitable discharge of a guarantor or a defense of a guarantor.

Guarantor Acknowledgement.  Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Agreement and that any misrepresentation may constitute fraud; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

INITIALS: _____

Joint and Several Liability.  The obligations hereunder of each Guarantor are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT. CAPITALIZED TERMS NOT DEFINED IN THIS AGREEMENT SHALL HAVE THE MEANINGS SET FORTH IN THE MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS.

MERCHANTS AND OWNERS/GUARANTORS ACKNOWLEDGE THAT THIS WRITING REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO. IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS OF ANY PARTY IF NOT INCLUDED IN THIS WRITTEN AGREEMENT ARE CONSIDERED NULL AND VOID. ANY MODIFICATION OR OTHER ALTERATION TO THE AGREEMENT MUST BE IN WRITING AND EXECUTED BY THE PARTIES TO THIS CONTRACT.

INITIALS: _____

MERCHANT #1
By _Sammy Vela_____
SS/          (Print Name and Title)

_____
(Signature)
Drivers License Number:

MERCHANT #2
By _____
SS#          (Print Name and Title)

_____
(Signature)
Drivers License Number:

OWNER/GUARANTOR #1
By _Sammy Vela_____
SS#          (Print Name and Title)

_____
(Signature)
Drivers License Number:

OWNER/GUARANTOR #2
By _____
SS#          (Print Name and Title)

_____
(Signature)
Drivers License Number:

CFN MCA 01-25-16                    Colonial Funding Network as Servicing Agent

# Trust Capital Funding

## MERCHANT CASH ADVANCE AGREEMENT

Agreement dated <u>October 26 2016</u> between Trust Capital Funding. ("FUNDER") doing business at 10 Kearney Rd Suite, 102 Needham, MA 02494 and the merchant listed below ("the <u>Merchant</u>").

### MERCHANT INFORMATION

Merchant's Legal Name: <u>Sammy's Grill LLC 2</u>
D/B/A: <u>Sammys Sports Grill 2</u>
Type of entity: ( ) Corporation  ( X ) Limited Liability Company  ( ) Limited Partnership  ( ) Limited Liability Partnership  ( ) Sole Proprietor      State of Incorporation / Organization: TX
Physical Address: <u>9550 Spring Green Blvd Ste 400</u>      City: Katy      State: TX
Date business started (mm/yy): 08/14      Federal ID# :      Zip: <u>77494-3759</u>

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to FUNDER, as the lead purchaser for itself and other co-investors, (making FUNDER on behalf of itself and all co-investors (collectively the Funders), the absolute owner] in consideration of the purchase price specified below (the "<u>Purchase Price</u>"), all of Merchant's future accounts, contract rights and other rights to payment arising from or relating to the use by Merchant's customers of cash, credit cards, charge cards, debit cards, prepaid cards, mobile payments and other similar payment methods in the ordinary course of Merchant's business (the "<u>Receipts</u>") for the payment of Merchant's sale of goods or rendition of services until the purchased amount specified below (the "<u>Purchased Amount</u>") has been delivered by Merchant to FUNDER, provided that the Purchase Price, the Specified Percentage (as defined below) and/or the Purchased Amount may be adjusted by FUNDER and Merchant in writing if one or more card processing conditions are not satisfied.

The Purchased Amount shall be paid to FUNDER by Merchant's using and irrevocably authorizing <u>only</u> one card processor acceptable to FUNDER ("Processor") to remit to or for the benefit of FUNDER the percentage specified below (the "<u>Specified Percentage</u>") of Merchant's settlement amounts due from each card issuer with respect to the Receipts, until such time as FUNDER receives payment in full of the Purchased Amount. Furthermore Merchant will not enter into another cash advance agreement or any other type of factoring agreement, or any other type of credit/debit card processing during the term of this contract. Notwithstanding anything to the contrary in this Agreement or any other agreement between FUNDER and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

Purchase Price: $160,000.00          Specified Percentage: 23%          Receipts Purchased Amount: $228,800.00

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", THE "MERCHANT SECURITY AGREEMENT AND GUARANTY" AND "ADMINISTRATIVE FORM" [Note: Is there a separate Administrative Form] ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

MERCHANT #1
By _Sammy Vela_____        _____
    (Print Name and Title)                 (Signature)

MERCHANT #2
By _____        _____
    (Print Name and Title)                 (Signature)

OWNER/GUARANTOR #1
By _Sammy Vela_____        _____
    (Print Name and Title)                 (Signature)

OWNER/GUARANTOR #2
By _____        _____
    (Print Name and Title)                 (Signature)

Trust Capital Funding
By _Mark Wesolowski_____        _____
    (Company Officer)                      (Signature)

Each person signing this Agreement on behalf of Merchant represents that he or she is authorized to sign this Agreement on behalf of Merchant, and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor represents that the information provided herein and in all of FUNDER's forms is true, accurate and complete in all respects. FUNDER may produce a monthly statement reflecting the delivery of the Specified Percentage of Receipts from Merchant to FUNDER and its participants via Processor. ANY MISREPRESENTATION MADE BY MERCHANT OR ANY OWNER/GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.

---

AUTHORIZED SERVICING AGENT – Colonial Funding Network, Inc.
Colonial Funding Network, Inc. (Colonial) is the Authorized Servicing Agent of the FUNDER for this contract providing administrative, bookkeeping, reporting and support services for the FUNDER and the Merchant. Colonial is not affiliated or owned by the FUNDER and is acting as independent agent for services including but not limited to background checks, credit checks, underwriting review, filing UCC-1 security interests, cash management, account reporting and remit capture. Colonial may at its sole discretion participate in this financing by providing a small portion of the funds for this transaction directly to the FUNDER. Colonial is not a credit card processor, or in the business of processing credit cards. Merchant hereby acknowledges that in no event will Colonial be liable for any claims made against the FUNDER or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by the Merchant and Owner/Guarantor.

MERCHANT #1
By _Sammy Vela_____        _____
    (Print Name and Title)                 (Signature)

---

CFN MCA 01-25-16                    Colonial Funding Network as Servicing Agent

## MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS

### I. TERMS OF ENROLLMENT IN PROGRAM

1.1 **Merchant Cash Advance Agreement.** These terms and conditions shall be incorporated in and made a part of the attached Merchant Cash Advance Agreement (such Merchant Cash Advance Agreement, as supplemented by these terms and conditions, this "Agreement").

1.2 **Merchant Processing Agreement.** Merchant shall execute an agreement (the "Merchant Processing Agreement") acceptable to FUNDER, with a card processor acceptable to FUNDER, to obtain card processing services. Merchant shall authorize Processor to deduct the amounts owed to FUNDER for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from Processor card transactions and to pay such amounts to FUNDER pursuant to FUNDER's instructions to Processor. The authorization shall be irrevocable without the written consent of FUNDER. Processor may rely upon the instructions of FUNDER, without any independent verification, in making such deductions and payments, and Merchant waives any claims for damages it may have against Processor in connection with such acts unless such damages were due to Processor's failure to follow FUNDER's instructions.

1.3 **Purchase Price Reduction.** FUNDER may, in its sole discretion, reduce the Purchase Price if one or more card processing conditions are not satisfied.

1.4 **Bridge / Control Account.** Merchant may be required to open a new bank account into which 100% of the settlement amounts will be deposited and the Specified Percentage collected by FUNDER (the "Bridge / Control Account"). Merchant appoints FUNDER as "Acting Agent" over the Bridge / Control Account, and shall instruct Processor to designate the Bridge / Control Account as the deposit account for all of Merchant's customers' card transactions. Merchant assumes all responsibility for all fees, costs, charge-backs or suspicious items processed through the Bridge / Control Account (see "Miscellaneous Service Fees" paragraph 3.7). Merchant agrees to maintain a minimum balance in the Bridge / Control Account (the "Minimum Balance") equal to the per-month average of all fees charged to Merchant by Processor, averaged over a six-month period.

1.5 **Financial Condition.** Merchant and each Owner/Guarantor authorize FUNDER, its agents and representatives, and any credit reporting agency engaged by FUNDER, to investigate their creditworthiness, financial responsibility and history, and they agree to provide FUNDER any financial statements, tax returns, references, or other credit or financial information as FUNDER deems necessary prior to or after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of credit and financial information. Merchant and each Owner/Guarantor authorize FUNDER to update their credit and financial profile from time to time in the future, as FUNDER deems appropriate. An investigative or consumer report may be made or obtained in connection with this Agreement.

1.6 **Transactional History.** Merchant authorizes Processor and each of Merchant's banks to provide FUNDER upon request with Merchant's card history or bank statements, as applicable.

1.7 **Indemnification.** Merchant and each Owner/Guarantor jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by FUNDER for monies owed to FUNDER from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by FUNDER.

1.8 **No Liability.** In no event will Processor and FUNDER

(or any of the Funders) be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and each Owner/Guarantor.

1.9 **Reliance on Terms.** Sections 1.2, 1.7, 1.8, 2.5, and 4.6 hereof are agreed to for the benefit of Merchant, FUNDER (and it's Participants) and Processor, and notwithstanding the fact that Processor is not a party to this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

1.10 **Sale of Receipts.** Merchant and FUNDER intend that the transfer of the interest in the Receipts from Merchant to FUNDER constitute a sale, and not a loan, for all purposes. Merchant agrees that the Purchase Price equals the fair market value of such interest. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to FUNDER a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. In no event shall the aggregate of all amounts deemed interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that FUNDER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FUNDER shall promptly refund to Merchant any interest received by FUNDER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FUNDER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's interest in the Receipts.

1.11 **Power of Attorney.** Merchant irrevocably appoints FUNDER and any assignee of FUNDER as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to FUNDER from Processor, or upon the occurrence of an Event of Default under Section 3.1 hereof, to settle all obligations due to FUNDER from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in the Merchant Security Agreement and Guaranty); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FUNDER; and (v) to file any claims or take any action or institute any proceeding which FUNDER may deem necessary for the collection of any unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

1.12 **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor, in respect of himself or herself personally, authorizes FUNDER to disclose to any third party information concerning Merchant's and each Owner's/Guarantor's credit standing (including credit bureau reports that FUNDER obtains) and business conduct. Merchant and each Owner/Guarantor hereby waive to the maximum extent permitted by law any claim for damages against FUNDER or any of its affiliates and the Funders relating to any (i) investigation undertaken by or on behalf of FUNDER as permitted by this Agreement or (ii) disclosure of information as

permitted by this Agreement.

1.13 **Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by FUNDER, including this Agreement, the Merchant Security Agreement and Guaranty and any other documents executed in connection with such agreements (collectively, "Confidential Information") are proprietary and confidential information of FUNDER. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to not disclose Confidential Information to any person in accordance with the terms of this Section 1.13.

1.14 **Publicity.** Merchant and each Owner/Guarantor authorize FUNDER to use their respective names in a listing of clients and in advertising and marketing materials.

1.15 **D/B/A's.** Merchant and each Owner/Guarantor hereby acknowledge and agree that FUNDER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FUNDER and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

1.16 **Financial Information.** Merchant and each Owner/Guarantor shall provide to FUNDER upon request copies of financial statements representing the financial condition of Merchant and/or such Owner/Guarantor.

### II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant and each Owner/Guarantor each represents, warrants and covenants that as of the date of this Agreement and on each date during the term of this Agreement:

2.1 **Financial Condition and Financial Information.** Its financial statements, copies of which have been furnished to FUNDER, and any financial statements furnished to FUNDER hereafter, fairly represent the financial condition of Merchant and each Owner/Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material adverse change in its financial condition, operation or ownership.

2.2 **Governmental Approvals.** Merchant is and will remain in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

2.3 **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to execute this Agreement and to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 **Insurance.** Merchant has and will maintain business-interruption insurance naming FUNDER as loss payee and additional insured in such amounts and against such risks as are satisfactory to FUNDER and shall provide FUNDER proof of such insurance upon request.

2.5 **Merchant Processing Agreement and Arrangements.** Without FUNDER's prior written consent, Merchant will not: (i) change the card processor through which the Receipts are settled from Processor to another card processor; (ii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another processor; (iii) change its arrangements with Processor or amend the Merchant Processing Agreement in any way that is adverse to FUNDER; (iv) add card processing terminals; (v) use multiple card processing terminals; (vi) change its financial institution or bank account(s) (including, if applicable, the Bridge / Control Account); (vii) take any other action that could have any adverse effect upon Merchant's obligations under this Agreement or FUNDER's interest in the Receipts; or (viii) take any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor, or to induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor, or permit any event to occur that could have an adverse effect on the use, acceptance, or authorization of cards for the purchase of Merchant's services and products.

2.6 **Change of Name or Location.** Merchant will not conduct its businesses under any name other than as disclosed to Processor and FUNDER or change any of its places of business.

2.7 **Daily Batch Out.** Merchant will batch out receipts with Processor on a daily basis.

2.8 **Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from FUNDER to Merchant, execute, acknowledge and deliver to FUNDER and/or to any other person, firm or corporation specified by FUNDER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates on which the Purchased Amount or any portion thereof has been paid.

2.9 **No Bankruptcy or Insolvency.** Merchant and Owner/Guarantors represent that they are not Insolvent and neither Merchant nor any Owner/Guarantor has filed any petition for bankruptcy protection under Title 11 of the United States Code, no involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor, neither Merchant nor any Owner/Guarantor has admitted in writing its inability to pay its debts or made a general assignment for the benefit of creditors, and no other proceeding has been instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it insolvent or seeking reorganization, arrangement, adjustment or composition of it or its debts. Merchant does not anticipate filing any such bankruptcy petition and is not aware and has no reason to believe that any such bankruptcy petition or other proceeding will be filed or brought against it or any Owner/Guarantor.

