## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

In re:

SAMMY VELA,

    Debtor.

_____/

Chapter 7

Case No.: 19-34286

KAPITUS SERVICING INC, F/K/A
COLONIAL FUNDING NETWORK, AS
SERVICING AGENT FOR YELLOW
STONE CAPITAL AND TRUST CAPITAL
FUNDING,

    Plaintiff,

v.

SAMMY VELA,

    Defendant.

_____/

Ad. Pro. No. 19-03671

### AFFIDAVIT OF DAVID WOLFSON IN SUPPORT OF DEFAULT JUDGMENT

STATE OF New York )
                         ) ss.
COUNTY OF New York )

David Wolfson, being first duly sworn on oath, deposes and states that:

1.     I am over eighteen (18) years of age, I have personal knowledge of the facts stated herein, and I am authorized to make this Affidavit on behalf of Kapitus Servicing, Inc., formerly known as Colonial Funding Network, Inc. ("Kapitus").

2.     I am the Vice President of Risk Management and Asset Recovery of plaintiff, Kapitus and I am familiar with the books, records, and accounts of Kapitus, including the books, records, and accounts associated with Sammy Vela ("Vela"). I make this Affidavit on the Merits and Amount Due in support of Kapitus' Motion for Entry of Default Judgment.

1

3.      In my capacity as Vice President of Risk Management and Asset Recovery and record custodian with Kapitus, I have been in control of certain business records, which include:

(1)     the Merchant Cash Advance Agreements executed by Vela for the Purchase and Sale of Future Receivables of (i) Sammy's Grill, LLC d/b/a Stadia Bar and Grill ("Sammy's 1"), (ii) Stadia Bar & Grill Licensing Co, LLC d/b/a Stadia Sports Grill ("Stadia"), (iii) Sammy's Grill LLC 2 d/b/a Sammy's Sports Grill 2 ("Sammy's 2"), (iv) Sammy's Grill LLC 3 d/b/a Sammy's Sports Grill 3 ("Sammy's 3"), (v) Sammy's Grill LLC 4 d/b/a Sammy's Sports Grill 4 ("Sammy's 4"), and (vi) Sammy's Grill LLC 5 d/b/a Sammy's Sports Grill 5 ("Sammy's 5" and collectively, with Sammy's 1, Sammy's 2, Sammy's 3 and Sammy's 4, the "Merchants" or "Restaurants"), with the first executed on August 16, 2016, the second and third both executed on October 26, 2016, the fourth on November 9, 2016, and the fifth on December 14, 2016 (the "Agreements"), which are attached as Exhibit A to the Complaint [Ad. Doc. No. 1].

(2)     the December 29, 2017 settlement agreement and the August 9, 2018 settlement agreement with Vela attached as Exhibit C to the Complaint; and

(3)     the default judgment entered against Vela in New York State for the amount of $559,982.97, plus interest accruing since April 22, 2019, along with attorneys' fees and costs attached as Exhibit D to the Complaint.

4.      Kapitus keeps these types of business records in the course of a regularly conducted business activity, and it is the regular practice of Kapitus to keep such business records. All such business records are made at or near the time of the act or events described in them, by or from information transmitted by a person with knowledge. These business records are kept and

2

maintained under my supervision and control. True and accurate copies of the Agreements, Security Agreement, and Guaranty are attached to the Complaint.

5. To the best of my knowledge and belief, Vela is not protected by the Servicemembers Civil Relief Act, P.L. 108-109, nor is he an infant or an incompetent person.

6. I have personally reviewed Kapitus' records relating to Vela. At all times relevant hereto, Vela was the guarantor of the obligations of the Restaurants in favor of Kapitus. Vela represented himself as the owner and authorized representative of the Restaurants. However, Kapitus subsequently learned that Vela is not the owner, managing member or authorized representative of Stadia. Specifically, Christopher L.S. Rivers, the actual owner of Stadia, attests in the affidavit of Christopher L.S. Rivers attached as Exhibit B to the Complaint that Vela did not have any ownership, management or other interest in Stadia at the time that Vela obtained funding from Kapitus.

## Summary of Facts and Claims

1. In 2016, Vela executed his first application for a merchant cash advance with Kapitus (the "Application"). Vela subsequently conducted several pre-funding phone interviews between August and December 2016, and entered into multiple agreements with Kapitus, to fund payments of business expenses related to multiple restaurants he represented himself as owning, including the Restaurants.