2.10 **Other Financing.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase (such as a merchant cash advance) of, a loan against, or the sale or purchase of credits against, any Receipts, cash deposits or future card or mobile payment sales with any party other than FUNDER without its written permission.

2.11 **Unencumbered Receipts.** Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, FUNDER.

2.12 **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.13 **Default Under Other Contracts.** Merchant's execution of or performance under this Agreement will not cause or create any breach or default by Merchant under any contract with another person or entity.

2.14 **Delivery of Confession of Judgment.** Upon execution of this Agreement, Merchant shall, if requested by FUNDER, deliver to FUNDER an executed Confession of Judgment (the "Confession of Judgment"), in the form provided by FUNDER, in favor of FUNDER in the amount of the Purchased Amount.

2.15 **Delivery of Assignment of Lease.** Merchant and each Owner/Guarantor authorize FUNDER to receive pertinent information regarding the commercial lease for the physical location(s) of Merchant's business (the "Premises") from any applicable leasing company and or agent. Merchant may be asked to deliver to FUNDER an executed Assignment of Lease assigning all of Merchant's right, title and interest in and to the Premises and under the lease for the Premises to FUNDER (the "Assignment of Lease").

2.16 **Sale of Business.** Merchant shall not sell, dispose, transfer or otherwise convey its business or assets without (i) the express prior written consent of FUNDER, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FUNDER.

2.17 **Bridge / Control Account.** If Merchant is required to open a Bridge / Control Account, (i) Merchant will not, unless otherwise directed in writing by FUNDER, take any action to cause the Specified Percentage of the settlement amounts to be settled or delivered to any account other than the Bridge / Control Account and (ii) Merchant will at all times maintain the Minimum Balance in the Bridge / Control Account.

2.18 **Use of Proceeds.** Merchant will conduct its business and use the Purchase Price in the ordinary course of its business, consistent with past practice.

2.19 **Accuracy of Information.** All information provided by Merchant and each Owner/Guarantor to FUNDER herein, in the Merchant Security Agreement and Guaranty, and in all other documents executed in connection with such agreements or related to such agreements is true, accurate and complete in all respects.

**III. EVENTS OF DEFAULT AND REMEDIES**

3.1 **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or any Owner/Guarantor violates any term, covenant or condition in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER; (b) any representation or warranty by Merchant or any Owner/Guarantor in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER shall prove to have been incorrect, incomplete, false or misleading in any material respect when made; (c) Merchant or any Owner/Guarantor admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) any Owner/Guarantor sends a notice of termination of the Merchant Security Agreement and Guaranty; (e) Merchant suspends, dissolves or terminates its business; (f) Merchant sells all or substantially all of its assets; (g) Merchant makes

or sends notice of any intended bulk sale or transfer by Merchant; (h) Merchant performs any act that encumbers the cash flow of the business placing undue stress on the viability of the operations and reduces the value of the Collateral or the security interest granted in the Collateral under the Merchant Security Agreement and Guaranty; (i) any Owner/Guarantor performs any act that reduces the value of the Additional Collateral (as defined in the Merchant Security Agreement and Guaranty) or the security interest granted in the Additional Collateral under the Merchant Security Agreement and Guaranty; or (j) Merchant or any Owner/Guarantor files any petition for bankruptcy under the United States code or an involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor; (k)Merchant or any Owner/Guarantor defaults under any of the terms, covenants and conditions of any other agreement with FUNDER including those with affiliated / associated businesses.

3.2 **Remedies.** Upon the occurrence of an Event of Default that is not waived pursuant to Section 4.4 hereof, FUNDER on its own and on behalf of it's Participants may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Merchant Security Agreement and Guaranty, or pursuant to any other legal or equitable right or remedy. Upon FUNDER's notice to Merchant of any Event of Default, the entire Receipts Purchased Amount and unpaid fees not already paid to FUNDER shall become immediately due and payable to FUNDER. In addition, upon an Event of Default (i) FUNDER may enforce the provisions of the Merchant Security Agreement and Guaranty against each Owner/Guarantor; (ii) FUNDER may enforce its security interest in the Collateral and Additional Collateral; (iii) FUNDER may debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise; (iv) FUNDER may enter the Confession of Judgment as a judgment with the appropriate Clerk of Court and execute thereon; and (v) FUNDER may exercise its rights under the Assignment of Lease. All rights, powers and remedies of FUNDER in connection with this Agreement and the Merchant Security Agreement and Guaranty may be exercised at any time by FUNDER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 **Costs.** Merchant and each Owner/Guarantor shall pay to FUNDER all costs reasonably incurred by FUNDER in connection with (a) any Event of Default including without limitation any breach by Merchant or any Owner/Guarantor of the representations, warranties and covenants in this Agreement or the Merchant Security Agreement and Guaranty, and (b) the enforcement of FUNDER's remedies set forth in Section 3.2 hereof, including but not limited to court costs and attorneys' fees.

**3.4 Required Notifications.** Merchant and each Owner/Guarantor shall give FUNDER written notice within 24 hours of any filing by Merchant or any Owner/Guarantor under Title 11 of the United States Code or of the occurrence of any other event described in Section 3.1(c) hereof. Merchant shall give FUNDER seven days' written notice prior to the closing of any sale of all or substantially all of Merchant's assets or stock. Merchant shall give FUNDER seven days' written notice prior to the suspension, dissolution or terminations its business.

**3.5 Default Fee.** Upon the Occurrence of any Event of Default, and written notice to Merchant thereof, Merchant shall pay to FUNDER a default fee ("Default Fee") of $2,500. This Default Fee shall be payable on demand and stand in addition to any other fees or penalties outlined within this Agreement, the Merchant Security Agreement or Guaranty.

**3.6 Processor Change Fee.** Merchant shall pay a processor change fee (the "Processor Change Fee") to FUNDER in the amount of $5,000.00 in the event that Merchant (i) uses multiple card processing terminals without the prior written consent of FUNDER, (ii) changes its card processor without the prior written consent of FUNDER, or (iii) directs Processor to deliver settlement amounts to any account other than the Bridge / Control Account (if Merchant is required to open a Bridge / Control Account). Such Processor Change Fee (i) shall be due and payable to FUNDER on demand, (ii) is not exclusive of, and is cumulative with, any other fee or amount paid or payable to FUNDER by Merchant pursuant to this Agreement or the Merchant Security Agreement and Guaranty; and (iii) shall not be construed as a waiver of any Event of Default hereunder or under the Merchant Security Agreement and Guaranty or as otherwise operating to reduce or limit FUNDER's rights or remedies provided for hereunder, under the Merchant Security Agreement and Guaranty or at law or in equity.

**3.7 Miscellaneous Service Fees.** Merchant shall pay certain fees for services related to the origination and maintenance of accounts which may include but not be limited to: Merchant funding is done electronically to their designated bank account and charged a fee of $35.00 for a Fed Wire or $15.00 for an ACH. The fee for underwriting and origination is paid from the funded amount in accordance with the schedule below. If Merchant is utilizing a Bridge / Control Account, there is an upfront fee of $395.00 for the bank fees and administrative costs of maintaining such account for each cash advance agreement with Merchant. Fund transfers from Bridge / Control Accounts to Merchant's operating bank account will be charged $10.95 per month via ACH. This fee will continue if the bridge account remains open after the RTR is paid. Merchant will be charged $50.00 for each change of its operating bank account once active with FUNDER. Any administrative adjustments associated with changes to the Specified Percentage will incur a fee of $75.00 per occurrence. (All fees are subject to change.)

INITIALS: _____

## IV. MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, or waiver of any provision of, or consent to any action under, this Agreement or the Merchant Security Agreement and Guaranty shall be effective unless the same is in writing and signed by FUNDER.

**4.2 Assignment.** Merchant acknowledges and understands that FUNDER is acting on its own behalf and as the administrator and lead investor for a group of independent co-investors a list of which can be provided to Merchant after funding and upon written notice to

FUNDER. FUNDER may assign its rights and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty in whole or in part without prior notice to Merchant or any Owner/Guarantor, including, without limitation, its right to receive all or any portion of the Purchased Amount and its obligation to fund all or any portion of the Purchase Price. Merchant acknowledges that, if any such assignment is made, persons other than FUNDER may have the right to exercise rights or remedies against Merchant pursuant to this Agreement. Merchant shall not have, and no Owner/Guarantor shall have, the right to assign its rights and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty or any interest herein or therein without the prior written consent of FUNDER, which consent may be withheld in FUNDER's sole discretion.

**4.3** All notices, requests, consent, demands and other communications hereunder and under the Merchant Security Agreement and Guaranty shall be delivered by ordinary mail, effective upon mailing, to the respective parties to this Agreement and the Merchant Security Agreement and Guaranty at the addresses set forth in this Agreement and shall become effective only upon receipt. The Parties hereto may also send such notices, requests, consent, demands and other communications via facsimile ("FAX") or electronic mail ("Email") at such FAX numbers and email addresses communicated by the parties hereto in writing.

**4.4 Waiver Remedies.** No failure on the part of FUNDER to exercise, and no delay in exercising, any right under this Agreement or the Merchant Security Agreement and Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement or the Merchant Security Agreement and Guaranty preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder and under the Merchant Security Agreement and Guaranty are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Solicitations.** Merchant and each Owner/Guarantor authorize FUNDER and its affiliates to communicate with, solicit and /or market to Merchant and each Owner/Guarantor via regular mail, telephone, email and facsimile in connection with the provision of goods or services by FUNDER, its affiliates or any third party that FUNDER shares, transfers, exchanges, discloses or provides information with and will hold FUNDER, its affiliates and such third parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by and any of the methods described above.

**4.6 Terminated Merchant File and Match File.** Merchant expressly acknowledges that a Terminated Merchant File ("TMF"), or any successor thereto, is maintained by MasterCard or VISA containing the business name and names and identification of principals of merchants which have been terminated for one or more of the reasons specified in MasterCard or VISA operating regulations. Such reasons include, but are not limited to, fraud, counterfeit drafts, unauthorized transactions, excessive charge-backs and retrieval requests, money laundering, or where a high security risk exists. MERCHANT ACKNOWLEDGES THAT PROCESSOR AND FUNDER ARE REQUIRED TO REPORT THE BUSINESS NAME OF MERCHANT AND THE NAMES AND IDENTIFICATION OF ITS PRINCIPALS TO THE TMF WHEN A MERCHANT IS TERMINATED FOR ONE OR MORE OF THE REASONS SPECIFIED IN MASTERCARD OR VISA OPERATING REGULATIONS. MERCHANT EXPRESSLY AGREES AND CONSENTS TO SUCH REPORTING BY PROCESSOR AND FUNDER AND RELEASES EACH FROM ANY DAMAGES FOR DOING SO IN GOOD FAITH.

**4.7 Binding Effect; Governing Law, Venue and**

Colonial Funding Network as Servicing Agent

**Jurisdiction.** This Agreement and the Merchant Security Agreement and Guaranty shall be binding upon and inure to the benefit of Merchant, each Owner/Guarantor, FUNDER (and it's Participants) and their respective successors and assigns. FUNDER's Participants shall be third party beneficiaries of all such agreements. This Agreement and the Merchant Security Agreement and Guaranty shall be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable conflicts of law principles. Any suit, action or proceeding arising hereunder or under the Merchant Security Agreement and Guaranty, or the interpretation, performance or breach hereof or thereof, shall, if FUNDER so elects, be instituted in any court sitting in New York, New York, (the "Acceptable Forum"). Each of Merchant and each Owner/Guarantor agrees that any state or federal court sitting in the Acceptable Forum is convenient to it, hereby irrevocably and unconditionally submits to the personal jurisdiction of any such court and hereby waives any and all objections to jurisdiction or venue. Each of Merchant and each Owner/Guarantor agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon such party and may be enforced in any other courts to whose jurisdiction such party is or may be subject, by suit upon such judgment. Should such suit, action or proceeding be initiated in any other forum, Merchant and each Owner/Guarantor waive any right to oppose any motion or application made by FUNDER to transfer such suit, action or proceeding to the Acceptable Forum.

**4.8 Survival of Representation, etc.** All representations, warranties and covenants herein and in the Merchant Security Agreement and Guaranty shall survive the execution and delivery of this Agreement and the Merchant Security Agreement and Guaranty and shall continue in full force until all obligations under this Agreement and the Merchant Security Agreement and Guaranty have been satisfied in full and this Agreement and the Merchant Security Agreement and Guaranty shall have terminated.

**4.9 Severability.** In case any of the provisions in this Agreement or the Merchant Security Agreement and Guaranty is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein or therein shall not in any way be affected or impaired.

**4.10 Entire Agreement.** Any provision hereof or of the Merchant Security Agreement and Guaranty prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof or thereof. This Agreement and the Merchant Security Agreement and Guaranty embody the entire agreement between Merchant, each Owner/Guarantor and FUNDER and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.12. ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* THIS SECTION PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT (FAA), AND SHALL BE INTERPRETED IN THE BROADEST WAY THE LAW WILL ALLOW.

**Covered claims**

- You or we may arbitrate any claim, dispute or controversy between you and us arising out of or related to your account, a previous related account or our relationship (called "Claims").
- If arbitration is chosen by any party, neither you nor we will have the right to litigate that Claim in court or have a jury trial on that Claim.
- Except as stated below, all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims. This also includes Claims made by or against anyone connected with us or you or claiming through us or you, or by someone making a claim through us or you, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.