2. During these phone interviews, Vela represented that he was up to date on the rent for the Restaurants, current on his taxes, had no other accounts with other merchant cash advance providers, and that he was not in arrears on any accounts with financial institutions. As outlined in more detail below, these representations were false and fraudulent when made. Indeed, Vela

stated during the calls that he understood false statements or misrepresentations could be construed as breaches of contract and fraud.

3. Vela provided five interviews on pre-funding calls in August, October (2), November, and December, during which Vela stated to Kapitus that (a) there were no material changes to the Restaurant's business, (b) Vela was current on all payments to the landlord for the Restaurants' business, (c) the Restaurants were current on their taxes, including all federal, state and payroll taxes, (d) Vela did not expect any tax liens to be filed, (e) Vela had no balance owed to another merchant cash advance provider, (f) Vela was not in arrears on any loans, and (g) Vela understood false statements constitute fraud.

4. The relevant portions of the pre-funding call related to Sammy's 1 and Stadia occurred in August 2016 are transcribed below:

> Kapitus: Have there been any important changes to your business or that have happened to your business since the last time we funded?
>
> Vela: No mam.
>
> Kapitus: How is the relationship with your landlord? Are you able to make all payments on schedule?
>
> Vela: Yes.
>
> Kapitus: So you are indeed up to date and current on your business property?
>
> Vela: Yes, yes
>
> Kapitus: Are you also current on your taxes, including all federal, state and payroll taxes?
>
> Vela: Yes.
>
> Kapitus: You do not expect any tax liens to be filed, do you?
>
> Vela: No.
>
> . . .

Kapitus: Do you currently have a balance with any other merchant cash advance provider?

Vela: No mam.

Kapitus: Are you in arrears on any of these balances or loans with any other financial institutions?

Vela: No mam.

Kapitus: Do you understand that making a false statement or misrepresenting any information can be construed as a breach to your contract and even fraud and could subject yourself to legal action?

Vela: Yes mam.

5. The relevant portions of the pre-funding call related to Sammy's 2 that occurred in October 2016 are transcribed below:

Kapitus: Have there been any important changes to your business or that impact your business since the last funding?

Vela: No.

Kapitus: Okay, how is your relationship with your landlord? Are you having any difficulty?

Vela: No.

Kapitus: All righty, and all payments to your landlord have been made on schedule?

Vela: Yeah.

Kapitus: Great, and are you current on your payments with your landlord for your business property?

Vela: Yeah.

Kapitus: Okay, are you current on your taxes, including all federal, state and payroll taxes?

Vela: Yeah.

Kapitus: Okay, do you expect any tax liens to be filed?

Vela: No.

. . .

Kapitus: Do you currently have a balance with any other merchant cash advance provider?

Vela: No.

Kapitus: Okay, and are you behind on any other balances, loans or financial obligations?

Vela: No.

Kapitus: Okay and do you recognize that making a false statement or misrepresentation could be construed as a breach to your contract and could subject you to legal action?

Vela: Yes.

6. The relevant portions of the pre-funding call related to Sammy's 3 that occurred in October 2016 are transcribed below:

Kapitus: Have there been any important changes to your business or that impact your business since the last funding?

Vela: No.

Kapitus: How is your relationship with your landlord? Are you having any difficulty?

Vela: No.

Kapitus: Okay, have all payments to your landlord been made on schedule?

Vela: Yes mam.

Kapitus: Okay, great, and are you current on your payments with your landlord on your business property?

Vela: Yeah.

Kapitus: All right, great, are you also current on your taxes, including all federal, state and payroll taxes?

Vela: Yes mam.

Kapitus: Okay, great, do you expect any tax liens to be filed?

Vela: No.

. . .

Kapitus: Do you currently have a balance with any other merchant cash advance provider?

Vela: No.

Kapitus: Are behind on any other balances, loans or financial obligations?

Vela: No mam.

Kapitus: Great, do you understand that making a false statement or misrepresentation could be construed as a breach to your contract and could subject you to legal action?

Vela: Yes.

7. The relevant portions of the pre-funding call related to Sammy's 4 that occurred in December 2016 are transcribed below:

Kapitus: Have there been any important changes to your business or that impact your business since the last funding?

Vela: No.

Kapitus: Okay, how is your relationship with your landlord? Are you having any difficulty?