**Arbitration limits**

- Individual Claims filed in a small claims court are not subject to arbitration, as long as the matter stays in small claims court.
- We won't initiate arbitration to collect a debt from you unless you choose to arbitrate or assert a Claim against us. If you assert a Claim against us, we can choose to arbitrate, including actions to collect a debt from you. You may arbitrate on an individual basis Claims brought against you, including Claims to collect a debt.
- Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis. The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis. If arbitration is chosen by any party, neither you nor we may pursue a Claim as part of a class action or other representative action. Claims of 2 or more persons may not be combined in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

**How arbitration works**

- Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA arbitration rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision. You can obtain copies of the AAA Rules at the AAA's website (www.adr.org) or by calling 800-778-7879. You or we may choose to have a hearing, appear at any

hearing by phone or other electronic means, and/or be represented by counsel. Any in-person hearing will be held in the same city as the U.S. District Court closest to your billing address.

- Arbitration may be requested any time, even where there is a pending lawsuit, unless a trial has begun or a final judgment entered. Neither you nor we waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, motion, or discovery in a court lawsuit. To choose arbitration, a party may file a motion to compel arbitration in a pending matter and/or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.
- The arbitration shall be conducted by a single arbitrator in accord with this arbitration provision and the AAA Rules, which may limit discovery. The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of either party if requested to do so. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statute of limitations, and may award damages or other relief under applicable law.
- The arbitrator shall make any award in writing and, if requested by you or us, may provide a brief statement of the reasons for the award. An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

**Paying for arbitration fees**

- We will pay your share of the arbitration fee for an arbitration of Claims of $75,000 or less if they are unrelated to debt collection. Otherwise, arbitration fees will be allocated according to the applicable AAA Rules. If we prevail, we may not recover our arbitration fees, unless the arbitrator decides you Claim was frivolous. All parties are responsible for their own attorney's fees, expert fees and any other expenses, unless the arbitrator awards such fees or expenses to you or us based on applicable law.

**The final award**

- Any award by an arbitrator is final unless a party appeals it in writing to the AAA within 30 days of notice of the award. The arbitration appeal shall be determined by a panel of 3 arbitrators. The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration, and will make decisions based on a majority vote. Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules. An award by a panel on appeal is final. A final award is subject to judicial review as provided by applicable law.

**Survival and Severability of Terms**

- This arbitration provision shall survive changes in this Agreement and termination of the account or the relationship between you and us, including the bankruptcy of any party and any sale of your account, or amounts owed on your account, to another person or entity. If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative Claim. This arbitration provision may not be amended, severed or waived, except as provided in this Agreement or in a written agreement between you and us.

**4.11 Facsimile Acceptance.** Facsimile signatures shall be deemed acceptable for all purposes

**4.13 Counterparts; Facsimile and PDF Acceptance.** This Agreement and the Merchant Security Agreement and Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument. Signatures on this Agreement and the Merchant Security Agreement and Guaranty sent by facsimile or PDF will be treated as original signatures for all purposes.

INITIALS: _____

**Origination Fee Schedule (From 3.7)**

| Amount Funded | Origination Fee |
|---|---|
| Up to $7,500.00 | $199.00 |
| $7,501.00-$25,000.00 | $295.00 |
| $25,000.00-$50,000.00 | $395.00 |
| $50,001.00-$100,000.00 | $595.00 |
| $100,001.00-$250,000.00 | $795.00 |
| Over $250,000.00 | $995.00 |

| | |
|---|---|
| Due diligence Fee | $0.00 |
| Administrative Fee | $0.00 |
| UCC Termination Fee | $150 |

**\*\*\* All fees listed in this contract are subject to change.**

INITIALS: _____

CFN MCA 01-25-16                Colonial Funding Network as Servicing Agent

## MERCHANT SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: Sammy's Grill LLC 2

D/B/A: Sammy's Sports Grill 2

Physical Address: 9550 Spring Green Blvd Ste 400     City: Katy     State: TX     Zip: 77494-3759

Federal ID#

### SECURITY AGREEMENT

**Security Interest.** To secure Merchant's payment and performance obligations to FUNDER and its affiliates or the Funders, a list of which may be provided to the Merchant if requested in writing after the funding of the purchase closes under the Merchant Cash Advance Agreement between Merchant and FUNDER (the "Merchant Agreement"), Merchant hereby grants to FUNDER a security interest in all personal property of Merchant, including all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, as those terms are defined in Article 9 of the Uniform Commercial Code of the State of New York as amended (the "UCC"), whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of such property, as that term is defined in Article 9 of the UCC (collectively, the "Collateral"). If the Merchant Agreement identifies more than one Merchant, this Security Agreement applies to each Merchant, jointly and severally.

Merchant acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Merchant and FUNDER will secure the obligations hereunder, and that the Merchant's payment and performance obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Collateral.

Merchant further acknowledges and agrees that, if Merchant enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Security Agreement, and that the Merchant's payment and performance obligations, and the Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Collateral.

**Cross-Collateral.** To secure Guarantor's payment and performance obligations to FUNDER(and the Funders) under this Merchant Security Agreement and Guaranty (this "Agreement"), each Guarantor hereby grants FUNDER, for itself and its participants, a security interest in Sammys Grill, LLC/ STADIA BAR & GRILL LICENSING CO LLC (d/b/a Stadia Bar and Grill/ STADIA SPORTS GRILL), SAMMY'S GRILL LLC 3 (d/b/a Sammy's Sports Grill 3) (the "Additional Collateral"). Each Guarantor agrees and acknowledges that FUNDER will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Guarantor acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Guarantor and FUNDER will secure the obligations hereunder, and that the Guarantor's payment and performance obligations under this Agreement, and the Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Additional Collateral.

Guarantor further acknowledges and agreements that, if Guarantor enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Agreement, and that the Guarantor's payment and performance obligations, and the Additional Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interesting the Additional Collateral.

Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as FUNDER deems necessary to perfect or maintain FUNDER's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements. Each of Merchant and each Guarantor hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's security interest, which financing statements may contain notification that Merchant and each Guarantor have granted a negative pledge to FUNDER with respect to the Collateral and Additional Collateral, and that any subsequent lender or lienor may be tortiously interfering with FUNDER's rights. Merchant and each Guarantor shall be jointly and severally liable for and shall pay to FUNDER upon demand all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in protecting, preserving and enforcing FUNDER's security interest and rights.

**Negative Pledge.** Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral or Additional Collateral, as applicable without written permission of FUNDER.

**Consent to Enter Premises and Assign Lease.** FUNDER shall have the right to cure Merchant's default in the payment of rent for the Premises on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FUNDER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FUNDER may enter into an agreement with Merchant's landlord giving FUNDER the right: (a) to enter the Premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at the Premises.

**Remedies.** Upon any Event of Default, FUNDER may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing to FUNDER, whether by acceleration or otherwise.

### GUARANTY

**Performance Guaranty.** Each undersigned Guarantor ("Guarantor") hereby unconditionally guarantees to FUNDER, and its affiliates or the Funders, , the payment and performance by Merchant of all of its obligations under this Agreement and the Merchant Agreement, as such agreement may be renewed, amended, extended or otherwise modified from time to time (the "Guaranteed Obligations"). Guarantor shall be liable for and FUNDER may charge and collect all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in connection with the collection of any or all of the Guaranteed Obligations from Guarantor or the enforcement of this Agreement. (It is understood by all parties that this Guaranty is not an absolute personal guaranty of payment and that the signors are only guaranteeing that they will not take any action or permit the merchant to take any action that is a breach of this agreement.)

**Guarantor Waivers.** In the event that Merchant fails to make a payment when due or otherwise perform under the Merchant Agreement, FUNDER may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral FUNDER may hold pursuant to this Agreement or any other guaranty.

FUNDER does not have to notify Guarantor of any of the following events and Guarantor will not be released from any of its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any material or adverse change in Merchant's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, or any other guarantee of the Guaranteed Obligations; (iv) FUNDER's acceptance of this Agreement; or (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FUNDER. In addition, FUNDER may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FUNDER; (ii) release Merchant from its obligations to FUNDER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to FUNDER under the Merchant Agreement and this Agreement are paid and performed in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts

CFN MCA 01-25-16                    Colonial Funding Network as Servicing Agent

paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FUNDER must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount. Guarantor agrees that its obligations under this Agreement shall be irrevocable and shall be unconditional irrespective of any circumstance that might otherwise operate as a legal or equitable discharge of a guarantor or a defense of a guarantor.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Agreement and that any misrepresentation may constitute fraud; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

INITIALS:

**Joint and Several Liability.** The obligations hereunder of each Guarantor are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT. CAPITALIZED TERMS NOT DEFINED IN THIS AGREEMENT SHALL HAVE THE MEANINGS SET FORTH IN THE MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS.

MERCHANTS AND OWNERS/GUARANTORS ACKNOWLEDGE THAT THIS WRITING REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO. IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS OF ANY PARTY IF NOT INCLUDED IN THIS WRITTEN AGREEMENT ARE CONSIDERED NULL AND VOID. ANY MODIFICATION OR OTHER ALTERATION TO THE AGREEMENT MUST BE IN WRITING AND EXECUTED BY THE PARTIES TO THIS CONTRACT.

INITIALS:

MERCHANT #1
By Sammy Vela
SS# _____ (Print Name and Title)

(Signature)
Drivers License Number:

MERCHANT #2
By _____
SS# _____ (Print Name and Title)

(Signature)
Drivers License Number:

OWNER/GUARANTOR #1
By Sammy Vela
SS# _____ (Print Name and Title)

(Signature)
Drivers License Number:

OWNER/GUARANTOR #2
By _____
SS# _____ (Print Name and Title)

(Signature)
Drivers License Number:

# Trust Capital Funding

## MERCHANT CASH ADVANCE AGREEMENT

Agreement dated <u>November 9 2016</u> between **Trust Capital Funding**. ("**FUNDER**") doing business at 10 Kearney Rd Suite, 102 Needham, MA 02494 and the merchant listed below ("**the Merchant**").

### MERCHANT INFORMATION

Merchant's Legal Name: <u>SAMMY'S GRILL, LLC 5</u>

D/B/A: <u>Sammy's Sports Grill</u>

Type of entity: ( ) Corporation ( X ) Limited Liability Company ( ) Limited Partnership ( ) Limited Liability Partnership ( ) Sole Proprietor    State of Incorporation / Organization: <u>TX</u>

Physical Address: <u>3555 Rayford Rd, Suite 100</u>    City: <u>Spring</u>    State: <u>TX</u>    Zip: <u>77380</u>

Date business started (mm/yy): <u>08/16</u>    Federal ID#

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to FUNDER, as the lead purchaser for itself and other co-investors, [making FUNDER on behalf of itself and all co-investors (collectively the Funders), the absolute owner] in consideration of the purchase price specified below (the "<u>Purchase Price</u>"), all of Merchant's future accounts, contract rights and other rights to payment arising from or relating to the use by Merchant's customers of cash, credit cards, charge cards, debit cards, prepaid cards, mobile payments and other similar payment methods in the ordinary course of Merchant's business (the "<u>Receipts</u>") for the payment of Merchant's sale of goods or rendition of services until the purchased amount specified below (the "<u>Purchased Amount</u>") has been delivered by Merchant to FUNDER, provided that the Purchase Price, and the Specified Percentage (as defined below) and/or the Purchased Amount may be adjusted by FUNDER and Merchant in writing if one or more card processing conditions are not satisfied.

The Purchased Amount shall be paid to FUNDER by Merchant's using and irrevocably authorizing <u>only one</u> card processor acceptable to FUNDER ("Processor") to remit to or for the benefit of FUNDER the percentage specified below (the "<u>Specified Percentage</u>") of Merchant's settlement amounts due from each card issuer with respect to the Receipts, until such time as FUNDER receives payment in full of the Purchased Amount. Furthermore Merchant will not enter into another cash advance agreement or any other type of factoring agreement, or any other type of credit/debit card processing during the term of this contract. Notwithstanding anything to the contrary in this Agreement or any other agreement between FUNDER and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

Purchase Price: $100,000.00          Specified Percentage: 18%          Receipts Purchased Amount: $143,000.00

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", THE "MERCHANT SECURITY AGREEMENT AND GUARANTY" AND "ADMINISTRATIVE FORM" [Note: Is there a separate Administrative Form] ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

MERCHANT #1
By <u>Sammy Vela</u>
    (Print Name and Title)                              (Signature)

MERCHANT #2
By _____
    (Print Name and Title)                              (Signature)

OWNER/GUARANTOR #1
By <u>Sammy Vela</u>
    (Print Name and Title)                              (Signature)

OWNER/GUARANTOR #2
By _____
    (Print Name and Title)                              (Signature)

Trust Capital Funding
By Mark Wesalawsk.
    (Company Officer)                                (Signature)

Each person signing this Agreement on behalf of Merchant represents that he or she is authorized to sign this Agreement on behalf of Merchant, and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor represents that the information provided herein and in all of FUNDER's forms is true, accurate and complete in all respects. FUNDER may produce a monthly statement reflecting the delivery of the Specified Percentage of Receipts from Merchant to FUNDER and its participants via Processor.
ANY MISREPRESENTATION MADE BY MERCHANT OR ANY OWNER/GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.