Vela: No.

Kapitus: Okay, have all payments to your landlord been made on schedule?

Vela: Yes.

Kapitus: Good, and are you current on your payments with your landlord for your business property?

Vela: Yes.

Kapitus: Good, are you current on your taxes, including all federal, state and payroll taxes?

Vela: Yes.

Kapitus: Good, do you expect any tax liens to be filed?

Vela: No.

7

. . .

Kapitus: Do you currently have a balance with another merchant cash advance provider?

Vela: No.

Kapitus: Are behind on any other loans, balances or financial obligations?

Vela: No.

Kapitus: Okay, and do you understand that making a false statement or misrepresentation could be construed as a breach to your contract or fraud and could subject you to legal action?

Vela: Yes.

8. The relevant portions of the pre-funding call related to Sammy's 5 that occurred in November 2016 are transcribed below:

Kapitus: Are you current on your payments to your landlord for the business property?

Vela: Yes.

Kapitus: Good, and are you current on your payments with your landlord for your business property?

Vela: Yes.

Kapitus: Are you in arears on any loans or with any financial institutions?

Vela: No mam.

Kapitus: Do you currently have a balance with any other merchant cash advance provider?

Vela: For another company. I do.

Kapitus: What's the name of that company?

Vela: Not, not for . . . its for Sammy's Sports Grill like number 2, but it's not with Sammy's 5 . . . so the answer is no I guess . . .

Kapitus: So not for this business at least . . .

Vela: No, no.

8

> Kapitus: Do you understand that making a false statement or misrepresentation could be construed as a breach to your contract or fraud and can subject you to legal action?
>
> Vela: Yeah.

9. In his capacity as owner and officer of the Restaurants, and in his individual capacity as guarantor, Vela entered into the five Agreements with Kapitus. Under the terms of the Agreements, Kapitus is designated as the agent to service and enforce the Agreements, including enforcement through legal action, on behalf of a funder specified in each Agreement (each a "Funder").

10. Vela signed the August 16, 2016 Agreement as an authorized representative of Stadia. However, according to the Vela's former business partner, Christopher I.S. Rivers, pursuant to a confidential agreement, dated effective May 23, Vela and Rivers agreed that the Stadia entity, along with all assets owned or controlled by Stadia, would be transferred to Rivers and that all membership interests in Stadia owned or held by Vela would be assigned to Rivers. *See* Declaration of Christopher I.S. Rivers attached as Exhibit B to the Complaint. Accordingly, at the time Vela signed the August 16, 2016 Agreement, Vela had no authority to sign on behalf of Stadia.

11. Pursuant to the Agreements, Kapitus purchased $830,195.00 of future accounts, monetary payments, and other general receivables generated in the course of the Restaurants' business operations (the "Receivables"). Contemporaneously with the execution of the Agreements, and as further security, the Vela executed personal guaranties (the "Guaranties"), guaranteeing Restaurants' full performance of all terms and obligations under the Agreements.

12. By entering into the Agreement, the Debtor agreed that "[t]he Purchased Amount shall be paid to Funder by Merchant's using and irrevocably authorizing only one card processor acceptable to Funder ("Processor") to remit to or for the benefit of Funder the percentage specified

9

below (the "Specified Percentage") of Merchant's settlement amounts due from each card issuer with respect to the Receipts . . ." Agreements, at p. 1. Further, the Debtor agreed to that "Merchant appoints Funder as "Acting Agent" over the Bridge / Control Account and shall instruct Processor to designate the Bridge / Control Account as the deposit account for all of Merchant's customers' card transactions. Agreements, p. 2.

13. By no later than December 2016, Kapitus had paid Vela $585,000.00 as the agreed purchase price for the Receivables. To allow Kapitus to collect its purchased Receivables, the Agreements required the Restaurants to use and irrevocably authorize only one card processor acceptable to Kapitus to provide card processing services and to remit the percentage of the Receivables collected by the Restaurants to Kapitus as set forth in the Agreements (the "Processor Account").

14. From the Processor Account, the Agreements entitled Kapitus to collect between 18%–25% of the weekly batch amount of Vela's collected receivables via Automated Clearing House ("ACH") or through a bridge account to which 100% of the card settlement amounts would be deposited and the specified percentage collected by Kapitus (the "Bridge Account") if the Bridge Account is required by Kapitus. *See* Agreements, p. 2, § 1.4. Kapitus required the Bridge Account to be used by the Restaurants.