AUTHORIZED SERVICING AGENT – Colonial Funding Network, Inc.
Colonial Funding Network, Inc. (Colonial) is the Authorized Servicing Agent of the FUNDER for this contract providing administrative, bookkeeping, reporting and support services for the FUNDER and the Merchant. Colonial is not affiliated or owned by the FUNDER and is acting as independent agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting and remit capture. Colonial may at its sole discretion participate in this financing by providing a small portion of the funds for this transaction directly to the FUNDER. Colonial is not a credit card processor, or in the business of processing credit cards. Merchant hereby acknowledges that in no event will Colonial be liable for any claims made against the FUNDER or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by the Merchant and Owner/Guarantor.

MERCHANT #1
By <u>Sammy Vela</u>
    (Print Name and Title)                              (Signature)

CFN MCA 01-25-16          Colonial Funding Network as Servicing Agent

## MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS

**I. TERMS OF ENROLLMENT IN PROGRAM**

1.1 **Merchant Cash Advance Agreement.** These terms and conditions shall be incorporated in and made a part of the attached Merchant Cash Advance Agreement (such Merchant Cash Advance Agreement, as supplemented by these terms and conditions, this "Agreement").

1.2 **Merchant Processing Agreement.** Merchant shall execute an agreement (the "Merchant Processing Agreement") acceptable to FUNDER, with a card processor acceptable to FUNDER, to obtain card processing services. Merchant shall authorize Processor to deduct the amounts owed to FUNDER for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from Processor card transactions and to pay such amounts to FUNDER pursuant to FUNDER's instructions to Processor. The authorization shall be irrevocable without the written consent of FUNDER. Processor may rely upon the instructions of FUNDER, without any independent verification, in making such deductions and payments, and Merchant waives any claims for damages it may have against Processor in connection with such acts unless such damages were due to Processor's failure to follow FUNDER's instructions.

1.3 **Purchase Price Reduction.** FUNDER may, in its sole discretion, reduce the Purchase Price if one or more card processing conditions are not satisfied.

1.4 **Bridge / Control Account.** Merchant may be required to open a new bank account into which 100% of the settlement amounts will be deposited and the Specified Percentage collected by FUNDER (the "Bridge / Control Account"). **Merchant appoints FUNDER as "Acting Agent" over the Bridge / Control Account, and shall instruct Processor to designate the Bridge / Control Account as the deposit account for all of Merchant's customers' card transactions. Merchant assumes all responsibility for all fees, costs, charge-backs or suspicious items processed through the Bridge / Control Account (see "Miscellaneous Service Fees" paragraph 3.7). Merchant agrees to maintain a minimum balance in the Bridge / Control Account (the "Minimum Balance") equal to the per-month average of all fees charged to Merchant by Processor, averaged over a six-month period.**

1.5 **Financial Condition.** Merchant and each Owner/Guarantor authorize FUNDER, its agents and representatives, and any credit reporting agency engaged by FUNDER, to investigate their creditworthiness, financial responsibility and history, and they agree to provide FUNDER any financial statements, tax returns, references, or other credit or financial information as FUNDER deems necessary prior to or after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of credit and financial information. Merchant and each Owner/Guarantor authorize FUNDER to update their credit and financial profile from time to time in the future, as FUNDER deems appropriate. An investigative or consumer report may be made or obtained in connection with this Agreement.

1.6 **Transactional History.** Merchant authorizes Processor and each of Merchant's banks to provide FUNDER upon request with Merchant's card history or bank statements, as applicable.

1.7 **Indemnification.** Merchant and each Owner/Guarantor jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by FUNDER for monies owed to FUNDER from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by FUNDER.

1.8 **No Liability.** In no event will Processor or FUNDER (or any of the Funders) be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and each Owner/Guarantor.

1.9 **Reliance on Terms. Sections 1.2, 1.7, 1.8, 2.5, and 4.6 hereof are agreed to for the benefit of Merchant, FUNDER (and it's Participants) and Processor, and notwithstanding the fact that Processor is not a party to this Agreement, Processor may rely upon their terms and raise them as a defense in any action.**

1.10 **Sale of Receipts.** Merchant and FUNDER intend that the transfer of the interest in the Receipts from Merchant to FUNDER constitute a sale, and not a loan, for all purposes. Merchant agrees that the Purchase Price equals the fair market value of such interest. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to FUNDER a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. In no event shall the aggregate of all amounts deemed interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that FUNDER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FUNDER shall promptly refund to Merchant any interest received by FUNDER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FUNDER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's interest in the Receipts.

1.11 **Power of Attorney.** Merchant irrevocably appoints FUNDER and any assignee of FUNDER as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to FUNDER from Processor, or upon the occurrence of an Event of Default under Section 3.1 hereof, to settle all obligations due to FUNDER from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in the Merchant Security Agreement and Guaranty); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FUNDER; and (v) to file any claims or take any action or institute any proceeding which FUNDER may deem necessary for the collection of any unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

1.12 **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor, in respect of himself or herself personally, authorizes FUNDER to disclose to any third party information concerning Merchant's and each Owner's/Guarantor's credit standing (including credit bureau reports that FUNDER obtains) and business conduct. Merchant and each Owner/Guarantor hereby waive to the maximum extent permitted by law any claim for damages against FUNDER or any of its affiliates and the Funders relating to any (i) investigation undertaken by or on behalf of FUNDER as permitted by this Agreement or (ii) disclosure of information as

permitted by this Agreement.

1.13 **Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by FUNDER, including this Agreement, the Merchant Security Agreement and Guaranty and any other documents executed in connection with such agreements or related to such agreements (collectively, "Confidential Information") are proprietary and confidential information of FUNDER. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to not disclose Confidential Information to any person in accordance with the terms of this Section 1.13.

1.14 **Publicity.** Merchant and each Owner/Guarantor authorize FUNDER to use their respective names in a listing of clients and in advertising and marketing materials.

1.15 **D/B/A's.** Merchant and each Owner/Guarantor hereby acknowledge and agree that FUNDER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FUNDER and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

1.16 **Financial Information.** Merchant and each Owner/Guarantor shall provide to FUNDER upon request copies of financial statements representing the financial condition of Merchant and/or such Owner/Guarantor.

**II. REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant and each Owner/Guarantor each represents, warrants and covenants that as of the date of this Agreement and on each date during the term of this Agreement:

2.1 **Financial Condition and Financial Information.** Its financial statements, copies of which have been furnished to FUNDER, and any financial statements furnished to FUNDER hereafter, fairly represent the financial condition of Merchant and each Owner/Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material adverse change in its financial condition, operation or ownership.

2.2 **Governmental Approvals.** Merchant is and will remain in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

2.3 **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to execute this Agreement and to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant has and will maintain business-interruption insurance naming FUNDER as loss payee and additional insured in such amounts and against such risks as are satisfactory to FUNDER and shall provide FUNDER proof of such insurance upon request.

**2.5 Merchant Processing Agreement and Arrangements.** Without FUNDER's prior written consent, Merchant will not: (i) change the card processor through which the Receipts are settled from Processor to another card processor; (ii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another processor; (iii) change its arrangements with Processor or amend the Merchant Processing Agreement in any way that is adverse to FUNDER; (iv) add card processing terminals; (v) use multiple card processing terminals; (vi) change its financial institution or bank account(s) (including, if applicable, the Bridge / Control Account); (vii) take any other action that could have any adverse effect upon Merchant's obligations under this Agreement or FUNDER's interest in the Receipts; or (viii) take any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor, or to induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor, or permit any event to occur that could have an adverse effect on the use, acceptance, or authorization of cards for the purchase of Merchant's services and products.

**2.6 Change of Name or Location.** Merchant will not conduct its businesses under any name other than as disclosed to Processor and FUNDER or change any of its places of business.

**2.7 Daily Batch Out.** Merchant will batch out receipts with Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from FUNDER to Merchant, execute, acknowledge and deliver to FUNDER and/or to any other person, firm or corporation specified by FUNDER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates on which the Purchased Amount or any portion thereof has been paid.

**2.9 No Bankruptcy or Insolvency.** Merchant and Owner/Guarantors represent that they are not Insolvent and neither Merchant nor any Owner/Guarantor has filed any petition for bankruptcy protection under Title 11 of the United States Code, no involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor, neither Merchant nor any Owner/Guarantor has admitted in writing its inability to pay its debts or made a general assignment for the benefit of creditors, and no other proceeding has been instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it insolvent or seeking reorganization, arrangement, adjustment or composition of it or its debts. Merchant does not anticipate filing any such bankruptcy petition and is not aware and has no reason to believe that any such bankruptcy petition or other proceeding will be filed or brought against it or any Owner/Guarantor.

**2.10 Other Financing.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase (such as a merchant cash advance) of, a loan against, or the sale or purchase of credits against, any Receipts, cash deposits or future card or mobile payment sales with any party other than FUNDER without its written permission.

**2.11 Unencumbered Receipts.** Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, FUNDER.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Default Under Other Contracts.** Merchant's execution of or performance under this Agreement will not cause or create any breach or default by Merchant under any contract with another person or entity.

**2.14 Delivery of Confession of Judgment.** Upon execution of this Agreement, Merchant shall, if requested by FUNDER, deliver to FUNDER an executed Confession of Judgment (the "Confession of Judgment"), in the form provided by FUNDER, in favor of FUNDER in the amount of the Purchased Amount.

**2.15 Delivery of Assignment of Lease.** Merchant and each Owner/Guarantor authorize FUNDER to receive pertinent information regarding the commercial lease for the physical location(s) of Merchant's business (the "Premises") from any applicable leasing company and or agent. Merchant may be asked to deliver to FUNDER an executed Assignment of Lease assigning all of Merchant's right, title and interest in and to the Premises and under the lease for the Premises to FUNDER (the "Assignment of Lease").

**2.16 Sale of Business.** Merchant shall not sell, dispose, transfer or otherwise convey its business or assets without (i) the express prior written consent of FUNDER, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FUNDER.

**2.17 Bridge / Control Account.** If Merchant is required to open a Bridge / Control Account, (i) Merchant will not, unless otherwise directed in writing by FUNDER, take any action to cause the Specified Percentage of the settlement amounts to be settled or delivered to any account other than the Bridge / Control Account and (ii) Merchant will at all times maintain the Minimum Balance in the Bridge / Control Account.

**2.18 Use of Proceeds.** Merchant will conduct its business and use the Purchase Price in the ordinary course of its business, consistent with past practice.

**2.19 Accuracy of Information.** All information provided by Merchant and each Owner/Guarantor to FUNDER herein, in the Merchant Security Agreement and Guaranty, and in all other documents executed in connection with such agreements or related to such agreements is true, accurate and complete in all respects.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or any Owner/Guarantor violates any term, covenant or condition in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER; (b) any representation or warranty by Merchant or any Owner/Guarantor in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER shall prove to have been incorrect, incomplete, false or misleading in any material respect when made; (c) Merchant or any Owner/Guarantor admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) any Owner/Guarantor sends a notice of termination of the Merchant Security Agreement and Guaranty; (e) Merchant suspends, dissolves or terminates its business; (f) Merchant sells all or substantially all of its assets, (g) Merchant makes or sends notice of any intended bulk sale or transfer by Merchant; (h) Merchant performs any act that encumbers the cash flow of the business placing undue stress on the viability of the operations and reduces the value of the Collateral or the security interest granted in the Collateral under the Merchant Security Agreement and Guaranty; (i) any Owner/Guarantor performs any act that reduces the value of the Additional Collateral (as defined in the Merchant Security Agreement and Guaranty) or the security interest granted in the Additional Collateral under the Merchant Security Agreement and Guaranty; or (j) Merchant or any Owner/Guarantor files any petition for bankruptcy under the United States code or an involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor; (k)Merchant or any Owner/Guarantor defaults under any of the terms, covenants and conditions of any other agreement with FUNDER including those with affiliated / associated businesses.

**3.2 Remedies.** Upon the occurrence of an Event of Default that is not waived pursuant to Section 4.4 hereof, FUNDER on its own and on behalf of it's Participants may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Merchant Security Agreement and Guaranty, or pursuant to any other legal or equitable right or remedy. Upon FUNDER's notice to Merchant of any Event of Default, the entire Receipts Purchased Amount and unpaid fees not already paid to FUNDER shall become immediately due and payable to FUNDER. In addition, upon an Event of Default (i) FUNDER may enforce the provisions of the Merchant Security Agreement and Guaranty against each Owner/Guarantor; (ii) FUNDER may enforce its security interest in the Collateral and Additional Collateral; (iii) FUNDER may debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise; (iv) FUNDER may enter the Confession of Judgment as a judgment with the appropriate Clerk of Court and execute thereon; and (v) FUNDER may exercise its rights under the Assignment of Lease. All rights, powers and remedies of FUNDER in connection with this Agreement and the Merchant Security Agreement and Guaranty may be exercised at any time by FUNDER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3 Costs.** Merchant and each Owner/Guarantor shall pay to FUNDER all costs reasonably incurred by FUNDER in connection with (a) any Event of Default including without limitation any breach by Merchant or any Owner/Guarantor of the representations, warranties and covenants in this Agreement or the Merchant Security Agreement and Guaranty, and (b) the enforcement of FUNDER's remedies set forth in Section 3.2 hereof, including but not limited to court costs and attorneys' fees.

3.4 **Required Notifications.** Merchant and each Owner/Guarantor shall give FUNDER written notice within 24 hours of any filing by Merchant or any Owner/Guarantor under Title 11 of the United States Code or of the occurrence of any other event described in Section 3.1(c) hereof. Merchant shall give FUNDER seven days' written notice prior to the closing of any sale of all or substantially all of Merchant's assets or stock. Merchant shall give FUNDER seven days' written notice prior to the suspension, dissolution or terminations its business.