15. To avoid disruption, the Agreements prohibited changes to the Processor Account or the designation of the Processor Account except with Kapitus's express written consent. *See id.* at pp. 2-3 §§ 1.2, 2.5. The Agreements further provide that the Restaurants would not take any action that could have an adverse effect upon their obligations under the Agreements. *See* p. 3 § 2.5. Moreover, the Agreements provide that the Merchant is responsible for maintaining a

minimum balance in the Bridge Account equal to all fees charged to the Restaurants by the processor per month averaged over a six-month period. *See* p. 2 §1.4.

16. By entering the Agreements, Vela represented, warranted, and covenanted the following:

> **II. REPRESENTATIONS, WARRANTIES AND COVENANTS.** [The Restaurants] and each Owner/Guarantor represents, warrants and covenants that as of this date and during the term of the Agreement:
>
> **2.1 Financial Condition and Financial Information.** Its financial statements, copies of which have been furnished to FUNDER, and any financial statements furnished to FUNDER hereafter, fairly represent the financial condition of Merchant and each Owner/Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material adverse change in its financial condition, operation or ownership.
>
> **2.2 Governmental Approvals.** Merchant is and will remain in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.
>
> **2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to execute this Agreement and to incur and perform the obligations under this Agreement, all of which have been duly authorized.
>
> ...
>
> **2.5 Merchant Processing Agreement and Arrangements.** Without FUNDER's prior written consent, Merchant will not: (i) change the card processor through which the Receipts are settled from Processor to another card processor; (ii) permit any event to occur that could cause diversion of any of Merchant's card transactions from Processor to another processor; (iii) change its arrangement with Processor or amend the Merchant Processing Agreement in any way that is adverse to FUNDER; (iv) add card processing terminals; (v) use multiple card processing terminals; (vi) change its financial institution or bank account(s) (including, if applicable, the Bridge/Control Account); (vii) take any other action

11

that could have any adverse effect upon Merchant's obligations under this Agreement or FUNDER's interest in the Receipts; or (viii) make any action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor, or to induce any customers to pay for Merchant's services with any means other than cards that are settled through Processor, or permit any event to occur that could have an adverse effect on the use, acceptance, or authorization of cards for the purchase of Merchant's services and products.

...

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

...

**2.9 No Bankruptcy or Insolvency.** Merchant and Owner/Guarantors represent that they are not insolvent and neither Merchant nor any Owner/Guarantor has filed any petition for bankruptcy protection under Title 11 of the United States Code, no involuntary petition for bankruptcy has been brought or is pending against Merchant or any Owner/Guarantor, neither Merchant nor any Owner/Guarantor has admitted in writing its inability to pay its debts or made a general assignment for the benefit of creditors, and no other proceeding has been instituted by or against Merchant or any Owner/Guarantor seeking to adjudicate it insolvent or seeking reorganization, arrangement, adjustment, or composition of it or its debts. Merchant does not anticipate filing any such bankruptcy petition and is not aware and has no reason to believe that any such bankruptcy petition or other proceeding will be: filed or brought against it or any Owner/Guarantor.

**2.10 Other Financing.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Receipts, whether in the form of a purchase (such as a merchant cash advance) of, a loan against, or the sale or purchase of credits against, any Receipts, cash deposits or future card or mobile payment sales with any party other than FUNDER without its written permission.

**2.11 Unencumbered Receipts.** Merchant has good and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be

> inconsistent with the transactions contemplated with, or adverse to the interests of, FUNDER.
>
> ...
>
> **2.17 Bridge/Control Account.** If Merchant is required to open a Bridge/Control Account, (i) Merchant will not, unless otherwise directed in writing by FUNDER, take any action to cause the Specified Percentage of the settlement amounts to be settled or delivered to any account other than the Bridge/Control Account and (ii) Merchant will at all times maintain the Minimum Balance in the Bridge/Control Account.

Agreements at pp. 2–3.

17. In executing the Agreements, Vela agreed that all information provided in forms and recorded interviews was "true, accurate, and complete in all respects", and the Agreements further emphasized that "**ANY MISREPRESENTATION MADE BY [THE RESTAURANT] OR [VELA] IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL FRAUDULENT INDUCEMENT TO OBTAIN FUNDING.**" *See* Agreements, p. 1 (emphasis in original).