3.5 **Default Fee.** Upon the Occurrence of any Event of Default, and written notice to Merchant thereof, Merchant shall pay to FUNDER a default fee ("Default Fee") of $2,500. This Default Fee shall be payable on demand and stand in addition to any other fees or penalties outlined within this Agreement, the Merchant Security Agreement or Guaranty.

3.6 **Processor Change Fee.** Merchant shall pay a processor change fee (the "Processor Change Fee") to FUNDER in the amount of $5,000.00 in the event that Merchant (i) uses multiple card processing terminals without the prior written consent of FUNDER, (ii) changes its card processor without the prior written consent of FUNDER or (iii) directs Processor to deliver settlement amounts to any account other than the Bridge / Control Account (if Merchant is required to open a Bridge / Control Account). Such Processor Change Fee (i) shall be due and payable to FUNDER on demand, (ii) is not exclusive of, and is cumulative with, any other fee or amount paid or payable to FUNDER by Merchant pursuant to this Agreement or the Merchant Security Agreement and Guaranty; and (iii) shall not be construed as a waiver of any Event of Default hereunder or under the Merchant Security Agreement and Guaranty or as otherwise operating to reduce or limit FUNDER's rights or remedies provided for hereunder, under the Merchant Security Agreement and Guaranty or at law or in equity.

3.7 **Miscellaneous Service Fees.** Merchant shall pay certain fees for services related to the origination and maintenance of accounts which may include but not be limited to: Merchant funding is done electronically to their designated bank account and charged a fee of $35.00 for a Fed Wire or $15.00 for an ACH. The fee for underwriting and origination is paid from the funded amount in accordance with the schedule below. If Merchant is utilizing a Bridge / Control Account, there is an upfront fee of $395.00 for the bank fees and administrative costs of maintaining such account for each cash advance agreement with Merchant. Fund transfers from Bridge / Control Accounts to Merchant's operating bank account will be charged $10.95 per month via ACH. This fee will continue if the bridge account remains open after the RTR is paid. Merchant will be charged $50.00 for each change of its operating bank account once active with FUNDER. Any administrative adjustments associated with changes to the Specified Percentage will incur a fee of $75.00 per occurrence. (All fees are subject to change)

INITIALS: ⟨signature⟩

## IV. MISCELLANEOUS

4.1 **Modifications; Agreements.** No modification, amendment, or waiver of any provision of, or consent to any action under, this Agreement or the Merchant Security Agreement and Guaranty shall be effective unless the same is in writing and signed by FUNDER.

4.2 **Assignment.** Merchant acknowledges and understands that FUNDER is acting on its own behalf and as the administrator and lead investor for a group of independent co-investors a list of which can be provided to Merchant after funding and upon written notice to

FUNDER. FUNDER may assign its rights and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty in whole or in part without prior notice to Merchant or any Owner/Guarantor, including, without limitation, its right to receive all or any portion of the Purchased Amount and its obligation to fund all or any portion of the Purchase Price. Merchant acknowledges that, if any such assignment is made, persons other than FUNDER may have the right to exercise rights or remedies against Merchant pursuant to this Agreement. Merchant shall not have, and no Owner/Guarantor shall have, the right to assign its rights and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty or any interest herein or therein without the prior written consent of FUNDER, which consent may be withheld in FUNDER's sole discretion.

4.3 All notices, requests, consent, demands and other communications hereunder and under the Merchant Security Agreement and Guaranty shall be delivered by ordinary mail, effective upon mailing, to the respective parties to this Agreement and the Merchant Security Agreement and Guaranty at the addresses set forth in this Agreement and shall become effective only upon receipt. The Parties hereto may also send such notices, requests, consent, demands and other communications via facsimile ("FAX") or electronic mail ("Email") at such FAX numbers and email addresses communicated by the parties hereto in writing.

4.4 **Waiver Remedies.** No failure on the part of FUNDER to exercise, and no delay in exercising, any right under this Agreement or the Merchant Security Agreement and Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement or the Merchant Security Agreement and Guaranty preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder and under the Merchant Security Agreement and Guaranty are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Solicitations.** Merchant and each Owner/Guarantor authorize FUNDER and its affiliates to communicate with, solicit and /or market to Merchant and each Owner/Guarantor via regular mail, telephone, email and facsimile in connection with the provision of goods or services by FUNDER, its affiliates or any third party that FUNDER shares, transfers, exchanges, discloses or provides information with and will hold FUNDER, its affiliates and such third parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by and any of the methods described above.

4.6 **Terminated Merchant File and Match File.** Merchant expressly acknowledges that a Terminated Merchant File ("TMF"), or any successor thereto, is maintained by MasterCard or VISA containing the business name and names and identification of principals of merchants which have been terminated for one or more of the reasons specified in MasterCard or VISA operating regulations. Such reasons include, but are not limited to, fraud, counterfeit drafts, unauthorized transactions, excessive charge-backs and retrieval requests, money laundering, or where a high security risk exists. MERCHANT ACKNOWLEDGES THAT PROCESSOR AND FUNDER ARE REQUIRED TO REPORT THE BUSINESS NAME OF MERCHANT AND THE NAMES AND IDENTIFICATION OF ITS PRINCIPALS TO THE TMF WHEN A MERCHANT IS TERMINATED FOR ONE OR MORE OF THE REASONS SPECIFIED IN MASTERCARD OR VISA OPERATING REGULATIONS. MERCHANT EXPRESSLY AGREES AND CONSENTS TO SUCH REPORTING BY PROCESSOR AND FUNDER AND RELEASES EACH FROM ANY DAMAGES FOR DOING SO IN GOOD FAITH.

4.7 **Binding Effect; Governing Law, Venue and**

Jurisdiction. This Agreement and the Merchant Security Agreement and Guaranty shall be binding upon and inure to the benefit of Merchant, each Owner/Guarantor, FUNDER (and it's Participants) and their respective successors and assigns. FUNDER's Participants shall be third party beneficiaries of all such agreements. This Agreement and the Merchant Security Agreement and Guaranty shall be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable conflicts of law principles. Any suit, action or proceeding arising hereunder or under the Merchant Security Agreement and Guaranty, or the interpretation, performance or breach hereof or thereof, shall, if FUNDER so elects, be instituted in any court sitting in New York, New York, (the "Acceptable Forum"). Each of Merchant and each Owner/Guarantor agrees that any state or federal court sitting in the Acceptable Forum is convenient to it, hereby irrevocably and unconditionally submits to the personal jurisdiction of any such court and hereby waives any and all objections to jurisdiction or venue. Each of Merchant and each Owner/Guarantor agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon such party and may be enforced in any other courts to whose jurisdiction such party is or may be subject, by suit upon such judgment. Should such suit, action or proceeding be initiated in any other forum, Merchant and each Owner/Guarantor waive any right to oppose any motion or application made by FUNDER to transfer such suit, action or proceeding to the Acceptable Forum.

4.8 **Survival of Representation, etc.** All representations, warranties and covenants herein and in the Merchant Security Agreement and Guaranty shall survive the execution and delivery of this Agreement and the Merchant Security Agreement and Guaranty and shall continue in full force until all obligations under this Agreement and the Merchant Security Agreement and Guaranty have been satisfied in full and this Agreement and the Merchant Security Agreement and Guaranty shall have terminated.

4.9 **Severability.** In case any of the provisions in this Agreement or the Merchant Security Agreement and Guaranty is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein or therein shall not in any way be affected or impaired.

4.10 **Entire Agreement.** Any provision hereof or of the Merchant Security Agreement and Guaranty prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof or thereof. This Agreement and the Merchant Security Agreement and Guaranty embody the entire agreement between Merchant, each Owner/Guarantor and FUNDER and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.12. ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* THIS SECTION PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT (FAA), AND SHALL BE INTERPRETED IN THE BROADEST WAY THE LAW WILL ALLOW.

**Covered claims**

- You or we may arbitrate any claim, dispute or controversy between you and us arising out of or related to your account, a previous related account or our relationship (called "Claims").
- **If arbitration is chosen by any party, neither you nor we will have the right to litigate that Claim** in court or have a jury trial on that Claim.
- Except as stated below, all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law. Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims. This also includes Claims made by or against anyone connected with us or you or claiming through us or you, or by someone making a claim through us or you, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.

**Arbitration limits**

- Individual Claims filed in a small claims court are not subject to arbitration, as long as the matter stays in small claims court.
- We won't initiate arbitration to collect a debt from you unless you choose to arbitrate or assert a Claim against us. If you assert a Claim against us, we can choose to arbitrate, including actions to collect a debt from you. You may arbitrate on an individual basis Claims brought against you, including Claims to collect a debt.
- Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis. The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis. If arbitration is chosen by any party, neither you nor we may pursue a Claim as part of a class action or other representative action. Claims of 2 or more persons may not be combined in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

**How arbitration works**

- Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA arbitration rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision. You can obtain copies of the AAA Rules at the AAA's website (www.adr.org) or by calling 800-778-7879. You or we may choose to have a hearing, appear at any

hearing by phone or other electronic means, and/or be represented by counsel. Any in-person hearing will be held in the same city as the U.S. District Court closet to your billing address.

- Arbitration may be requested any time, even where there is a pending lawsuit, unless a trial has begun or a final judgment entered. Neither you nor we waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, motion, or discovery in a court lawsuit. To choose arbitration, a party may file a motion to compel arbitration in a pending matter and/or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.
- The arbitration shall be conducted by a single arbitrator in accord with this arbitration provision and the AAA Rules, which limit discovery. The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of either party if requested to do so. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statute of limitations, and may award damages or other relief under applicable law.
- The arbitrator shall make any award in writing and, if requested by you or us, may provide a brief statement of the reasons for the award. An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

**Paying for arbitration fees**

- We will pay your share of the arbitration fee for an arbitration of Claims of $75,000 or less if they are unrelated to debt collection. Otherwise, arbitration fees will be allocated according to the applicable AAA Rules. If we prevail, we may not recover our arbitration fees, unless the arbitrator decides you Claim was frivolous. All parties are responsible for their own attorney's fees, expert fees and any other expenses, unless the arbitrator awards such fees or expenses to you or us based on applicable law.

**The final award**

- Any award by an arbitrator is final unless a party appeals it in writing to the AAA within 30 days of notice of the award. The arbitration appeal shall be determined by a panel of 3 arbitrators. The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration, and will make decisions based on a majority vote. Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules. An award by a panel on appeal is final. A final award is subject to judicial review as provided by applicable law.

**Survival and Severability of Terms**

- This arbitration provision shall survive changes in this Agreement and termination of the account or the relationship between you and us, including the bankruptcy of any party and any sale of your account, or amounts owed on your account, to another person or entity. If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative Claim. This arbitration provision may not be amended, severed or waived, except as provided in this Agreement or in a written agreement between you and us.

4.11 **Facsimile Acceptance.** Facsimile signatures shall be deemed acceptable for all purposes

4.13 **Counterparts; Facsimile and PDF Acceptance..** This Agreement and the Merchant Security Agreement and Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument. Signatures on this Agreement and the Merchant Security Agreement and Guaranty sent by facsimile or PDF will be treated as original signatures for all purposes.

INITIALS: _____

| Origination Fee Schedule (From 3.7) | |
|---|---|
| **Amount Funded** | **Origination Fee** |
| Up to $7,500.00 | $199.00 |
| $7,501.00-$25,000.00 | $295.00 |
| $25,000.00-$50,000.00 | $395.00 |
| $50,001.00-$100,000.00 | $595.00 |
| | |
| $100,001.00-$250,000.00 | $795.00 |
| Over $250,000.00 | $995.00 |
| | |
| Due diligence Fee | $0.00 |
| Administrative Fee | $0.00 |
| UCC Termination Fee | $150 |

**\*\*\* All fees listed in this contract are subject to change.**

INITIALS:  _____

## MERCHANT SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: <u>SAMMY'S GRILL LLC 5</u>

D/B/A: <u>Sammy's Sports Grill</u>

Physical Address: <u>3555 Rayford Rd. Suite 100</u>       City: <u>Spring</u>       State: <u>TX</u>       Zip: <u>77380</u>

Federal ID# _____

### SECURITY AGREEMENT

**Security Interest**. To secure Merchant's payment and performance obligations to FUNDER and its affiliates or the Funders, a list of which may be provided to the Merchant if requested in writing after the funding of the purchase closes under the Merchant Cash Advance Agreement between Merchant and FUNDER (the "Merchant Agreement"), Merchant hereby grants to FUNDER a security interest in all personal property of Merchant, including all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, as those terms are defined in Article 9 of the Uniform Commercial Code of the State of New York as amended (the "UCC"), whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of such property, as that term is defined in Article 9 of the UCC (collectively, the "Collateral"). If the Merchant Agreement identifies more than one Merchant, this Security Agreement applies to each Merchant, jointly and severally.

Merchant acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Merchant and FUNDER will secure the obligations hereunder, and that the Merchant's payment and performance obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Collateral.

Merchant further acknowledges and agrees that, if Merchant enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Security Agreement, and that the Merchant's payment and performance obligations, and the Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC_3 statement, perfecting FUNDER's interest in the Collateral.