18. The Agreements were signed by Vela on behalf of the Restaurants and individually as Guarantor. Under the terms of the Agreements, Vela represented, warranted and covenanted in writing to Kapitus the following: (i) its financial statements, copies of which have been furnished to Kapitus fairly represent the financial condition of the Restaurants; (ii) without Kapitus's prior written consent, the Restaurants will not: (a) change the card processor through which the Receipts are settled from Processor to another card processor; (b) permit any event to occur that could cause diversion of any of the Restaurants' card transactions from Processor to another processor; (c) change its arrangements with Processor or amend the Merchant Processing Agreement in any way that is adverse to Kapitus; (d) take any other action that could have any adverse effect upon the Restaurants' obligations under this Agreement or Kapitus's interest in the Receipts; or (e) take any

action, fail to take any action, or offer any incentive—economic or otherwise—the result of which could be to discourage the use of cards that are settled through Processor, or to induce any customers to pay for the Restaurants' services with any means other than cards that are settled through Processor, or permit any event to occur that could have an adverse effect on the use, acceptance, or authorization of cards for the purchase of the Restaurants' services and products; (iii) the Restaurants and Vela are not insolvent and the Restaurants do not anticipate filing any such bankruptcy petition and are not aware and have no reason to believe that any such bankruptcy petition or other proceeding will be filed or brought against them or Vela; and (iv) the Agreements are entered in to by Vela and the Restaurants for business purposes and not as a consumer for personal, family, or household purposes.

19. Vela executed a security agreement (the "Security Agreement") granting Kapitus a security interest in all personal property of the Restaurants, including all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, inventory, and investment property.

20. During the pre-funding calls and/or in the Agreements, Vela made the following material fraudulent representations and/or material omissions of fact, including:

   a) Despite executing the August 16, 2016 Agreement as an authorized representative of Stadia (one of the Restaurants), Vela had no relationship with Stadia, and had no authority to sign on behalf of that entity.

   b) On the pre-funding calls, Vela represented to Kapitus that Vela and the Restaurants were current with their taxes, including federal, state, and payroll. However, the IRS filed tax liens against Sammy's 1 in April 2015, against Sammy's 2 in May 2017, against Sammy's 3 in August 2017, and against Sammy's 4 in June 2018. Vela falsely and fraudulently misrepresented that he and the Restaurants were current on their tax obligations.

c) On the pre-funding calls, Vela represented to Kapitus that Vela and the Restaurants were current on their lease obligations. However, based on the Debtor's schedules, certain of the Restaurants were behind on their lease obligations when Vela made these representations. Vela falsely and fraudulently misrepresented that he and the Restaurants were current on their lease obligations.

d) On the pre-funding calls, Vela represented to Kapitus that Vela and the Restaurants did not have a balance with any other merchant cash advance provider or financial institution, and were not in delinquency on any balances, loans, or any other financial obligations. However, based on Vela's schedules, certain of the Restaurants had financings with other merchant cash advance providers. If Vela and the Merchant had these financings prior to entering into the Agreements, then the Merchant failed to sell unencumbered receipts contrary to the representations contained in section 2.11 of the Agreements. If Vela and the Merchant obtained these financings after entering into the Agreements, then Vela and the Merchant breached section 2.10 of the Agreements because it did not obtain Kapitus's consent prior to entering into these other financings.

e) In the Agreements, Vela falsely and fraudulently represented to Kapitus that he and the Restaurants had no intention of filing for bankruptcy and that he and the Restaurants were not insolvent. However, almost immediately after executing each of the agreements and Settlement Agreements (defined below), Vela defaulted on his obligations.

21. Kapitus reasonably and justifiably relied on the Debtor's material fraudulent representations and/or material omissions in the Agreements and the pre-funding calls in connection with providing money to the Restaurants and Vela.

22. Since August 2016, when Vela executed the first of the Agreements, and subsequently when he entered into the remaining Agreements, Vela was familiar with the requirement that the Restaurants not change the processor without Plaintiff's written consent. Kapitus relied on these provisions when agreeing to fund. Notwithstanding his knowledge of this requirement, less than three months after Kapitus entered into the Agreements, the Restaurants and Vela, secretly and without Kapitus's knowledge or written consent, changed the processor. By this unauthorized change of the processor, the Restaurants and Vela converted the Receivables that Kapitus purchased from the Restaurants. Due to Vela's secret and unauthorized change of the processor, Vela knowingly and improperly deprived Kapitus of the Receivables it purchased, interfered with Kapitus's right to collect the Receivables from and after the date of the change and, accordingly, Kapitus was not able to collect any of the Receivables from and after that time.