**Cross-Collateral**. To secure Guarantor's payment and performance obligations to FUNDER(and the Funders) under this Merchant Security Agreement and Guaranty (this "Agreement"), each Guarantor hereby grants FUNDER, for itself and its participants, a security interest in <u>SAMMY'S GRILL LLC (d/b/a Stadia Bar and Grill) Sammy's Grill LLC 2  (d/b/a Sammy's Sports Grill 2), SAMMY'S GRILL LLC 3 (d/b/a Sammy's Sports Grill 3), SAMMY'S GRILL LLC 4 (d/b/a Sammy's Sports Grill 4)</u> (the "Additional Collateral"). Each Guarantor agrees and acknowledges that FUNDER will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Guarantor acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Guarantor and FUNDER will secure the obligations hereunder, and that the Guarantor's payment and performance obligations under this Agreement, and the Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Additional Collateral.

Guarantor further acknowledges and agreements that, if Guarantor enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Agreement, and that the Guarantor's payment and performance obligations, and the Additional Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interesting the Additional Collateral.

Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as FUNDER deems necessary to perfect or maintain FUNDER's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements. Each of Merchant and each Guarantor hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's security interest, which financing statements may contain notification that Merchant and each Guarantor have granted a negative pledge to FUNDER with respect to the Collateral and Additional Collateral, and that any subsequent lender or lienor may be tortiously interfering with FUNDER's rights. Merchant and each Guarantor shall be jointly and severally liable for and shall pay to FUNDER upon demand all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in protecting, preserving and enforcing FUNDER's security interest and rights.

**Negative Pledge.** Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral or Additional Collateral, as applicable without written permission of FUNDER.

**Consent to Enter Premises and Assign Lease**. FUNDER shall have the right to cure Merchant's default in the payment of rent for the Premises on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FUNDER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FUNDER may enter into an agreement with Merchant's landlord giving FUNDER the right: (a) to enter the Premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at the Premises.

**Remedies**. Upon any Event of Default, FUNDER may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing to FUNDER, whether by acceleration or otherwise.

### GUARANTY

**Performance Guaranty**. Each undersigned Guarantor ("Guarantor") hereby unconditionally guarantees to FUNDER, and its affiliates or the Funders, , the payment and performance by Merchant of all of its obligations under this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified from time to time (the "Guaranteed Obligations"). Guarantor shall be liable for and FUNDER may charge and collect all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in connection with the collection of any or all of the Guaranteed Obligations from Guarantor or the enforcement of this Agreement. (It is understood by all parties that this Guaranty is not an absolute personal guaranty of payment and that the signors are only guaranteeing that they will not take any action or permit the merchant to take any action that is a breach of this agreement.)

**Guarantor Waivers**. In the event that Merchant fails to make a payment when due or otherwise perform under the Merchant Agreement, FUNDER may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral FUNDER may hold pursuant to this Agreement or any other guaranty.

FUNDER does not have to notify Guarantor of any of the following events and Guarantor will not be released from any of its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any material or adverse change in Merchant's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, or any other guarantee of the Guaranteed Obligations; (iv) FUNDER's acceptance of this Agreement; or (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FUNDER. In addition, FUNDER may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FUNDER; (ii) release Merchant from its obligations to FUNDER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to FUNDER

CFN MCA 01-25-16                    Colonial Funding Network as Servicing Agent

under the Merchant Agreement and this Agreement are paid and performed in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FUNDER must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount. Guarantor agrees that its obligations under this Agreement shall be irrevocable and shall be unconditional irrespective of any circumstance that might otherwise operate as a legal or equitable discharge of a guarantor or a defense of a guarantor.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Agreement and that any misrepresentation may constitute fraud; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

INITIALS: _____

**Joint and Several Liability.** The obligations hereunder of each Guarantor are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT. CAPITALIZED TERMS NOT DEFINED IN THIS AGREEMENT SHALL HAVE THE MEANINGS SET FORTH IN THE MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS.

MERCHANTS AND OWNERS/GUARANTORS ACKNOWLEDGE THAT THIS WRITING REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO. IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS OF ANY PARTY IF NOT INCLUDED IN THIS WRITTEN AGREEMENT ARE CONSIDERED NULL AND VOID. ANY MODIFICATION OR OTHER ALTERATION TO THE AGREEMENT MUST BE IN WRITING AND EXECUTED BY THE PARTIES TO THIS CONTRACT.

INITIALS: _____

**MERCHANT #1**
By  Sammy Vela
_____
        (Print Name and Title)
SS# _____

_____
            (Signature)
Drivers License Number:

**MERCHANT #2**
By _____
        (Print Name and Title)
SS# _____

_____
            (Signature)
Drivers License Number:

**OWNER/GUARANTOR #1**
By  Sammy Vela
_____
        (Print Name and Title)
SS# _____

_____
            (Signature)
Drivers License Number:

**OWNER/GUARANTOR #2**
By _____
        (Print Name and Title)
SS# _____

_____
            (Signature)
Drivers License Number:

# Trust Capital Funding

## MERCHANT CASH ADVANCE AGREEMENT

Agreement dated <u>December 14 2016</u> between **Trust Capital Funding. ("FUNDER")** doing business at 10 Kearney Rd Suite, 102 Needham, MA 02494 and the merchant listed below ("the **Merchant**").

(Month)(Day)(Year)

### MERCHANT INFORMATION

| | | | |
|---|---|---|---|
| Merchant's Legal Name: SAMMY'S GRILL, LLC 4 | | | |
| D/B/A: SAMMY'S SPORTS GRILL 4 | | | State of Incorporation / Organization: TX |
| Type of entity: ( ) Corporation ( X ) Limited Liability Company ( ) Limited Partnership ( ) Limited Liability Partnership ( ) Sole Proprietor | | | |
| Physical Address: 1027 Sawdust Rd | City: Spring | State: TX | Zip: 77380-2151 |
| Mailing Address: 7035 W Grand Pkwy S Ste 99 | City: Richmond | State: TX | Zip: 77407-8681 |
| Date business started (mm/yy): 04/16 | Federal ID#: | | |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to FUNDER, as the lead purchaser for itself and other co-investors, [making FUNDER on behalf of itself and all co-investors (collectively the Funders), the absolute owner] in consideration of the purchase price specified below (the "<u>Purchase Price</u>"), all of Merchant's future accounts, contract rights and other rights to payment arising from or relating to the use by Merchant's customers of cash, credit cards, charge cards, debit cards, prepaid cards, mobile payments and other similar payment methods in the ordinary course of Merchant's business (the "<u>Receipts</u>") for the payment of Merchant's sale of goods or rendition of services until the purchased amount specified below (the "<u>Purchased Amount</u>") has been delivered by Merchant to FUNDER, provided that the Purchase Price, the Specified Percentage (as defined below) and/or the Purchased Amount may be adjusted by FUNDER and Merchant in writing if one or more card processing conditions are not satisfied.

The Purchased Amount shall be paid to FUNDER by Merchant's using and irrevocably authorizing <u>only one</u> card processor acceptable to FUNDER ("<u>Processor</u>") to remit to or for the benefit of FUNDER the percentage specified below (the "<u>Specified Percentage</u>") of Merchant's settlement amounts due from each card issuer with respect to the Receipts, until such time as FUNDER receives payment in full of the Purchased Amount. Furthermore Merchant will not enter into another cash advance agreement or any other type of factoring agreement, or any other type of credit/debit card processing during the term of this contract. Notwithstanding anything to the contrary in this Agreement or any other agreement between FUNDER and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

Purchase Price: $50,000.00          Specified Percentage: 20%          Receipts Purchased Amount: $71,500.00

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", THE "MERCHANT SECURITY AGREEMENT AND GUARANTY" AND "ADMINISTRATIVE FORM" [Note: Is there a separate Administrative Form] ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.**

**MERCHANT #1**
By  Sammy Vela
(Print Name and Title)                    (Signature)

**MERCHANT #2**
By
(Print Name and Title)                    (Signature)

**OWNER/GUARANTOR #1**
By  Sammy Vela
(Print Name and Title)                    (Signature)

**OWNER/GUARANTOR #2**
By
(Print Name and Title)                    (Signature)

**Trust Capital Funding**
By
(Company Officer)                    (Signature)

Each person signing this Agreement on behalf of Merchant represents that he or she is authorized to sign this Agreement on behalf of Merchant, and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor represents that the information provided herein and in all of FUNDER's forms is true, accurate and complete in all respects. FUNDER may produce a monthly statement reflecting the delivery of the Specified Percentage of Receipts from Merchant to FUNDER and its participants via Processor.
**ANY MISREPRESENTATION MADE BY MERCHANT OR ANY OWNER/GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

---

**AUTHORIZED SERVICING AGENT – Colonial Funding Network, Inc.**
Colonial Funding Network, Inc. (Colonial) is the Authorized Servicing Agent of the FUNDER for this contract providing administrative, bookkeeping, reporting and support services for the FUNDER and the Merchant. Colonial is not affiliated or owned by the FUNDER and is acting as an independent agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting and remit capture. Colonial may at its sole discretion participate in this financing by providing a small portion of the funds for this transaction directly to the FUNDER. Colonial is not a credit card processor, or in the business of processing credit cards. Merchant hereby acknowledges that in no event will Colonial be liable for any claims made against the FUNDER or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by the Merchant and Owner/Guarantor.

**MERCHANT #1**
By  Sammy Vela
(Print Name and Title)                    (Signature)

---

CFN MCA 01-25-16                    Colonial Funding Network as Servicing Agent

## MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS

### I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Cash Advance Agreement.** These terms and conditions shall be incorporated in and made a part of the attached Merchant Cash Advance Agreement (such Merchant Cash Advance Agreement, as supplemented by these terms and conditions, this "Agreement").

**1.2 Merchant Processing Agreement.** Merchant shall execute an agreement (the "Merchant Processing Agreement") acceptable to FUNDER, with a card processor acceptable to FUNDER, to obtain card processing services. Merchant shall authorize Processor to deduct the amounts owed to FUNDER for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from Processor card transactions and to pay such amounts to FUNDER pursuant to FUNDER's instructions to Processor. The authorization shall be irrevocable without the written consent of FUNDER, without any independent verification, in making such deductions and payments, and Merchant waives any claims for damages it may have against Processor in connection with such acts unless such damages were due to Processor's failure to follow FUNDER's instructions.

**1.3 Purchase Price Reduction.** FUNDER may, in its sole discretion, reduce the Purchase Price if one or more card processing conditions are not satisfied.

**1.4 Bridge / Control Account.** Merchant may be required to open a new bank account into which 100% of the settlement amounts will be deposited and the Specified Percentage collected by FUNDER (the "Bridge / Control Account"). **Merchant appoints FUNDER as "Acting Agent" over the Bridge / Control Account, and shall instruct Processor to designate the Bridge / Control Account as the deposit account for all of Merchant's customers' card transactions. Merchant assumes all responsibility for all fees, costs, charge-backs or suspicious items processed through the Bridge / Control Account** (see "Miscellaneous Service Fees" paragraph 3.7). **Merchant agrees to maintain a minimum balance in the Bridge / Control Account (the "Minimum Balance") equal to the per-month average of all fees charged to Merchant by Processor, averaged over a six-month period.**

**1.5 Financial Condition.** Merchant and each Owner/Guarantor authorize FUNDER, its agents and representatives, and any credit reporting agency engaged by FUNDER, to investigate their creditworthiness, financial responsibility and history, and they agree to provide FUNDER any financial statements, tax returns, references, or other credit or financial information as FUNDER deems necessary prior to or after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of credit and financial information. Merchant and each Owner/Guarantor authorize FUNDER to update their credit and financial profile from time to time in the future, as FUNDER deems appropriate. An investigative or consumer report may be made or obtained in connection with this Agreement.

**1.6 Transactional History.** Merchant authorizes Processor and each of Merchant's banks to provide FUNDER upon request with Merchant's card history or bank statements, as applicable.

**1.7 Indemnification.** Merchant and each Owner/Guarantor jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by FUNDER for monies owed to FUNDER from Merchant and (b) actions taken by

Processor in reliance upon information or instructions provided by FUNDER.

**1.8 No Liability.** In no event will Processor or FUNDER (or any of the Funders) be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and each Owner/Guarantor.

**1.9 Reliance on Terms.** Sections 1.2, 1.7, 1.8, 2.5, and 4.6 hereof are agreed to for the benefit of Merchant, FUNDER (and it's Participants) and Processor, and **notwithstanding the fact that Processor is not a party to this Agreement, Processor may rely upon their terms and raise them as a defense in any action.**

**1.10 Sale of Receipts.** Merchant and FUNDER intend that the transfer of the interest in the Receipts from Merchant to FUNDER constitute a sale, and not a loan, for all purposes. Merchant agrees that the Purchase Price equals the fair market value of such interest. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to FUNDER a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. In no event shall the aggregate of all amounts deemed interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that FUNDER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FUNDER shall promptly refund to Merchant any interest received by FUNDER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FUNDER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's interest in the Receipts.

**1.11 Power of Attorney.** Merchant irrevocably appoints FUNDER and any assignee of FUNDER as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to FUNDER from Processor, or upon the occurrence of an Event of Default under Section 3.1 hereof, to settle all obligations due to FUNDER from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in the Merchant Security Agreement and Guaranty); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FUNDER; and (v) to file any claims or take any action or institute any proceeding which FUNDER may deem necessary for the collection of any unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor, in respect of himself or herself personally, authorizes FUNDER to disclose to any third party information concerning Merchant's and each Owner's/Guarantor's credit standing (including credit bureau reports that FUNDER obtains) and business conduct. Merchant and each

Owner/Guarantor hereby waive the maximum extent permitted by law any claim for damages against FUNDER or any of its affiliates and the Funders relating to any (i) investigation undertaken by or on behalf of FUNDER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by FUNDER, including this Agreement, the Merchant Security Agreement and Guaranty and any other documents executed in connection with such agreements or related to such agreements (collectively, "Confidential Information") are proprietary and confidential information of FUNDER. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to not disclose Confidential Information to any person in accordance with the terms of this Section 1.13.