23. Following the default under the Agreements, Kapitus entered into a settlement agreement dated on or about December 29, 2017 (the "December 2017 Settlement Agreement"). Pursuant to the December 2017 Settlement Agreement, Vela and the Restaurants acknowledged that a total outstanding balance $504,218.29 remained due and owing pursuant to the Agreements. Almost immediately thereafter, Vela and the Restaurants defaulted on the December 2017 Settlement Agreement.

24. Subsequently, Kapitus filed suit against the Vela and the Restaurants in the amount of $486,918.23 plus costs and interest. Thereafter, on or about August 9, 2018, Kapitus entered into a Stipulation of Settlement (the "August 2018 Settlement Agreement" and together with the December 2017 Settlement Agreement, the "Settlement Agreements").

25. Vela and the Restaurants again defaulted and failed to pay amounts owed under the August 2018 Settlement Agreement. Kapitus filed suit under the August 2018 Settlement

Agreement and obtained a default judgment in New York State in the amount of $559,982.97, plus interest accruing since April 22, 2019. Accordingly, Vela and the Restaurants are jointly and severally liable to Kapitus for the amount of $559,982.97, plus interest accruing since April 22, 2019, along with attorneys' fees and costs. As of August 4, 2019, the total claim with interest is $574,481.14.

26. Vela signed the December 2017 Settlement Agreement as the "Owner" of Stadia Bar & Licensing Co., LLC and the other Restaurants. Vela signed the August 2018 Settlement Agreement as the "Managing Member" of Stadia Bar & Licensing Co., LLC and the other Restaurants. However, Vela was not the owner, managing member, or authorized representative of Stadia Bar & Licensing Co., LLC at any of these times.

27. Based upon my many years as the Vice President of Risk Management and Asset Recovery for Kapitus, I am familiar with the terms of merchant cash advance agreements, similar to the terms of the Agreement, as well as the administration of such agreements by Kapitus and its merchant-counterparties, including the critical requirement that the Merchant not change its third-party credit card processor without Kapitus's written consent so that Kapitus is able to collect the Receivables it purchases under the Agreements.

28. Based upon my review of Kapitus's records relating to Vela, my knowledge and experience as Vice President of Risk Management and Asset Recovery for Kapitus, my familiarity with the terms of the Agreement and the administration of the merchant cash advance agreements by Kapitus and its merchant-counterparties, and my review of the schedules filed by Vela as part of his bankruptcy petition, it is my considered opinion that at the time the Agreements and the Settlement Agreements were being negotiated between Kapitus and Vela and contrary to the representations made by Vela to Kapitus, Vela and the Restaurants were delinquent on their taxes,

were delinquent on their obligations to their landlords, were insolvent, and had no present intent to perform the obligations under the Agreements and the Settlement Agreements. Kapitus had no reason to doubt the truthfulness of Vela's misrepresentations of fact and, therefore, Kapitus reasonably and justifiably relied upon Vela's misrepresentations of fact in entering into the Agreements, purchasing the Receivables, and then subsequently entering into the Settlement Agreements.

**Itemization of Claim Amount**

29. Vela's Schedule E/F additionally admits to owing Kapitus $ 504,218.29, though that amount is actually $559,982.97, as of April 22, 2019, based on the judgment obtained against the Restaurants and the Vela in New York State. As of August 4, 2019, the total claim with interest (at the New York legal rate of 9%) is $574,481.14.

30. Kapitus has incurred legal fees and expenses in pursuing its rights and remedies against Vela. Kapitus is entitled to recover its attorney fees and expenses in connection with this dispute pursuant to the Agreements, Settlement Agreements, and the default judgment properly obtained against Vela in New York State.

David Wolfson
Vice President of Risk Management
and Asset Recovery
Kapitus Funding Network, Inc.
120 West 45th Street—6th Floor
New York, New York 10036

Subscribed and sworn to before me this
___4___ day of March, 2020.

Notary Public

SHANTEL BOYD
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BO6364530
Qualified in New York County
My Commission Expires 09-18-2021

18