**1.14 Publicity.** Merchant and each Owner/Guarantor authorize FUNDER to use their respective names in a listing of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant and each Owner/Guarantor hereby acknowledge and agree that FUNDER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FUNDER and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Financial Information.** Merchant and each Owner/Guarantor shall provide to FUNDER upon request copies of financial statements representing the financial condition of Merchant and/or such Owner/Guarantor.

### II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant and each Owner/Guarantor each represents, warrants and covenants that as of the date of this Agreement and on each date during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Its financial statements, copies of which have been furnished to FUNDER, and any financial statements furnished to FUNDER hereafter, fairly represent the financial condition of Merchant and each Owner/Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material adverse change in its financial condition, operation or ownership.

**2.2 Governmental Approvals.** Merchant is and will remain in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to execute this Agreement and to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 **Insurance.** Merchant has and will maintain business-interruption insurance naming FUNDER as loss payee and additional insured in such amounts and against such risks as are satisfactory to FUNDER and shall provide FUNDER proof of such insurance upon request.

2.5 **Merchant Processing Agreement and Arrangements.** Without FUNDER's prior written consent, Merchant will not: (i) change the card processor through which the Receipts are settled from Processor to another card processor; (ii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another processor; (iii) change its arrangements with Processor or amend the Merchant Processing Agreement in any way that is adverse to FUNDER; (iv) add card processing terminals; (v) use multiple card processing terminals; (vi) change its financial institution or bank account(s) (including, if applicable, the Bridge / Control Account); (vii) take any other action that could have any adverse effect upon Merchant's obligations under this Agreement or FUNDER's interest in the Receipts; or (viii) take any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor, or to induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor, or permit any event to occur that could have an adverse effect on the use, acceptance, or authorization of cards for the purchase of Merchant's services and products.

2.6 **Change of Name or Location.** Merchant will not conduct its businesses under any name other than as disclosed to Processor and FUNDER or change any of its places of business.

2.7 **Daily Batch Out.** Merchant will batch out receipts with Processor on a daily basis.

2.8 **Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from FUNDER to Merchant, execute, acknowledge and deliver to FUNDER and/or to any other person, firm or corporation specified by FUNDER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates on which the Purchased Amount or any portion thereof has been paid.

2.9 **No Bankruptcy or Insolvency.** Merchant and Owner/Guarantors represent that they are not Insolvent and neither Merchant nor any Owner/Guarantor has filed any petition for bankruptcy protection under Title 11 of the United States Code, no involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor, neither Merchant nor any Owner/Guarantor has admitted in writing its inability to pay its debts or made a general assignment for the benefit of creditors, and no other proceeding has been instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it insolvent or seeking reorganization, arrangement, adjustment or composition of it or its debts. Merchant does not anticipate filing any such bankruptcy petition and is not aware and has no reason to believe that any such bankruptcy petition or other proceeding will be filed or brought against it or any Owner/Guarantor.

2.10 **Other Financing.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase (such as a merchant cash advance) of, a loan against, or the sale or purchase of credits against, any Receipts, cash deposits or future card or mobile payment sales with any party other than FUNDER without its written permission.

2.11 **Unencumbered Receipts.** Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, charges, restrictions,

conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, FUNDER.

2.12 **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.13 **Default Under Other Contracts.** Merchant's execution of or performance under this Agreement will not cause or create any breach or default by Merchant under any contract with another person or entity.

2.14 **Delivery of Confession of Judgment.** Upon execution of this Agreement, Merchant shall, if requested by FUNDER, deliver to FUNDER an executed Confession of Judgment (the "Confession of Judgment"), in the form provided by FUNDER, in favor of FUNDER in the amount of the Purchased Amount.

2.15 **Delivery of Assignment of Lease.** Merchant and each Owner/Guarantor authorize FUNDER to receive pertinent information regarding the commercial lease for the physical location(s) of Merchant's business (the "Premises") from any applicable leasing company and or agent. Merchant may be asked to deliver to FUNDER an executed Assignment of Lease assigning all of Merchant's right, title and interest in and to the Premises and under the lease for the Premises to FUNDER (the "Assignment of Lease").

2.16 **Sale of Business.** Merchant shall not sell, dispose, transfer or otherwise convey its business or assets without (i) the express prior written consent of FUNDER, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FUNDER.

2.17 **Bridge / Control Account.** If Merchant is required to open a Bridge / Control Account, (i) Merchant will not, unless otherwise directed in writing by FUNDER, take any action to cause the Specified Percentage of the settlement amounts to be settled or delivered to any account other than the Bridge / Control Account and (ii) Merchant will at all times maintain the Minimum Balance in the Bridge / Control Account.

2.18 **Use of Proceeds.** Merchant will conduct its business and use the Purchase Price in the ordinary course of its business, consistent with past practice.

2.19 **Accuracy of Information.** All information provided by Merchant and each Owner/Guarantor to FUNDER herein, in the Merchant Security Agreement and Guaranty, and in all other documents executed in connection with such agreements or related to such agreements is true, accurate and complete in all respects.

### III. EVENTS OF DEFAULT AND REMEDIES

3.1 **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or any Owner/Guarantor violates any term, covenant or condition in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER; (b) any representation or warranty by Merchant or any Owner/Guarantor in this Agreement, the Merchant Security Agreement and Guaranty or any other agreement with FUNDER shall prove to have been incorrect, incomplete, false or misleading in any material respect when made; (c) Merchant or any Owner/Guarantor admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or

composition of it or its debts; (d) any Owner/Guarantor sends a notice of termination of the Merchant Security Agreement and Guaranty; (e) Merchant suspends, dissolves or terminates its business; (f) Merchant sells all or substantially all of its assets; (g) Merchant makes or sends notice of any intended bulk sale or transfer by Merchant; (h) Merchant performs any act that encumbers the cash flow of the business placing undue stress on the viability of the operations and reduces the value of the Collateral or the security interest granted in the Collateral under the Merchant Security Agreement and Guaranty; (i) any Owner/Guarantor performs any act that reduces the value of the Additional Collateral (as defined in the Merchant Security Agreement and Guaranty) or the security interest granted in the Additional Collateral under the Merchant Security Agreement and Guaranty; or (j) Merchant or any Owner/Guarantor files any petition for bankruptcy under the United States code or an involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor; (k)Merchant or any Owner/Guarantor defaults under any of the terms, covenants and conditions of any other agreement with FUNDER including those with affiliated / associated businesses.

3.2 **Remedies.** Upon the occurrence of an Event of Default that is not waived pursuant to Section 4.4 hereof, FUNDER on its own and on behalf of it's Participants may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Merchant Security Agreement and Guaranty, or pursuant to any other legal or equitable right or remedy. Upon FUNDER's notice to Merchant of any Event of Default, the entire Receipts Purchased Amount and unpaid fees not already paid to FUNDER shall become immediately due and payable to FUNDER. In addition, upon an Event of Default (i) FUNDER may enforce the provisions of the Merchant Security Agreement and Guaranty against each Owner/Guarantor; (ii) FUNDER may enforce its security interest in the Collateral and Additional Collateral; (iii) FUNDER may debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise; (iv) FUNDER may enter the Confession of Judgment as a judgment with the appropriate Clerk of Court and execute thereon; and (v) FUNDER may exercise its rights under the Assignment of Lease. All rights, powers and remedies of FUNDER in connection with this Agreement and the Merchant Security Agreement and Guaranty may be exercised at any time by FUNDER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 **Costs.** Merchant and each Owner/Guarantor shall pay to FUNDER all costs reasonably incurred by FUNDER in connection with (a) any Event of Default including without limitation any breach by Merchant or any Owner/Guarantor of the representations, warranties and covenants in this Agreement or the Merchant Security Agreement and Guaranty, and (b) the enforcement of FUNDER's remedies set forth in Section 3.2 hereof, including but not limited to court costs and attorneys' fees.

3.4 **Required Notifications.** Merchant and each Owner/Guarantor shall give FUNDER written notice within 24 hours of any filing by Merchant or any Owner/Guarantor under Title 11 of the United States Code or of the occurrence of any other event described in Section 3.1(c) hereof. Merchant shall give FUNDER seven days' written notice prior to the closing of any sale of all or substantially all of Merchant's assets or stock. Merchant shall give FUNDER seven days' written notice prior to the suspension, dissolution or terminations its business.

3.5 **Default Fee.** Upon the Occurrence of any Event of Default, and written notice to Merchant thereof, Merchant shall pay to FUNDER a default fee ("Default Fee") of $2,500. This Default Fee shall be payable on demand and stand in addition to any other fees or penalties outlined within this Agreement, the Merchant Security Agreement or Guaranty.

3.6 **Processor Change Fee.** Merchant shall pay a processor change fee (the "Processor Change Fee") to FUNDER in the amount of $5,000.00 in the event that Merchant (i) uses multiple card processing terminals without the prior written consent of FUNDER, (ii) changes its card processor without the prior written consent of FUNDER or (iii) directs Processor to deliver settlement amounts to any account other than the Bridge / Control Account (if Merchant is required to open a Bridge / Control Account). Such Processor Change Fee (i) shall be due and payable to FUNDER on demand, (ii) is not exclusive of, and is cumulative with, any other fee or amount paid or payable to FUNDER by Merchant pursuant to this Agreement or the Merchant Security Agreement and Guaranty; and (iii) shall not be construed as a waiver of any Event of Default hereunder or under the Merchant Security Agreement and Guaranty or as otherwise operating to reduce or limit FUNDER's rights or remedies provided for hereunder, under the Merchant Security Agreement and Guaranty or at law or in equity.

3.7 **Miscellaneous Service Fees.** Merchant shall pay certain fees for services related to the origination and maintenance of accounts which may include but not be limited to: Merchant funding is done electronically to their designated bank account and charged a fee of $35.00 for a Fed Wire or $15.00 for an ACH. The fee for underwriting and origination is paid from the funded amount in accordance with the schedule below. If Merchant is utilizing a Bridge / Control Account, there is an upfront fee of $395.00 for the bank fees and administrative costs of maintaining such account for each cash advance agreement with Merchant. Fund transfers from Bridge / Control Accounts to Merchant's operating bank account will be charged $10.95 per month via ACH. This fee will continue if the bridge account remains open after the RTR is paid. Merchant will be charged $50.00 for each change of its operating bank account once active with FUNDER. Any administrative adjustments associated with changes to the Specified Percentage will incur a fee of $75.00 per occurrence. (All fees are subject to change)

INITIALS: _____

## IV. MISCELLANEOUS

4.1 **Modifications; Agreements.** No modification, amendment, or waiver of any provision of, or consent to any action under, this Agreement or the Merchant Security Agreement and Guaranty shall be effective unless the same is in writing and signed by FUNDER.

4.2 **Assignment.** Merchant acknowledges and understands that FUNDER is acting on its own behalf and as the administrator and lead investor for a group of independent co-investors a list of which can be provided to Merchant after funding and upon written notice to FUNDER. FUNDER may assign its rights

and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty in whole or in part without prior notice to Merchant or any Owner/Guarantor, including, without limitation, its right to receive all or any portion of the Purchased Amount and its obligation to fund all or any portion of the Purchase Price. Merchant acknowledges that, if any such assignment is made, persons other than FUNDER may have the right to exercise rights or remedies against Merchant pursuant to this Agreement. Merchant shall not have, and no Owner/Guarantor shall have, the right to assign its rights and/or obligations under this Agreement and/or the Merchant Security Agreement and Guaranty or any interest herein or therein without the prior written consent of FUNDER, which consent may be withheld in FUNDER's sole discretion.

4.3 All notices, requests, consent, demands and other communications hereunder and under the Merchant Security Agreement and Guaranty shall be delivered by ordinary mail, effective upon mailing, to the respective parties to this Agreement and the Merchant Security Agreement and Guaranty at the addresses set forth in this Agreement and shall become effective only upon receipt. The Parties hereto may also send such notices, requests, consent, demands and other communications via facsimile ("FAX") or electronic mail ("Email") at such FAX numbers and email addresses communicated by the parties hereto in writing.

4.4 **Waiver Remedies.** No failure on the part of FUNDER to exercise, and no delay in exercising, any right under this Agreement or the Merchant Security Agreement and Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement or the Merchant Security Agreement and Guaranty preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder and under the Merchant Security Agreement and Guaranty are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Solicitations.** Merchant and each Owner/Guarantor authorize FUNDER and its affiliates to communicate with, solicit and /or market to Merchant and each Owner/Guarantor via regular mail, telephone, email and facsimile in connection with the provision of goods or services by FUNDER, its affiliates or any third party that FUNDER shares, transfers, exchanges, discloses or provides information with and will hold FUNDER, its affiliates and such third parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by and any of the methods described above.

4.6 **Terminated Merchant File and Match File.** Merchant expressly acknowledges that a Terminated Merchant File ("TMF"), or any successor thereto, is maintained by MasterCard or VISA containing the business name and names and identification of principals of merchants which have been terminated for one or more of the reasons specified in MasterCard or VISA operating regulations. Such reasons include, but are not limited to, fraud, counterfeit drafts, unauthorized transactions, excessive charge-backs and retrieval requests, money laundering, or where a high security risk exists. MERCHANT ACKNOWLEDGES THAT PROCESSOR AND FUNDER ARE REQUIRED TO REPORT THE BUSINESS NAME OF MERCHANT AND THE NAMES AND IDENTIFICATION OF ITS PRINCIPALS TO THE TMF WHEN A MERCHANT IS TERMINATED FOR ONE OR MORE OF THE REASONS SPECIFIED IN MASTERCARD OR VISA OPERATING REGULATIONS. MERCHANT EXPRESSLY AGREES AND CONSENTS TO SUCH REPORTING BY PROCESSOR AND FUNDER AND RELEASES EACH FROM ANY DAMAGES FOR DOING SO IN

**GOOD FAITH.**

4.7 **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement and the Merchant Security Agreement and Guaranty shall be binding upon and inure to the benefit of Merchant, each Owner/Guarantor, FUNDER (and it's Participants) and their respective successors and assigns. FUNDER's Participants shall be third party beneficiaries of all such agreements. This Agreement and the Merchant Security Agreement and Guaranty shall be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable conflicts of law principles. Any suit, action or proceeding arising hereunder or under the Merchant Security Agreement and Guaranty, or the interpretation, performance or breach hereof or thereof, shall, if FUNDER so elects, be instituted in any court sitting in New York, New York, (the "Acceptable Forum"). Each of Merchant and each Owner/Guarantor agrees that any state or federal court sitting in the Acceptable Forum is convenient to it, hereby irrevocably and unconditionally submits to the personal jurisdiction of any such court and hereby waives any and all objections to jurisdiction or venue. Each of Merchant and each Owner/Guarantor agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon such party and may be enforced in any other courts to whose jurisdiction such party is or may be subject, by suit upon such judgment. Should such suit, action or proceeding be initiated in any other forum, Merchant and each Owner/Guarantor waive any right to oppose any motion or application made by FUNDER to transfer such suit, action or proceeding to the Acceptable Forum.

4.8 **Survival of Representation, etc.** All representations, warranties and covenants herein and in the Merchant Security Agreement and Guaranty shall survive the execution and delivery of this Agreement and the Merchant Security Agreement and Guaranty and shall continue in full force until all obligations under this Agreement and the Merchant Security Agreement and Guaranty shall have been satisfied in full and this Agreement and the Merchant Security Agreement and Guaranty shall have terminated.

4.9 **Severability.** In case any of the provisions in this Agreement or the Merchant Security Agreement and Guaranty is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein or therein shall not in any way be affected or impaired.

4.10 **Entire Agreement.** Any provision hereof or of the Merchant Security Agreement and Guaranty prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof or thereof. This Agreement and the Merchant Security Agreement and Guaranty embody the entire agreement between Merchant, each Owner/Guarantor and FUNDER and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.12. ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* THIS SECTION PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT (FAA), AND SHALL BE INTERPRETED IN THE BROADEST WAY THE LAW WILL ALLOW.

**Covered claims**

- You or we may arbitrate any claim, dispute or controversy between you and us arising out of or related to your account, a previous related account or our relationship (called "Claims").
- **If arbitration is chosen by any party, neither you nor we will have the right to litigate that Claim in court or have a jury trial on that Claim.**
- Except as stated below, all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims. This also includes Claims made by or against anyone connected with us or you or claiming through us or you, or by someone making a claim through us or you, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.

**Arbitration limits**

- Individual Claims filed in a small claims court are not subject to arbitration, as long as the matter stays in small claims court.
- We won't initiate arbitration to collect a debt from you unless you choose to arbitrate or assert a Claim against us. If you assert a Claim against us, we can choose to arbitrate, including actions to collect a debt from you. You may arbitrate on an individual basis Claims brought against you, including Claims to collect a debt.
- Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis. The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis. If arbitration is chosen by any party, neither you nor we may pursue a Claim as part of a class action or other representative action. Claims of 2 or more persons may not be combined in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

**How arbitration works**

- Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA arbitration rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision. You can obtain copies of the AAA Rules at the AAA's website (www.adr.org) or by calling 800-778-7879. You

or we may choose to have a hearing, appear at any hearing by phone or other electronic means, and/or be represented by counsel. Any in-person hearing will be held in the same city as the U.S. District Court closet to your billing address.

- Arbitration may be requested any time, even where there is a pending lawsuit, unless a trial has begun or a final judgment entered. Neither you nor we waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, motion, or discovery in a court lawsuit. To choose arbitration, a party may file a motion to compel arbitration in a pending matter and/or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.
- The arbitration shall be conducted by a single arbitrator in accord with this arbitration provision and the AAA Rules, which may limit discovery. The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of either party if requested to do so. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statute of limitations, and may award damages or other relief under applicable law.
- The arbitrator shall make any award in writing and, if requested by you or us, may provide a brief statement of the reasons for the award. An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

**Paying for arbitration fees**

- We will pay your share of the arbitration fee for an arbitration of Claims of $75,000 or less if they are unrelated to debt collection. Otherwise, arbitration fees will be allocated according to the applicable AAA Rules. If we prevail, we may not recover our arbitration fees, unless the arbitrator decides you Claim was frivolous. All parties are responsible for their own attorney's fees, expert fees and any other expenses, unless the arbitrator awards such fees or expenses to you or us based on applicable law.

**The final award**

- Any award by an arbitrator is final unless a party appeals it in writing to the AAA within 30 days of notice of the award. The arbitration appeal shall be determined by a panel of 3 arbitrators. The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration, and will make decisions based on a majority vote. Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules. An award by a panel on appeal is final. A final award is subject to judicial review as provided by applicable law.

**Survival and Severability of Terms**

- This arbitration provision shall survive changes in this Agreement and termination of the account or the relationship between you and us, including the bankruptcy of any party and any sale of your account, or amounts owed on your account, to another person or entity. If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative Claim. This arbitration provision may not be amended, severed or waived, except as provided in this Agreement or in a written agreement between you and us.

**4.11 Facsimile Acceptance.** Facsimile signatures shall be deemed acceptable for all purposes

**4.13 Counterparts; Facsimile and PDF Acceptance.** This Agreement and the Merchant Security Agreement and Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument. Signatures on this Agreement and the Merchant Security Agreement and Guaranty sent by facsimile or PDF will be treated as original signatures for all purposes.

INITIALS: _____

**Origination Fee Schedule (From 3.7)**

| Amount Funded | Origination Fee |
|---|---|
| Up to $7,500.00 | $199.00 |
| $7,501.00-$25,000.00 | $295.00 |
| $25,000.00-$50,000.00 | $395.00 |
| $50,001.00-$100,000.00 | $595.00 |
| $100,001.00-$250,000.00 | $795.00 |
| Over $250,000.00 | $995.00 |
| Due diligence Fee | $0.00 |
| Administrative Fee | $0.00 |
| UCC Termination Fee | $150 |

\*\*\* All fees listed in this contract are subject to change.

INITIALS: _____

## MERCHANT SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: <u>SAMMY'S GRILL, LLC 4</u>

D/B/A: <u>SAMMY'S SPORTS GRILL 4</u>

Physical Address: <u>1027 Sawdust Rd</u>          City: <u>Spring</u>          State: <u>TX</u>          Zip: <u>77380-2151</u>

Federal ID#

### SECURITY AGREEMENT

**Security Interest**. To secure Merchant's payment and performance obligations to FUNDER and its affiliates or the Funders, a list of which may be provided to the Merchant if requested in writing after the funding of the purchase closes under the Merchant Cash Advance Agreement between Merchant and FUNDER (the "<u>Merchant Agreement</u>"), Merchant hereby grants to FUNDER a security interest in all personal property of Merchant, including all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, as those terms are defined in Article 9 of the Uniform Commercial Code of the State of New York as amended (the "<u>UCC</u>"), whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of such property, as that term is defined in Article 9 of the UCC (collectively, the "<u>Collateral</u>"). If the Merchant Agreement identifies more than one Merchant, this Security Agreement applies to each Merchant, jointly and severally.

Merchant acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Merchant and FUNDER will secure the obligations hereunder, and that the Merchant's payment and performance obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Collateral.

Merchant further acknowledges and agrees that, if Merchant enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Security Agreement, and that the Merchant's payment and performance obligations, and the Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC_3 statement, perfecting FUNDER's interest in the Collateral.

**Cross-Collateral**. To secure Guarantor's payment and performance obligations to FUNDER(and the Funders) under this Merchant Security Agreement and Guaranty (this "<u>Agreement</u>"), each Guarantor hereby grants FUNDER, for itself and its participants, a security interest in <u>Sammy's Grill LLC 2  (d/b/a Sammy's Sports Grill 2), SAMMY'S GRILL LLC 3 (d/b/a Sammy's Sports Grill 3), SAMMY'S GRILL, LLC 4 (d/b/a SAMMY'S SPORTS GRILL 4), Sammys Grill, LLC/ STADIA BAR & GRILL LICENSING CO LLC (d/b/a Stadia Bar and Grill/ STADIA SPORTS GRILL  (Weekly Payment Plan)), SAMMY'S GRILL LLC 5 (d/b/a SAMMY'S GRILL 5)</u> (the "<u>Additional Collateral</u>"). Each Guarantor agrees and acknowledges that FUNDER will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Guarantor acknowledges and agrees that any security interest granted to FUNDER under any other agreement between Guarantor and FUNDER will secure the obligations hereunder,  and that the Guarantor's payment and performance obligations under this Agreement, and the Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interest in the Additional Collateral.

Guarantor further acknowledges and agreements that, if Guarantor enters into future Agreements with FUNDER, any security interest granted to FUNDER under such future Agreements will relate back to this Agreement, and that the Guarantor's payment and performance obligations, and the Additional Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting FUNDER's interesting the Additional Collateral.

Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as FUNDER deems necessary to perfect or maintain FUNDER's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements. Each of Merchant and each Guarantor hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's security interest, which financing statements may contain notification that Merchant and each Guarantor have granted a negative pledge to FUNDER with respect to the Collateral and Additional Collateral, and that any subsequent lender or lienor may be tortiously interfering with FUNDER's rights. Merchant and each Guarantor shall be jointly and severally liable for and shall pay to FUNDER upon demand all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in protecting, preserving and enforcing FUNDER's security interest and rights.

**Negative Pledge.** Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral or Additional Collateral, as applicable without written permission of FUNDER.

**Consent to Enter Premises and Assign Lease.** FUNDER shall have the right to cure Merchant's default in the payment of rent for the Premises on the following terms.  In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FUNDER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FUNDER may enter into an agreement with Merchant's landlord giving FUNDER the right: (a) to enter the Premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at the Premises.

**Remedies.** Upon any Event of Default, FUNDER may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing to FUNDER, whether by acceleration or otherwise.

### GUARANTY

**Performance Guaranty**. Each undersigned Guarantor ("<u>Guarantor</u>") hereby unconditionally guarantees to FUNDER, and its affiliates or the Funders,  , the payment and performance by Merchant of all of its obligations under this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified from time to time (the "<u>Guaranteed Obligations</u>"). Guarantor shall be liable for and FUNDER may charge and collect all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FUNDER in connection with the collection of any or all of the Guaranteed Obligations from Guarantor or the enforcement of this Agreement. (It is understood by all parties that this Guaranty is not an absolute personal guaranty of payment and that the signors are only guaranteeing that they will not take any action or permit the merchant to take any action that is a breach of this agreement.)

**Guarantor Waivers**. In the event that Merchant fails to make a payment when due or otherwise perform under the Merchant Agreement, FUNDER may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral FUNDER may hold pursuant to this Agreement or any other guaranty.

FUNDER does not have to notify Guarantor of any of the following events and Guarantor will not be released from any of its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any material or adverse change in Merchant's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, or any other guarantee of the Guaranteed Obligations; (iv) FUNDER's acceptance of this Agreement; or (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FUNDER.  In addition, FUNDER may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FUNDER; (ii) release Merchant from its obligations to FUNDER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv)

foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations, including without limitation the Collateral or Additional Collateral, in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to FUNDER under the Merchant Agreement and this Agreement are paid and performed in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FUNDER must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount. Guarantor agrees that its obligations under this Agreement shall be irrevocable and shall be unconditional irrespective of any circumstance that might otherwise operate as a legal or equitable discharge of a guarantor or a defense of a guarantor.

<u>Guarantor Acknowledgement</u>.  Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Agreement and that any misrepresentation may constitute fraud; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

INITIALS: _____

<u>Joint and Several Liability</u>.  The obligations hereunder of each Guarantor are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT. CAPITALIZED TERMS NOT DEFINED IN THIS AGREEMENT SHALL HAVE THE MEANINGS SET FORTH IN THE MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE MERCHANT CASH ADVANCE AGREEMENT TERMS AND CONDITIONS.

MERCHANTS AND OWNERS/GUARANTORS ACKNOWLEDGE THAT THIS WRITING REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO.  IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS OF ANY PARTY IF NOT INCLUDED IN THIS WRITTEN AGREEMENT ARE CONSIDERED NULL AND VOID.  ANY MODIFICATION OR OTHER ALTERATION TO THE AGREEMENT MUST BE IN WRITING AND EXECUTED BY THE PARTIES TO THIS CONTRACT.

INITIALS: _____

MERCHANT #1
By  Sammy Vela _____
                          (Print Name and Title)
SS/

_____
                      (Signature)
Drivers License Number:

MERCHANT #2
By  _____
                          (Print Name and Title)
SS#

_____
                      (Signature)
Drivers License Number:

OWNER/GUARANTOR #1
By  Sammy Vela _____
                          (Print Name and Title)
SS#

_____
                      (Signature)
Drivers License Number:

OWNER/GUARANTOR #2
By  _____
                          (Print Name and Title)
SS#

_____
                      (Signature)
Drivers License Number: